No. 26-1874

IN THE

# United States Court of Appeals for the Fourth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

THE COMMONWEALTH OF VIRGINIA, *et al.*,

*Defendants-Appellants*.

**On Appeal from the United States District Court for the Eastern District of Virginia**

## Opening Brief of Defendants-Appellants

JAY JONES
*Attorney General*

TRAVIS G. HILL
*Chief Deputy Attorney General*

GRETCHEN ELLEN NYGAARD
*Deputy Attorney General*

TILLMAN J. BRECKENRIDGE
*Solicitor General*

ETHAN P. FALLON
*Deputy Solicitor General*

TRISTON C. O'SAVIO
*Assistant Solicitor General*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-2071 – Telephone
(804) 786-1991 – Facsimile
SolicitorGeneral@oag.state.va.us

August 19, 2026

*Counsel for Defendants-Appellants*

# TABLE OF CONTENTS

Table of Contents ..... i

Table of Authorities ..... iv

Introduction ..... 7

Issues Presented ..... 9

Jurisdictional Statement ..... 10

Statement of the Case ..... 11

A. Virginia's longstanding regulation of concealed identity, and the Mask/Identity Law ..... 11

B. Federal agencies recently changed their practice but there is no federal rule requiring anonymity ..... 14

C. The preliminary injunction proceedings. ..... 15

Standard of Review ..... 17

Summary of Argument ..... 18

Argument ..... 22

I. The district court applied the wrong rule for identifying a direct regulation of the United States. ..... 22

A. *Johnson* distinguishes state control of the federal function from neutral rules that only affect how federal employees do their work. ..... 22

B. The district court's "ordinary citizen" test asks the wrong question and, in any event, supports Virginia ..... 26

C. Federal discretion is not federal law, and silence is not a constitutional entitlement. ..... 29

D. Virginia regulates the public-facing manner of an encounter, not the federal function. ............................ 31

E. The authorities the district court invoked all involved state control over federal functions that is absent here. ......................................................... 32

F. The law's origin as a reaction to federal immigration practices does not establish direct regulation, particularly where discrimination is not before the Court. ................................................. 33

II. At a minimum, the Court should vacate the injunction as to the facial-covering prohibition and tailor any relief to the distinct provisions at issue............................... 36

A. No court of appeals has held that an evenhanded facial-covering prohibition directly regulates the United States, and the only appellate decision the federal government invokes decided a different provision. ......................................................... 36

B. The only court to separately resolve direct regulation of a comparable masking prohibition rejected the federal government's theory. ................... 38

C. The masking prohibition and the identification requirement present distinct questions, and the injunction swept them together. ................................. 39

D. Any relief must be tailored to the violation actually shown. ......................................................... 40

III. The United States did not make the clear showing of irreparable harm that a preliminary injunction requires. ..................................................................... 42

A. The federal government's purported injuries are not sufficiently established. ........................................ 42

B. The compressed preliminary timeline reinforces the federal government's burden. ... 46

IV. The district court did not balance the equities and the public interest but instead restated its merits conclusion. ... 48

A. *Winter* requires an independent balance, not a restatement of the merits. ... 48

B. Virginia's sovereign injury is independently cognizable, and the authority the court invoked does not eliminate it ... 49

C. Virginia's public-safety interest is not irrelevant merely because federal officers are involved. ... 51

Conclusion ... 53

Certificate of Compliance ... 55

Certificate of Service ... 56

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**


*Abbott v. Perez*,
585 U.S. 579 (2018) ........ 51

*Ayotte v. Planned Parenthood of N. New Eng.*,
546 U.S. 320 (2006) ........ 41

*CoreCivic, Inc. v. Governor of N.J.*,
145 F.4th 315 (3d Cir. 2025) ........ 33

*Centro Tepeyac v. Montgomery Cnty.*,
722 F.3d 184 (4th Cir. 2013) (en banc) ........ 49

*Di Biase v. SPX Corp.*,
872 F.3d 224 (4th Cir. 2017) ........ 17, 42, 43

*Direx Israel, Ltd. v. Breakthrough Med. Corp.*,
952 F.2d 802 (4th Cir. 1991) ........ 42

*Geo Grp., Inc. v. Newsom*,
50 F.4th 745 (9th Cir. 2022) (en banc) ........ 33

*Johnson v. Maryland*,
254 U.S. 51 (1920) ........ *passim*

*Kelley v. Johnson*,
425 U.S. 238 (1976) ........ 52

*Leaders of a Beautiful Struggle v. Baltimore Police Dep't*,
2 F.4th 330 (4th Cir. 2021) ........ 49

*League of Women Voters of N.C. v. North Carolina*,
769 F.3d 224 (4th Cir. 2014) ........ 17

*Leslie Miller, Inc. v. Arkansas*,
352 U.S. 187 (1956) ........ 25, 32

*Lewis v. Casey*,
518 U.S. 343 (1996) .......... 41

*Maryland v. King*,
567 U.S. 1301 (2012) (Roberts, C.J., in chambers) .......... 50

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*,
915 F.3d 197 (4th Cir. 2019) .......... 42

*New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*,
434 U.S. 1345 (1977) (Rehnquist, J., in chambers) .......... 50

*Nken v. Holder*,
556 U.S. 418 (2009) .......... 49

*North Dakota v. United States*,
495 U.S. 423 (1990) .......... 23, 29

*Pashby v. Delia*,
709 F.3d 307 (4th Cir. 2013) .......... 18, 49, 53

*Texas v. Dep't of Homeland Sec.*,
123 F.4th 186 (5th Cir. 2024) .......... 16, 28, 30

*United States v. Alabama*,
691 F.3d 1269 (11th Cir. 2012) .......... 50

*United States v. California*,
173 F.4th 1060 (9th Cir. 2026) .......... 8, 16, 20, 26, 37, 39, 39

*United States v. California*,
819 F. Supp. 3d 1109 (C.D. Cal. 2026) .......... 9, 20, 35, 38, 39

*United States v. City of Arcata*,
629 F.3d 986 (9th Cir. 2010) .......... 32

*United States v. City of Philadelphia*,
2026 WL 1906075 (E.D. Pa. July 2, 2026) .......... 38

*United States v. New York*,
2026 WL 2225423 (N.D.N.Y. Aug. 3, 2026) .......... 37, 38

*United States v. Virginia*,
139 F.3d 984 (4th Cir. 1998) .................................................. 25, 32

*United States v. Washington*,
596 U.S. 832 (2022) ............................................... 7, 8, 18, 22, 23

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ......................................................... *passim*

**Statutes**

10 U.S.C. § 723 ................................................................. 31

28 U.S.C. § 1292(a)(1) .......................................................... 11

28 U.S.C. § 1331 ................................................................ 10

28 U.S.C. § 1345 ................................................................ 10

Va. Code § 1-214 ............................................................ 11, 12

Va. Code § 18.2-422 ......................................................... 11, 28

Va. Code § 19.2-83.6:2 .................................................... *passim*

2026 Va. Acts Spec. Sess. I ch. 1 ............................................. 41

**Regulations**

8 C.F.R. § 287.8(c)(2)(iii)(A) ................................................. 31

**Rules**

Fed. R. App. P. 4(a)(1)(B) .................................................... 10

Fed. R. Civ. P. 65 .............................................................. 15

## INTRODUCTION

The Supremacy Clause protects the operations of the federal government from state control, but it does not cloak federal employees in general immunity from state law. *Johnson v. Maryland*, 254 U.S. 51 (1920), resolved that question more than a century ago, and the Supreme Court re-affirmed the governing framework four years ago, *United States v. Washington*, 596 U.S. 832 (2022). The intergovernmental immunity doctrine bars state laws that directly regulate the United States or discriminate against it. This appeal *should* concern only the first category because the United States did not rely on its discrimination claim in seeking preliminary relief. Virginia's Mask/Identity Law does not directly regulate the federal government; it regulates only the manner in which covered officers present themselves to the public.

But in stepping aside from the adversarial system, and relying on false assumptions that no one raised, the district court conflated the two questions and developed its own test that was suggested by neither party and is neither supported by case law nor supports the court's ultimate ruling. The district court developed an "ordinary citizen" test based on whether the law regulates conduct that ordinary citizens cannot perform.

If it does, then it is barred. There is little support in case law for this test, and in any event, the Mask/Identity Law survives it because Virginia *already has a law forbidding ordinary citizens from wearing masks to conceal their identities*. The Mask/Identity Law is an exception to that law that turns the crime from a felony to a misdemeanor for law enforcement officers. So, the district court's test is incorrect *and* does not support the injunction.

When the correct test is applied, the correct conclusion also is that the injunction is improper. Three points confirm that the injunction cannot stand. *First*, *Johnson* forecloses the general immunity rule the court adopted, and *Washington* confirms that intergovernmental immunity is limited to direct regulation and discrimination. *Second*, the only appellate decision the federal government invokes did not decide the facial covering question. In seeking emergency appellate relief in California, the United States sought to enjoin only the identification requirement, *see United States v. California*, 173 F.4th 1060, 1066 (9th Cir. 2026), and the Ninth Circuit addressed only that, not masking. The only court to separately decide whether a comparable facial-covering prohibition directly regulates the federal government held that it does

not. *United States v. California*, 819 F. Supp. 3d 1109, 1132, 1137 (C.D. Cal. 2026) ("With regard to SB 627 . . . the United States has failed to demonstrate that the facial covering prohibition directly regulates the federal government."). *Third*, even if the merits were close, the district court never performed the independent equitable analysis a preliminary injunction demands. It let its contested merits ruling drive irreparable harm, the balance of equities, and the public interest, and it took Virginia's sovereign and public-safety interests off the scale. That is not what *Winter* requires.

The Court should vacate the preliminary injunction. Or, at a minimum, it should vacate the injunction insofar as it reaches subsection B's facial-covering prohibition and remand for provision-specific consideration of any preliminary relief directed to the identification requirement as it now exists.

## ISSUES PRESENTED

1. Whether the district court erred in ruling that the Mask/Identity Law directly regulates the United States and so violates intergovernmental immunity.

2. Whether, at minimum, the preliminary injunction must be vacated as to subsection B and narrowed as to subsection D, where no court of appeals has held that an evenhanded facial-covering prohibition directly regulates the United States and the operative identification requirement contains exceptions the district court did not analyze.

3. Whether the United States satisfied the remaining requirements for preliminary relief.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. § 1331, because the United States' complaint arises under the Supremacy Clause of the United States Constitution, and under 28 U.S.C. § 1345, because the United States is the plaintiff.

On June 30, 2026, the district court entered an order granting the United States' motion for a preliminary injunction and enjoining enforcement of the Mask/Identity Law against covered federal officers, and on July 2, 2026, it issued a memorandum opinion explaining that order. JA 422–23. The Commonwealth filed a timely notice of appeal from that order on July 6, 2026. JA 354. *See* Fed. R. App. P. 4(a)(1)(B). After this Court authorized correction of the statutory citation, the

district court vacated those documents solely for that correction and entered a corrected preliminary injunction order and memorandum opinion. *See* JA 372–76.

This Court has jurisdiction under 28 U.S.C. § 1292(a)(1), which authorizes appeals from interlocutory orders of the district courts granting injunctions.

## STATEMENT OF THE CASE

### A. Virginia's longstanding regulation of concealed identity, and the Mask/Identity Law.

For decades Virginia has generally forbidden concealing one's identity behind a mask in public. Virginia Code § 18.2-422 makes it unlawful for "any person over 16 years of age," acting "with the intent to conceal his identity," to "wear any mask, hood, or other device whereby a substantial portion of the face is hidden or covered so as to conceal the identity of the wearer" in public, subject to enumerated exceptions. Va. Code § 18.2-422.

The 2026 Mask/Identity Law addressed the particular danger that arises when the person concealing his identity is exercising police power. The General Assembly enacted it as Senate Bill 352, the Governor signed it on May 20, 2026, and it took effect on July 1, 2026. *See* Va. Code § 1-

214. The law was initially codified as § 19.2-83.6:1 and has since been renumbered as § 19.2-83.6:2.[1] It is an exception to the general rule against facial coverings that renders such conduct a felony and instead replaces it with a misdemeanor, specifies exceptions endemic to law enforcement, and requires identification to be worn.

Subsection B prohibits a "law-enforcement officer," "while engaged in the performance of his official duties," from wearing "a facial covering that conceals, obscures, or otherwise covers his face." Va. Code § 19.2-83.6:2(B). Subsection C exempts eight categories of coverings, including translucent shields and clear masks, medical masks, hazardous-environment and protective gear, motorcycle helmets, coverings used by SWAT and other specialized tactical units, and coverings used in undercover, drug, gang, or surveillance work. *Id.* § 19.2-83.6:2(C). Given the additional exceptions and lessened penalty, Subsection D requires a covered officer to visibly display a badge or insignia bearing his name or a unique identifier, together with his employing agency's name. *Id.* § 19.2-83.6:2(D). Subsection E makes a violation a Class 1 misdemeanor

[1] On August 17, 2026, this Court granted a joint motion to correct the district court's order to reflect the re-numbering.

unless the officer's employing "law-enforcement agency" has adopted a qualifying written facial-covering policy. *Id.* § 19.2-83.6:2(E). The statute defines "law-enforcement officer" to reach both Virginia's own officers and federal law enforcement officers. *Id.* § 19.2-83.6:2(A). Nothing in the law regulates whom an officer may stop or arrest, what force he may use, or how he is trained or deployed.

The identification requirement now in force is not the version the district court analyzed. As amended by the Commonwealth's 2026 Special Session budget act, approved June 29, 2026, the day of the preliminary-injunction hearing, and effective with the rest of the law on July 1, 2026, subsection D exempts, through June 30, 2028, any officer assigned to a SWAT or other specialized tactical unit and any officer assigned to an undercover, drug, gang, executive-protection, or surveillance unit where protection of the officer's identity is necessary. Va. Code § 19.2-83.6:2(D). The court's opinion, issued July 2, 2026, quoted and addressed the earlier text and did not address these exemptions.

### B. Federal agencies recently changed their practice but there is no federal rule requiring anonymity.

The United States sued to enjoin the law as applied to federal officers engaged in enforcing the immigration laws, contending that requiring those officers to show their faces and identify themselves unconstitutionally regulates the federal government. The premise of that challenge is a recent and undisputed change in federal practice. As the Commonwealth's expert, Scott Shuchart—a former senior ICE official who served as Counselor to the Director beginning in May 2022 and as Assistant Director for Regulatory Affairs and Policy from November 2023 through January 2025, with senior responsibility for ICE's written policies—explained, the routine use of identity-concealing masks and the removal of visible identifiers during ordinary public-facing immigration enforcement were not standard ICE practice before 2025. JA 184, 186, 193–94. ICE has adopted no formal or written policy requiring, or even authorizing, routine masking. JA 192. And officer-safety concerns, the expert explained, can be met through written policies, supervisory risk assessments, and targeted safety exceptions rather than through routine, across-the-board concealment. JA 186.

The United States supported its motion with four agency declarations describing purported doxxing, threats, and harassment directed at federal officers. JA 107–08, 118, 122–23, 126–31.

### C. The preliminary injunction proceedings.

The United States filed its motion three and a half weeks after the Governor signed the law, and the district court then set an expedited schedule that gave the Commonwealth only three business days, over a holiday weekend, to develop and submit contrary evidence. JA 134–35. The court offered the Commonwealth the "option" of postponing enforcement of its own law and consolidating the motion with a merits trial under Rule 65, a Hobson's choice that the Commonwealth declined. JA 413. The Commonwealth nonetheless submitted the detailed counter-declaration of an expert. JA 183–206.

After a June 29 hearing, the district court granted the injunction on June 30 and issued a supporting opinion on July 2. JA 422–23. It gave dispositive weight to the federal government's declarations while dismissing the Commonwealth's contrary expert evidence as a "paucity." JA 412. The order enjoins the Commonwealth and the Attorney General from enforcing Section 19.2-83.6:2 "against any federal officer, employee,

or agency involved in enforcing federal immigration laws and regulations." JA 375.

*First*, on the merits, the court held that Virginia's masking and identification requirements imposed additional state qualifications beyond those the federal government had chosen. JA 401 (citing *Johnson*, 254 U.S. at 57). Distinguishing *Texas v. DHS*, the court reasoned that traffic rules govern conduct ordinary citizens also perform, whereas Virginia's Mask/Identity Law governs conduct unique to law enforcement. JA 404 (citing *California*, 173 F.4th at 1068). The court rested solely on the direct-regulation theory, expressly declining to consider the discrimination theory pleaded in Count II because the United States did not raise it in the preliminary injunction motion. JA 400.

*Second*, on irreparable harm, the court credited the federal government's declarations of threats to federal officers and inferred that similar harms could occur in Virginia. JA 408–12. *Third*, on the balance of equities and the public interest, the court reasoned that because the law was likely unconstitutional, the Commonwealth suffered no cognizable sovereign harm from being enjoined and there was no public

interest in enforcing the law. JA 413–15. The court did not separately weigh the Commonwealth's public safety and accountability interests, or the law's own safety exceptions, against the government's asserted operational needs.

## STANDARD OF REVIEW

This Court reviews the grant of a preliminary injunction for abuse of discretion, reviewing the district court's findings of fact for clear error and its conclusions of law de novo. *Di Biase v. SPX Corp.*, 872 F.3d 224, 229 (4th Cir. 2017). A district court necessarily abuses its discretion when its decision rests on an error of law, including when it "misapprehends or misapplies the applicable law." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 235 (4th Cir. 2014). Whether Virginia's Mask/Identity Law directly regulates the United States is a legal question this Court decides de novo. The ultimate decision to grant preliminary relief remains discretionary, but that discretion must be exercised within the governing rules of law and equity, and the United States was required to establish all four preliminary injunction requirements—a likelihood of success on the merits, a likelihood of irreparable harm, that the balance of equities favors it, and

that an injunction serves the public interest—so that the failure of any one requires vacatur. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see Pashby v. Delia*, 709 F.3d 307, 319, 321 (4th Cir. 2013).

## SUMMARY OF ARGUMENT

The Supremacy Clause protects federal operations from state control, but it does not immunize federal officers from state law. Under *Washington* and *Johnson*, the relevant question is whether Virginia directly regulates the federal government. *Johnson* distinguishes state control over who may perform federal work or whether it may proceed from general rules that may incidentally affect the mode of carrying out federal employment. The district court treated *Johnson*'s prohibition on additional state qualifications as swallowing its separate recognition that federal employees remain subject to general state rules. Because federal agencies presently leave officer masking to discretion, the court treated that silence as a federal command and Virginia's contrary rule as an unconstitutional "qualification" on federal service.

That reasoning turns federal discretion into federal immunity and has no stopping point. Under the court's novel "ordinary citizen" test, any regulation that affects something ordinary citizens cannot do must

then violate intergovernmental immunity principles. That would exempt federal officers from every evenhanded rule governing conduct unique to police work simply because ordinary citizens do not police. It also carries the false implication that masking is unique to police work—a theory belied by Virginia's general law against wearing a mask to conceal one's identity. Virginia's law selects no federal personnel, imposes no professional qualification, requires no state approval, and dictates nothing about whom officers may investigate or arrest, how they deploy, or whether an operation may proceed. It regulates only the public-facing manner in which officers conceal or display their identities. That is not direct regulation.

Nor can the law's origin in concerns regarding federal immigration practices be a substitute for direct state control; discrimination is a distinct prong of intergovernmental immunity, and the United States did not rely on that theory in seeking this preliminary injunction. JA 400. In any event, the law is not discriminatory against the federal government on its face, and the district court's contrary finding—unsupported by anything either party argued—that it only affects federal officers is plain wrong.

At a minimum, the injunction cannot stand as to the facial-covering prohibition. No court of appeals has held that an evenhanded facial-covering prohibition directly regulates the federal government. The Ninth Circuit decision the United States invokes addressed only California's separate identification requirement. 173 F.4th at 1066-68. The district court that separately decided the direct-regulation question for California's comparable masking provision rejected that theory. 819 F. Supp. 3d at 1137. Later, district courts in New York and Pennsylvania reached the opposite result by extending the Ninth Circuit's identification reasoning to comparable laws, but those decisions did not properly apply the *Johnson* test, whereas the Central District of California did.

The United States also failed to make the clear showing of irreparable harm that a preliminary injunction requires. Its constitutional injury exists only if it prevails on the merits, and the district court acknowledged as much, holding that a Supremacy Clause violation "would, if proved," be irreparable. Its officer-safety evidence establishes at most that federal officers face danger, not that Virginia's law causes that danger or that enjoining the law will prevent it,

particularly because the law preserves concealment for the very tactical, hazardous, and undercover situations the United States contends are dangerous.

*Finally*, the district court did not independently balance the equities and the public interest. It treated its preliminary merits ruling as effectively resolving those factors. But *Winter* requires a court to weigh the competing harms and public consequences of interim relief. Virginia has a cognizable sovereign interest in enforcement of duly enacted law while constitutionality remains contested, and it asserted concrete public-safety and accountability interests in recognizability, reducing impersonation, and meaningful identification of officers. The existence of important interests on both sides is the reason *Winter* requires balancing, not a reason to dispense with it. The preliminary injunction should be vacated. Or, at a minimum, it should be vacated as to subsection B and remanded for provision-specific consideration of subsection D as it now exists.

## ARGUMENT

### I. The district court applied the wrong rule for identifying a direct regulation of the United States.

#### A. *Johnson* distinguishes state control of the federal function from neutral rules that only affect how federal employees do their work.

The United States sought its injunction on a single theory, that the Mask/Identity Law "directly regulates" the federal government. That theory presents a pure question of law, and the district court answered it incorrectly by adopting a rule that cannot be reconciled with governing precedent. On the district court's rule, a State directly regulates the United States whenever it requires federal officers to do something federal law does not itself require. But intergovernmental immunity forbids only two things: (1) direct regulation of the federal government and (2) discrimination against it. And a neutral rule governing the manner of an officer's public conduct is neither.

The Supremacy Clause bars a State from "interfering with or controlling the operations of the federal government," but that doctrine "has evolved to bar state laws that either regulate the United States directly or discriminate against the federal government or [those with whom it deals]." *United States v. Washington*, 596 U.S. 832, 838 (2022).

Those are the only two categories. A state law "is thus no longer unconstitutional just because it indirectly increases costs for the federal government, so long as the law imposes those costs in a neutral, nondiscriminatory way." *Id.* at 839. As the Supreme Court explained in *North Dakota*, "[c]laims to any further degree of immunity must be resolved under principles of congressional pre-emption." *North Dakota v. United States*, 495 U.S. 423, 435 (1990) (plurality opinion).

That framework traces to *Johnson v. Maryland*, 254 U.S. 51, 57 (1920), which identifies the two materially different forms of state regulation relevant here. *Johnson* did two things at once. It first held that Maryland could not require a federal postal driver to obtain a state license, because a State may not compel a federal employee to "desist from performance until [he] satisf[ies] a state officer upon examination that [he is] competent," and may not impose "qualifications in addition to those that the [federal] Government has pronounced sufficient." *Id.* at 57. But the Court noted that a federal employee "does not secure a general immunity from state law while acting in the course of his employment," and "when the United States has not spoken," a state's "general rules" may "affect incidentally the mode of carrying out the

employment," as with "a statute or ordinance regulating the mode of turning at the corners of streets." *Id.* at 56.

*Johnson* thus identifies two materially different forms of state regulation. At one extreme are state laws that take control of the federal function itself, as by dictating who may perform federal work or conditioning its performance on a state officer's approval. At the other are general state rules that federal employees must follow while doing their jobs and that merely affect the manner in which the work is performed. *Johnson* prohibits the former while expressly recognizing that the latter may apply to federal employees. The relevant question here is therefore whether Virginia's law controls federal operations, not merely whether federal officers must comply with Virginia law while working.

This Court has applied the distinction on the prohibited side, and its decision shows how far Virginia's law is from it. In *United States v. Virginia*, the Commonwealth sought to apply its private investigator licensing and registration scheme to contractors the FBI had selected to conduct background investigations, which would have let the State "second-guess" the FBI's own determination of who was fit to perform

that federal work. 139 F.3d 984, 988–89 (4th Cir. 1998); *see Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187, 190 (1956) (state contractor-licensing scheme gave the State "a virtual power of review" over the federal responsibility determination). That additional qualification essentially functioned as a state veto over who may do the federal government's work. Virginia's Mask/Identity Law does nothing of the kind. It sets no qualification for federal service, requires no state license or permission, and gives no state official power to review any federal decision. The FBI still decides who investigates. ICE still decides whom to arrest. Federal agencies still decide how to deploy their officers. Virginia reviews none of it.

The district court reached the opposite result only by treating *Johnson*'s prohibition on additional state qualifications as if it displaced *Johnson*'s separate recognition that federal employees remain subject to general state rules. It reasoned that because the law requires officers to refrain from wearing masks and identify themselves, steps federal agencies do not presently require, it imposes "qualifications in addition to those that the [federal] Government has pronounced sufficient." JA 401. But a rule of conduct is not a "qualification" merely because a

federal employee must obey it. If it were, an obligation to obey traffic laws—the example the Supreme Court gave in *Johnson*—also would be a "qualification" of employment. *Johnson*'s recognition that general state rules may incidentally affect the manner of federal employment would be meaningless. Any state rule that required a federal employee to act differently from what federal law independently requires could simply be re-labeled an additional "qualification." *Johnson*'s distinction between qualifications and general rules cannot survive a reading that makes every general rule a qualification.

### B. The district court's "ordinary citizen" test asks the wrong question and, in any event, supports Virginia.

The district court tried to account for the neutral-rule side of *Johnson* with its own spin on a test borrowed from the Ninth Circuit's identification decision. It reasoned that "ordinary citizens are not allowed to engage in law enforcement activities," and so Virginia law "does not regulate conduct that any ordinary citizen could perform." JA 404 (quoting *California*, 173 F.4th at 1068).

But that test asks the wrong question and misidentifies the conduct Virginia regulates here. The relevant inquiry is not whether ordinary citizens can "engage in law enforcement activities." It is whether the

challenged state rule takes control of a federal function or instead regulates conduct that occurs while federal employees perform their work. The district court defined the relevant conduct at an artificially high level of generality. Virginia does not regulate the federal government's authority to engage in law enforcement; it regulates whether covered officers may conceal their identities while exercising that authority. The fact that the regulated conduct occurs during law enforcement does not itself make that conduct "reserved to sovereigns."

The district court's own example exposes the flaw. The court treated the traffic rule for "turn[ing] at a corner" as the very model of a permissible general rule. JA 404. But *Johnson* did not offer that example because ordinary citizens turn corners. It offered it because a rule about how one turns a corner regulates the manner of conduct without controlling its substance. It tells the driver how to drive, not whether he may drive or where he may go. Virginia's law likewise regulates the manner in which covered officers present themselves to the public without determining whom they may stop, whether they may arrest, where they may deploy, or whether a federal operation may proceed. The

district court applied *Johnson*'s own example against Virginia while missing the reason the example appears in *Johnson* at all.

In any event, the Mask/Identity Law satisfies the district court's novel "ordinary citizen" test. The district court distinguished *Texas v. Dep't of Homeland Sec.*, 123 F.4th 186 (5th Cir. 2024), on the ground that it involved conduct private citizens also perform, because no one may cut wire on another's property, but that just illustrates how the Mask/Identity Law also fits into the allowable category of generally applicable law, *see* JA 404. Virginia already prohibits ordinary citizens from wearing a mask in public with the intent to conceal their identity. *See* Va. Code § 18.2-422. Subsection B regulates the same underlying conduct—concealing one's identity behind a facial covering—when it is undertaken by a law-enforcement officer performing official duties. And the Mask/Identity Law itself defines a "facial covering" by reference to whether it hides or covers a substantial portion of the face "to conceal the identity of the wearer." Va. Code § 19.2-83.6:2(A).[2] The fact that an

[2] As enacted, the Mask/Identity Law operated as an exception to § 18.2-422 when the new section was numbered § 19.2-83.6:1. After the Code Commission re-numbered the Mask/Identity Law as § 19.2-83.6:2, the published text of § 18.2-422 continued to cross-reference § 19.2-83.6:1.

officer is engaged in law enforcement when he conceals his identity does not transform masking one's face into conduct that only a sovereign can perform. Thus, even if the relevant question were whether Virginia regulates conduct an ordinary citizen can perform, subsection B satisfies that test—just as no ordinary citizen can go on another's property and cut a fence, no ordinary citizen can generally wear a mask in public to conceal his identity.

### C. Federal discretion is not federal law, and silence is not a constitutional entitlement.

The district court also treated the federal government's decision to leave masking to officer discretion as critical. But that reasoning sounds in preemption, not direct regulation. As the Supreme Court explained in *North Dakota*, a state law is invalid under intergovernmental immunity if it directly regulates the United States or discriminates against it; "[c]laims to any further degree of immunity must be resolved under the principles of congressional preemption." 495 U.S. at 435. The United States did not seek preliminary relief on a preemption theory. The district court nevertheless reasoned that because federal agencies presently leave masking to federal discretion and Virginia restricts that discretion, Virginia must directly regulate the United States. But that

assumes the answer to the threshold question. The relevant inquiry is whether Virginia's rule is a direct regulation in the first place, and the non-exercise of federal discretion over a subject does not itself transform a state rule affecting that purported discretion into direct regulation.

*Johnson* confirms that reading. It contemplated application of local general rules in areas where the United States had not spoken, so long as those rules only incidentally affected the manner of federal work. 254 U.S. at 56. *Texas* framed the same distinction as whether state law improperly controls federal duties or merely has incidental effects on how agents perform them. *Texas v. Dep't of Homeland Sec.*, 123 F.4th 186, 206–07 (5th Cir. 2024) (holding that Texas acted as proprietor and, alternatively, that generally applicable tort law did not control federal duties). The absence of a federal requirement therefore cannot itself transform a state conduct rule into direct regulation. Federal silence is not a federal command.

Federal law confirms the point from the other direction. Far from having "pronounced" officer identification unnecessary, the federal government requires it in some circumstances. Congress has directed that federal law-enforcement personnel supporting a federal response to

a civil disturbance "visibly display" a unique identifier and the name of the employing federal entity, subject to exceptions for personnel who are not ordinarily uniformed and personnel engaged in undercover operations. 10 U.S.C. § 723(a), (c). And a federal regulation directs a designated immigration officer, at an arrest, to identify himself as an immigration officer authorized to make the arrest. 8 C.F.R. § 287.8(c)(2)(iii)(A).

### D. Virginia regulates the public-facing manner of an encounter, not the federal function.

Applying the correct rule resolves likelihood of success on the merits in Virginia's favor. A direct regulation is one that controls the federal function, that selects federal personnel, imposes qualifications for federal work, requires federal officers to obtain a state license or permission, or gives a state official authority to override a substantive federal decision. Virginia's Mask/Identity Law does none of that. It does not select who may serve as a federal officer. It imposes no professional qualification. It requires no state license or approval. It gives no state official a veto over any federal determination. It does not prohibit immigration enforcement, dictate whom ICE may target, direct whom officers may arrest, limit what force they may use, or control where they

may deploy. It regulates one thing: whether and how an officer who exercises coercive authority in public conceals or displays his identity. Va. Code § 19.2-83.6:2(B)–(D).

### E. The authorities the district court invoked all involved state control over federal functions that is absent here.

The district court's authorities do not support its result. Each involved a State asserting genuine control over a federal function of a kind Virginia's law does not address. They fall into three groups.

The first is the licensing and qualification cases, *Johnson*, *Leslie Miller*, and this Court's decision in *United States v. Virginia*. Each struck a state scheme that conditioned the performance of federal work on satisfying state qualifications or obtaining state approval. *See supra* Part I.A. Virginia imposes no qualification and requires no approval.

The second is the direct prohibition cases. In *United States v. City of Arcata*, the Ninth Circuit addressed municipal ordinances that expressly prohibited federal military recruiters from carrying out federal recruitment activity. 629 F.3d 986, 991 (9th Cir. 2010). That was a state ban on the federal function itself. Virginia bans no federal activity. An officer subject to its law remains free to do everything his federal office authorizes.

The third group consists of contractor and functional control cases. In *CoreCivic*, New Jersey prohibited contracting with the federal government to operate private immigration detention facilities, eliminating the federal government's chosen detention option in the State. *CoreCivic, Inc. v. Governor of N.J.*, 145 F.4th 315 (3d Cir. 2025). In *Geo Grp., Inc. v. Newsom*, California's ban on private detention facilities would have forced ICE to "entirely transform its approach to detention in the state or else abandon its California facilities," giving the State a "virtual power of review" over federal detention decisions. 50 F.4th 745, 750–51 (9th Cir. 2022) (en banc). Those cases turned on state control of a federal operational choice—whether and how the federal government could use private detention facilities in the State. Virginia's law does nothing comparable. It leaves federal personnel, deployment, targets, and operations untouched and regulates only the public-facing manner in which covered officers identify themselves.

### F. The law's origin as a reaction to federal immigration practices does not establish direct regulation, particularly where discrimination is not before the Court.

The district court emphasized that the law responded to recent masked federal immigration enforcement, but legislative reaction to

federal conduct does not itself determine whether the enacted rule directly controls a federal operation. In its denial of the Commonwealth's motion to stay the injunction, the district court asserted, based on the law's origins in concerns about ICE enforcement, that "[o]nly federal law enforcement officers are actually affected by the Mask/Identity Law." JA 363. That is an incorrect extension of the post hoc ergo propter hoc fallacy. It assumes that the law targets *only* federal officers because seeing abuses by federal officers was part of what spurred the legislature to action. That assumption has no basis in fact or in logic.

There is an old saying that a wise man learns from his own mistakes and a wiser man learns from the mistakes of others. A state legislature can learn how to govern its own law enforcement officers from the federal government's failure to properly ensure its officers' compliance and accountability. Given that the General Assembly wrote a law that applies to federal, state, and local officers, the only reasonable view is that the General Assembly was concerned with both ICE enforcement practices and the possibility that state and local law enforcement might adopt the behavior. At the very least, it is improper to simply assume that the law is intended to target only federal officers—

an assumption the federal government did not advance, but that the district court supplied on its behalf.

The district court's psychological projection highlights exactly what is wrong with that approach. Intergovernmental immunity separately addresses direct regulation and discrimination. Treating motive or provenance as sufficient for direct regulation would blur those distinct inquiries and render any generally applicable law subject to the speculation of a court as to the motives behind it. The California litigation illustrates the distinction. The Central District of California recognized that its facial covering prohibition "may be a direct response to recent federal law enforcement practices," yet held the provision generally applicable and not a direct regulation of federal functions, enjoining it only because California treated similarly situated state and federal officers differently on its face. *California*, 819 F. Supp. 3d at 1132–33.

Here, the preliminary injunction purportedly does not rest on discrimination. The United States pleaded a separate discrimination claim but did not rely on it in seeking preliminary relief, and the district court declined to consider it. JA 400. Evidence that a court may think

bears on discrimination therefore cannot substitute for the required showing that Virginia's law itself exercises direct state control over federal operations.

## II. At a minimum, the Court should vacate the injunction as to the facial-covering prohibition and tailor any relief to the distinct provisions at issue.

### A. No court of appeals has held that an evenhanded facial-covering prohibition directly regulates the United States, and the only appellate decision the federal government invokes decided a different provision.

Even if the Court were not inclined to vacate the injunction in full, it should not let this injunction stand as written. The district court enjoined the entire law, both the facial-covering prohibition and the identification requirement, against every covered federal officer, without separately analyzing the two provisions or identifying which applications, if any, offend intergovernmental immunity. That was further error. The masking prohibition presents a question no court of appeals has decided. And the district court never tailored its relief to the provisions and applications that purportedly offend intergovernmental immunity, sweeping in even the identification requirement as amended, whose tactical and undercover exceptions it never addressed. At a minimum, the injunction must be vacated as to the facial-covering

prohibition, and any remaining relief must be tailored to any violation actually found.

The federal government's appellate authority is a single Ninth Circuit decision, and it did not decide the same issues as in this case. In seeking emergency appellate relief, the United States asked the Ninth Circuit to enjoin only the identification requirement of the California law. As the Ninth Circuit's opinion states, "[t]he motion sought to enjoin only § 10 of the No Vigilantes Act, the statute's identification requirement." *California*, 173 F.4th at 1066. Its analysis therefore addressed identification, not a rule against concealing one's face. *Id.* at 1066–68. The Northern District of New York later recognized the same limitation. *See United States v. New York*, 2026 WL 2225423, at *8 (N.D.N.Y. Aug. 3, 2026).

No court of appeals has held that an evenhanded facial-covering prohibition like subsection B directly regulates the federal government. *See California*, 173 F.4th at 1065 n.4. This Court can therefore vacate the injunction as to masking without creating a conflict with the Ninth Circuit, which granted relief from a different provision and expressly framed its analysis around § 10's identification requirement. *See id.* at

1066–68. Later district courts in the Eastern District of Pennsylvania and Northern District of New York extended the Ninth Circuit's reasoning to comparable masking-and-identification laws. *See United States v. City of Philadelphia*, 2026 WL 1906075, at *9–11 (E.D. Pa. July 2, 2026); *New York*, 2026 WL 2225423, at *8, *11–12. But those decisions conflict with the Central District of California, *see California*, 819 F. Supp. 3d at 1137, and remain district-court mis-applications of a Ninth Circuit holding that itself concerned identification.

### B. The only court to separately resolve direct regulation of a comparable masking prohibition rejected the federal government's theory.

When a court *did* confront a materially comparable facial-covering prohibition, it held that the prohibition is not a direct regulation. The Central District of California held that California's mask ban "does not directly regulate federal functions or target federal practices but rather generally applies to law enforcement officers in California." *California*, 819 F. Supp. 3d at 1132. It enjoined that prohibition on one ground only, that California had exempted its own peace officers, so the law "treat[ed] federal law enforcement officers differently than similarly situated state law enforcement officers," in violation of the anti-discrimination prong.

*Id.* at 1132–33. Virginia's law contains no comparable exemption because it applies to Virginia's own officers on the same terms as federal officers.

The district court acknowledged that California's facial-covering provision was enjoined only on discrimination grounds and that "[t]hat finding was not appealed." JA 400 (citing *California*, 173 F.4th at 1065 n.4). Yet the United States asks this Court to extend the Ninth Circuit's identification analysis to a masking question the Ninth Circuit did not decide, while the only court to decide that masking question rejected direct regulation. And the discrimination theory that ultimately defeated California's provision has no weight against Virginia's evenhanded law.

**C. The masking prohibition and the identification requirement present distinct questions, and the injunction swept them together.**

The two provisions of the Mask/Identity Law are not interchangeable. Subsection B asks only that an officer not conceal his face behind a mask. It compels no disclosure of any particular information. Subsection D separately requires an officer to display specified identifying information, a badge bearing his name or unique identifier, together with his employing agency. The Ninth Circuit's decision addressed that affirmative disclosure, asking whether compelled

identification interferes with federal operations. Whatever force that reasoning has as to identification, it does not reach a bare rule against hiding one's face, which does not compel disclosure of a name, badge number, agency, or other specified identifying information. The two provisions implicate different federal interests and call for separate analysis.

The district court did not separately analyze those questions. It analyzed the law as a single unit, held that "the Law" imposes additional qualifications, and enjoined both provisions together. JA 399–404. It never asked whether the facial-covering prohibition, standing alone, is a direct regulation, the very question the only court to reach it answered in the negative. That omission is an additional reason the injunction cannot stand as to subsection B.

### D. Any relief must be tailored to the violation actually shown.

The provision-specific errors flow through the district court barring enforcement of the entire law against every covered federal officer without the district court's ever having identified which applications, masking or identification, routine or tactical, actually offend intergovernmental immunity. That is not how equitable relief works. A

remedy "must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Lewis v. Casey*, 518 U.S. 343, 357 (1996). And a court crafting relief against a state statute "tries not to nullify more of a legislature's work than is necessary," while restraining itself from rewriting the law. *Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 329 (2006).

The identification requirement further illustrates the remedial problem. The district court's July 2 opinion analyzed the earlier version of subsection D even though the amended version took effect July 1. As amended, subsection D exempts specified tactical and undercover-related assignments when protection of an officer's identity is necessary. Va. Code § 19.2-83.6:2(D); *see* 2026 Va. Acts Spec. Sess. I ch. 1. Those amendments materially narrow the circumstances in which subsection D requires identification. Any analysis or relief directed at subsection D therefore must be conformed to the operative text.

The remedy that follows is straightforward. This Court should vacate the preliminary injunction in full, for the reasons given in Part I. Should the Court conclude that the identification requirement presents a closer question in light of the Ninth Circuit's decision, it should still

vacate the injunction as to subsection B's facial-covering prohibition and remand for provision-specific consideration of any preliminary relief directed to subsection D. The Court should not leave standing a blanket injunction that no court has ever justified provision by provision.

## III. The United States did not make the clear showing of irreparable harm that a preliminary injunction requires.

### A. The federal government's purported injuries are not sufficiently established.

A preliminary injunction is an extraordinary remedy, and the movant must make a "clear showing" of a *likelihood* of irreparable harm; a mere "possibility" will not do. *Winter*, 555 U.S. at 22. In this Circuit, the threatened injury must be "neither remote nor speculative, but actual and imminent." *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 216 (4th Cir. 2019) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991)). As the district court itself recited, "[t]he likelihood of harm must be more than a possibility." JA 406 (quoting *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017)). The United States asserted two harms below, and neither meets that standard.

The asserted constitutional injury rises or falls with the merits. If Virginia's law is not an impermissible direct regulation, compliance with

it causes no Supremacy Clause injury. That derivative injury therefore cannot independently sustain the injunction if the district court's classification is wrong, and in any event, it cannot justify relief broader than the constitutional violation actually shown.

The United States' second asserted injury rests on four agency declarations describing doxxing, threats, and harassment directed at federal officers. Weiss described threats and assaults against ICE officers, cartel bounties, the use of facial-recognition technology, and instances in which Richmond ICE officers were photographed and placed on posters; Allen described concern that photographs of DEA agents could facilitate targeting, citing a Minneapolis incident in which a social-media user identified an unmasked agent from a photograph; Kaufmann described the need to protect FBI identities during undercover and surveillance work; and Hargis collected examples of threats to immigration officers nationally. JA 107–08, 118, 123, 127–31. The existence of generalized danger is not the showing of imminent harm the second factor requires. The United States had to show a likelihood, more than just a "possibility," that the challenged applications of Virginia's law will cause irreparable injury. *Di Biase*, 872 F.3d at 230. The declarations

do not establish the required link between enforcement of Virginia's law and likely irreparable harm.

*First*, the law does not force officers to expose themselves in the situations the United States identifies as most safety sensitive. Subsection C preserves facial coverings for tactical operations, hazardous environments, and undercover, drug, gang, and surveillance work. And subsection D exempts officers engaged in SWAT and other specialized tactical operations and officers engaged in undercover, drug, gang, executive protection, or surveillance units where protection of their identities is necessary. Va. Code § 19.2-83.6:2(C), (D). The United States' declarations do not establish that a genuine operational need for concealment falls outside those statutory exceptions. They do not even contemplate how the exceptions might apply.

*Second*, the declarations do not show that routine, across-the-board concealment is necessary, as distinct from the targeted measures the statute preserves. They establish that a visible face can facilitate identification, but they do not compare threats in masked and unmasked operations, show how often a visible face rather than names, records, social media, or other sources enabled harmful identification, or show

that officers who work unmasked ordinarily face materially greater danger than those who mask. The Minneapolis incident illustrates the general concern; it does not establish that the officer was put in danger, does not connect the conduct to Virginia, and does not show that every officer performing ordinary public-facing work in Virginia needs relief from subsection B. The Commonwealth's expert addressed that gap. Drawing on his oversight of ICE written policy and his review of the federal declarations, he explained that routine masking was not standard ICE practice before 2025, that ICE adopted no written policy requiring it, and that evolving risks, including those from facial-recognition technology, can be met through written policies, supervisory risk assessments, protective equipment, and targeted exceptions rather than blanket concealment. JA 186, 192–93. The expert, himself doxxed while at ICE, did not deny the danger; he disputed the inference that it makes routine anonymous enforcement necessary. JA 204.

*Third*, an agency's refusal to comply does not establish that compliance is dangerous. The DEA declaration stated that the agency would not require its agents to comply and reasoned that they could therefore face prosecution. JA 119. But a categorical decision not to

require compliance does not show that compliance is incompatible with federal duties. The question is whether the challenged requirements will likely inflict the asserted injury, which turns on identifying the circumstances in which compliance would actually impair enforcement, circumstances the declarations do not supply and the law's tactical and undercover exceptions already accommodate.

*Fourth*, the declarations say least of all about the identification requirement. They do not establish that displaying a name or unique identifier creates any intolerable risk, and the expert explained that there is no officer safety justification for withholding a badge number, which serves the very accountability the statute is designed to protect. JA 197–99.

On this record, the United States did not carry its burden. It showed that a danger exists. It did not show that Virginia's law is its cause, or that suspending the law is its cure.

### B. The compressed preliminary timeline reinforces the federal government's burden.

The district court discounted the Commonwealth's evidence against a record assembled on sharply different timelines. The United States spent at least three and a half weeks after the law's signing gathering

agency declarations—that is, declarations from its own employees—and securing the internal approvals needed to seek emergency relief. JA 413. The Commonwealth had only days, over a holiday weekend, to answer. JA 134–35; *see also* JA 178. It nonetheless submitted the detailed counter-declaration of a former senior ICE official. JA 183–206.

The compressed schedule goes to the burden of proof that remains on the United States. A preliminary record assembled under those circumstances should not be treated as conclusively establishing the operational necessity of routine masking across every application covered by the injunction, particularly where the Commonwealth produced contrary evidence within the limited time available.

Moreover, the litigation timeline helps establish the lack of exigency the federal government placed on the issue. The law had been passed by the General Assembly months prior to the Governor's signature, and the federal government apparently did not begin preparing its declarations until after signature or otherwise exercised no alacrity in getting the declarations and their motion on file. In response to this, the district court adopted an odd double-standard, whereby the Commonwealth's Office of the Attorney General is expected to expend its

extremely limited resources preparing opposition evidence to a case it does not know will be presented and must divine what information will be in declarations attached to this hypothetical litigation. Then, it must bear the cost of hiring experts to prepare declarations blindly responding to declarations they have not seen in litigation that has not been filed. Yet the federal government is not expected to lift a finger to prepare declarations from its own employees until weeks after the law is passed. The fact that the United States was in no hurry to file its complaint and request for injunctive relief speaks volumes about the exigency of the issue to it. "Emergency" relief was not warranted.

The United States had to make the clear showing *Winter* requires; Virginia did not have to prove that no federal officer could ever face increased risk from appearing unmasked.

## IV. The district court did not balance the equities and the public interest but instead restated its merits conclusion.

### A. *Winter* requires an independent balance, not a restatement of the merits.

The final two *Winter* factors require a genuine assessment of competing harms and public consequences. Courts must "balance the competing claims of injury" and consider the effects of granting or withholding relief, giving particular regard to "the public consequences."

*Winter*, 555 U.S. at 24. Those considerations substantially overlap here because both sides are sovereign governments asserting public interests. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). And this Court has held that likelihood of success can satisfy the public-interest prong "only if other considerations did not meaningfully weigh on that factor." *Pashby*, 709 F.3d at 329–30. The district court instead treated its merits prediction as dispositive, reasoning that "if the plaintiff is likely to succeed on the merits of a constitutional claim, the last two factors tip in its favor." JA 414. But a prediction about the merits does not eliminate the remaining equitable inquiry. *Winter* still requires the court to assess the consequences of interim relief for both sides.

### B. Virginia's sovereign injury is independently cognizable, and the authority the court invoked does not eliminate it.

The court held that Virginia suffers no harm, resting on the proposition that "a state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional." JA 414 (quoting *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021) and *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 191 (4th Cir. 2013)).

But that proposition is expressly conditional. It concerns restrictions "likely to be found unconstitutional." It does not hold that a State suffers no cognizable harm whenever a district court has preliminarily ruled against it, least of all where the constitutional question is novel and unsettled and the courts of first instance are divided. Read that way, a preliminary merits finding would erase the State's injury and collapse the remaining equitable factors into the first factor in every constitutional case, while disregarding the sovereign injury the Supreme Court has recognized. The out-of-circuit decision the court also invoked shares the same flaw. *United States v. Alabama*, a preemption case, held only that "we discern no harm from the state's nonenforcement of invalid legislation." 691 F.3d 1269, 1301 (11th Cir. 2012) (emphasis added). That proposition, too, presupposes the invalidity that is disputed here.

The Supreme Court has recognized the competing injury the district court discounted. "[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in

chambers)). *Abbott* likewise explains that, "[u]nless [the] statute is unconstitutional," an injunction preventing its implementation may "seriously and irreparably harm" the State. *Abbott v. Perez*, 585 U.S. 579, 602–03 (2018). Those authorities establish that, at the preliminary stage, the State's sovereign interest is a real interest to be weighed rather than an interest that vanishes by virtue of the first-factor prediction.

### C. Virginia's public-safety interest is not irrelevant merely because federal officers are involved.

The district court refused to weigh Virginia's public-safety interest at all. When the Commonwealth argued that masked, unidentified policing undermines public safety, the court did not place that interest on the scale. In its merits discussion, it answered that the argument "is addressed to the wisdom of the federal policy" and that "federal, not state, authorities make the policies that animate the enforcement of federal immigration laws." JA 405. But that missed the other side of this issue. Of course, state, not federal, authorities make the policies that animate the enforcement of state criminal laws. The injunction bars the state from protecting its citizens by enforcing its own generally applicable criminal laws.

In its equitable discussion, it re-framed the "status quo" as "no Mask/Identity Law" and concluded that the equities favor enjoining a law that "offends the Supremacy Clause." JA 414. At no point did it weigh the public-safety and accountability interests the law serves, nor did it account for the fact that a status quo of "no Mask/Identity Law" means covered law enforcement officers commit *felonies* when wearing masks to conceal their identities.

That was error. Virginia has substantial interests in public recognition of lawful authority, accountability, and reducing confusion over whether an armed person asserting governmental power is a legitimate officer. *Kelley v. Johnson* confirms the legitimacy of governmental interests in making uniformed officers readily recognizable to the public. 425 U.S. 238, 247–48 (1976). Virginia's statute itself reflects a legislative effort to balance those interests against officer safety by preserving masking and identification exceptions for tactical, hazardous, undercover, and surveillance circumstances, and lowering the crime from a felony to a misdemeanor. Va. Code § 19.2-83.6:2(C)–(D).

The existence of important interests on both sides is the reason *Winter* and *Pashby* require balancing rather than a reason to dispense with it. *See* Pashby, 709 F.3d at 329–30. The district court could give weight to its preliminary merits assessment and to the Government's evidence of threats; it could not treat Virginia's sovereign and public-safety interests as legally irrelevant on the premise that the first factor had already been resolved. Because the court substituted its merits ruling for the independent balance *Winter* requires, the injunction cannot be sustained on the equities.

## CONCLUSION

For the foregoing reasons, the Court should vacate the preliminary injunction. In the alternative, it should vacate the injunction insofar as it reaches Va. Code § 19.2-83.6:2(B)'s facial-covering prohibition and remand for provision-specific consideration of any preliminary relief directed to subsection D.

Respectfully submitted,

COMMONWEALTH OF VIRGINIA and JAY JONES, in His Official Capacity as Attorney General for the Commonwealth of Virginia

/s/ *Ethan P. Fallon*
ETHAN P. FALLON
*Deputy Solicitor General*

JAY JONES
*Attorney General*

TRAVIS G. HILL
*Chief Deputy Attorney General*

GRETCHEN ELLEN NYGAARD
*Deputy Attorney General*

TILLMAN J. BRECKENRIDGE
*Solicitor General*

TRISTON C. O'SAVIO
*Assistant Solicitor General*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-2071 – Telephone
(804) 786-1991 – Facsimile
SolicitorGeneral@oag.state.va.us

August 19, 2026

*Counsel for Defendants-Appellants*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), it contains 8,896 words. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook.

/s/ *Ethan P. Fallon*
ETHAN P. FALLON
*Deputy Solicitor General*

## CERTIFICATE OF SERVICE

I certify that on August 19, 2026, I electronically filed the foregoing brief with the Clerk of the Court using the appellate CM/ECF system, which will serve all parties or their counsel of record through the CM/ECF system.

/s/ *Ethan P. Fallon*
ETHAN P. FALLON
*Deputy Solicitor General*