**No. 26-1874**

**IN THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

THE UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

THE COMMONWEALTH OF VIRGINIA; JAY JONES, in his official capacity as Attorney General of Virginia,

Defendants-Appellants.

On Appeal from the United States District Court for the Eastern District of Virginia

# UNITED STATES' OPPOSITION TO MOTION FOR STAY PENDING APPEAL

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. MCARTHUR
*Deputy Assistant Attorney General*

MARK R. FREEMAN
DANIEL TENNY
ANDREW M. BERNIE
*Attorneys, Appellate Staff*
*Civil Division*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-3511*

# TABLE OF CONTENTS

Page


TABLE OF AUTHORITIES ........ ii

INTRODUCTION ........ 1

STATEMENT ........ 2

ARGUMENT ........ 7

A. Virginia is not likely to succeed on the merits. ........ 7

B. The other injunction factors strongly favor the government. ........ 18

CONCLUSION ........ 22

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## Cases

*Arizona v. California*,
283 U.S. 423 (1931) ....................7, 8

*Georgia Latino All. for Hum. Rts. v. Governor of Georgia*,
691 F.3d 1250 (11th Cir. 2012) ....................19

*Goodyear Atomic Corp. v. Miller*,
486 U.S. 174 (1988) ....................7

*Hancock v. Train*,
426 U.S. 167 (1976) ....................7

*In re Neagle*,
135 U.S. 1 (1890) ....................7

*Johnson v. Maryland*,
254 U.S. 51 (1920) .................... 7, 12, 13, 14

*Mayo v. United States*,
319 U.S. 441 (1943) .................... 1, 7, 8, 17

*McCulloch v. Maryland*,
17 U.S. (4 Wheat.) 316 (1819) ....................7

*New Orleans Pub. Serv., Inc. v. Council of New Orleans*,
491 U.S. 350 (1989) ....................18

*Nken v. Holder*,
556 U.S. 418 (2009) ....................7

*North Dakota v. United States*,
495 U.S. 423 (1990) ....................7, 8

*United States v. California*,
173 F.4th 1060 (9th Cir. 2026) .................... 10, 11, 22

*United States v. California*,
819 F. Supp. 3d 1109 (C.D. Cal. 2026) ....................10

*United States v. City of Arcata*,
629 F.3d 986 (9th Cir. 2010) ........................................................................16

*United States v. City of Philadelphia*,
--- F. Supp. 3d ----, No. 26-4208, 2026 WL 1906075 (E.D. Pa. July 2, 2026)....10

*United States v. New York*,
No. 26-CV-1360, 2026 WL 2225423 (N.D.N.Y. Aug. 3, 2026) .................. 10, 16

*United States v. Washington*,
596 U.S. 832 (2022) ......................................................................................12

**Statutes**

10 U.S.C. § 723(a) ..........................................................................................15

Va. Code § 1-214 ................................................................................................2

Va. Code § 9.1-102(75) .......................................................................................4

Va. Code § 15.2-1627(B).......................................................................................4

Va. Code § 19.2-83.6:2(A) ....................................................................................3

Va. Code § 19.2-83.6:2(B).................................................................................3, 8

Va. Code § 19.2-83.6:2(C)(1)-(7) ..........................................................................3

Va. Code § 19.2-83.6:2(C)(8) ................................................................................3

Va. Code § 19.2-83.6:2(D) ................................................................................4, 8

Va. Code § 19.2-83.6:2(E) .....................................................................................4

## INTRODUCTION

For more than 200 years, the Supreme Court has repeatedly held that, absent express congressional authorization, states have no authority to directly regulate the federal government. Without such authorization, "the activities of the Federal Government are free from regulation by any state." *Mayo v. United States*, 319 U.S. 441, 445 (1943). That prohibition applies without exception, and is not subject to balancing tests, burden analysis, or any other qualification. *See id.* ("No other adjustment of competing enactments or legal principles is possible.").

This case involves a straightforward application of that principle. Virginia passed a statute that purports to prohibit "any fulltime or part-time employee of a federal law-enforcement agency" from wearing a facial covering, requires such federal officers to visibly display identification, sets forth a comprehensive list of exceptions, and subjects federal officers who do not comply to criminal penalties. Virginia is free to impose these requirements on its own officials. But it has no authority to impose them on federal officials.

The district court correctly granted a preliminary injunction prohibiting Virginia from enforcing these requirements against federal officers, employees, and agencies involved in federal immigration enforcement. This Court should deny Virginia's motion for a stay of that injunction pending appeal. Virginia has no

possibility—let alone a likelihood—of prevailing on appeal, and Virginia cannot satisfy any of the other stay requirements.

A unanimous Ninth Circuit panel reached the same conclusion as the district court here in a challenge to a materially identical California statute, as did district courts in New York and Pennsylvania. Those decisions are correct. States and localities may not directly regulate the federal government and this prohibition is absolute.

The other factors favor the federal government as well. Any regulation that violates the Supremacy Clause causes irreparable harm to the United States—especially an attempt by a State to regulate how the United States conducts law enforcement operations, backed by criminal penalties. And although that is itself sufficient, the United States also explained in thorough declarations the hostile circumstances that require protection of the personal identity of law enforcement under at least some circumstances. The motion should be denied.

## STATEMENT

**1.** On May 20, 2026, Governor Spanberger signed Senate Bill 352, which added a new section to the Virginia Code, § 19.2-83.6:2, *Prohibition on wearing of facial coverings; penalty* (Mask/ID Law). The Mask/ID Law, which was scheduled to take effect on July 1, 2026, *see* Va. Code § 1-214, defines "law-enforcement officer" to include "any full-time or part-time employee of a federal law-

enforcement agency," *id.* § 19.2-83.6:2(A). And it provides that "no law-enforcement officer shall wear a facial covering that conceals, obscures, or otherwise covers his face while such law-enforcement officer is engaged in the performance of his official duties." *Id.* § 19.2-83.6:2(B).

The Mask/ID Law contains exceptions related to health and safety, such as face coverings to protect against diseases, toxins, gas, smoke, severe weather conditions, helmets, protective eyewear, or tactical team (Special Weapons and Tactics (SWAT)) facial coverings. Va. Code § 19.2-83.6:2(C)(1)-(7). Another exception relates to "a law-enforcement officer who is assigned to an undercover, drug, gang, or surveillance unit where the protection of such law-enforcement officer's identity is necessary as determined by the law-enforcement agency overseeing such unit or other responsible law-enforcement agency." *Id.* § 19.2-83.6:2(C)(8). Virginia has urged that this exception applies to federal officials, although the statutory text suggests otherwise. *See id.* § 19.2-83.6:2(A) (seemingly defining "law-enforcement agency," unlike the definition of "law-enforcement officer," as limited to state and local agencies); Dkt. No. 91 at 3-4 (district court noting that, contrary to Virginia's representation, this exception does not appear to apply to federal officials). Since a stay must be denied regardless of this issue, we do not discuss it further.

A separate provision of the new law provides, again with enumerated exceptions, that "a law-enforcement officer, while engaged in the performance of his official duties, shall visibly display (i) a badge or insignia bearing such law-enforcement officer's name or other individual identifier unique to that particular law-enforcement officer and (ii) the name of the law-enforcement agency that employs such law-enforcement officer." Va. Code § 19.2-83.6:2(D). Virginia notes that there are several exceptions to the identification requirement, Mot. 6, but—as Virginia acknowledges in its opening brief on appeal—those exceptions are effective only through June 30, 2028. Since a stay must be denied without regard to the existence or breadth of the exceptions, their time-limited nature has no bearing on this motion.

Violation of the Mask/ID Law constitutes "a Class 1 misdemeanor unless the law-enforcement agency that employs such law-enforcement officer has adopted and established a written policy for the use of facial coverings, using as guidance the model policy established by the Department of Criminal Justice Services under § 9.1-102." Va. Code § 19.2-83.6:2(E). Assuming that federal agencies are eligible for this safe harbor, it would be available only if federal agencies establish a written policy that parrots the specific prohibition and exceptions set forth in Virginia's statute. *Id.* § 9.1-102(75). Each Commonwealth Attorney can enforce the law. *Id.* § 15.2-1627(B).

**2.** The United States brought this suit on June 11, 2026, and on June 17 moved for a preliminary injunction against the provisions discussed above as applied to the federal government. Following briefing and oral argument, the district court issued a preliminary injunction on June 30, and a memorandum opinion on July 2.[1] Dkt. Nos. 1, 8, 90, 91.[2]

The district court concluded that the Mask/ID Law violates principles of intergovernmental immunity, because it "requires that federal law enforcement officers satisfy additional requirements . . . which are not required under federal law, and which the federal authorities specifically say they need not meet." Dkt. No. 91 at 27. The court rejected Virginia's contention that the statute was a generally

[1] Following the injunction, the Virginia Code Commission renumbered the challenged law and, with this Court's permission, the district court modified the preliminary injunction to refer to the correctly numbered statute. We cite to the injunction and memorandum as modified.

[2] Virginia complains the district court did not give it sufficient time to oppose the preliminary injunction motion. Mot. 7-8. Virginia had a week to prepare its response. Dkt. No. 12. This was a somewhat accelerated briefing schedule, but not dramatically so. And it was appropriate given the immediate, irreparable harm the United States faced absent an injunction, and Virginia's enactment of a law on May 20 that took effect on July 1. Virginia was offered the opportunity for a less condensed schedule if it agreed to stay enforcement of the law against the federal government while the preliminary injunction motion was litigated—something California agreed to in the litigation challenging its similar statute—but Virginia rejected that proposal. Dkt. No. 91 at 38. In any event, none of this matters. Since the injunction issued nearly two months ago, Virginia has not even attempted to supplement the record with any meaningful additional material. And the Mask/ID Law violates principles of intergovernmental immunity as a matter of law, so more time could not have made a difference anyway.

applicable law, noting that the statute refers specifically to law enforcement officers and regulates an activity—law enforcement—in which ordinary citizens cannot engage. *Id.* at 29.

The district court concluded that the United States had demonstrated irreparable harm warranting an injunction because "[i]t seems rather clear that being subjected to a state law that regulates an activity that is constitutionally delegated to the federal government is an infringement of the Supremacy Clause that constitutes an irreparable injury," a proposition that Virginia conceded at oral argument. Dkt. No. 91 at 33. Although that was itself sufficient, the court also examined in detail, and credited, the United States' declarations concerning the safety issues necessitating personal-identity protections, including doxxing, threats and assaults against federal agents, intelligence showing that criminals have placed targeted bounties on federal agents, as well as specific examples of harassment of U.S. Immigration and Customs Enforcement (ICE), Drug Enforcement Administration (DEA), Federal Bureau of Investigation (FBI), and U.S. Customs and Border Protection (CBP) officials. *Id.* at 34-37. The court further concluded that the balance of the equities and public interest supported an injunction. *Id.* at 39.

The district court denied Virginia's motion for a stay pending appeal. Dkt. No. 76.

## ARGUMENT

Virginia cannot satisfy any of the familiar four factors that govern a stay pending appeal, much less all of them. *See Nken v. Holder*, 556 U.S. 418, 434 (2009).

### A. Virginia is not likely to succeed on the merits.

**1.** "[T]he activities of the Federal Government are free from regulation by any state." *Mayo v. United States*, 319 U.S. 441, 445 (1943). States "have no power" to "in any manner control, the operations of the constitutional laws enacted by congress to carry into execution the powers vested in the general government." *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 436 (1819). This prohibition on direct state regulation has been repeated by the Supreme Court time and time again. *See, e.g.*, *North Dakota v. United States*, 495 U.S. 423, 435 (1990) (state or local law is invalid "if it regulates the United States directly"); *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 180 (1988); *Hancock v. Train*, 426 U.S. 167, 179 (1976). Thus, Maryland could not tax the Bank of the United States, *McCulloch*, or enforce its driver's license laws against federal postal workers delivering mail, *Johnson v. Maryland*, 254 U.S. 51 (1920), California could not prosecute a Deputy U.S. Marshal for his actions protecting a Supreme Court Justice, *In re Neagle*, 135 U.S. 1, 75 (1890), and Arizona could not superimpose its own approval process on a congressionally authorized dam construction project, *Arizona v. California*, 283 U.S. 423 (1931).

The prohibition on direct state regulation of the federal government (absent express Congressional authorization) is absolute. It is not subject to a balancing test or any similar qualification. *See Mayo*, 319 U.S. at 445 ("No other adjustment of competing enactments or legal principles is possible."). Simply put, "[t]he United States may perform its functions without conforming to the police regulations of a State." *Arizona*, 283 U.S. at 451.

Applying this settled framework, it is difficult to imagine an easier intergovernmental-immunity case than this one. There can be no serious dispute that the Mask/ID Law, which imposes restrictions on federal officers while performing "official duties," Va. Code § 19.2-83.6:2(B), (D), directly regulates the federal government. *See Regulate*, Black's Law Dictionary (12th ed. 2024) (defining "regulate" as "[t]o control (an activity or process) esp. through the implementation of rules"). In particular, the law purports to prohibit the wearing of a facial covering, Va. Code § 19.2-83.6:2(B), and likewise purports to require federal law enforcement officers to display identification, *id.* § 19.2-83.6:2(D), dictates the content of that identification, and sets forth what purports to be a comprehensive list of exceptions, *id.* § 19.2-83.6:2(C).

And that regulation is "direct." It applies to the federal government and its employees, not merely to third parties who interface with the federal government. *Cf. North Dakota*, 495 U.S. at 436-37 ("There is no claim in this case, nor could

there be, that North Dakota regulates the Federal Government directly. Both the reporting requirement and the labeling regulation operate against suppliers, not the Government . . . ." (citations omitted)).

It should thus come as little surprise that other courts have concluded that materially identical laws are invalid. *See infra* p. 10. The same result is warranted here.

**2.** Virginia's arguments in defense of the Mask/ID Law are wrong.

**a.** Initially, Virginia contends that the legal issues presented by its appeal are debatable, characterizing them as "open and substantial," Mot. 10, and "unsettled," Mot. 11, 26, while asserting that "[c]ourts have divided over comparable laws," Mot. 12. That is both incorrect and would not suffice to entitle them to a stay pending appeal. The relevant legal principle—that states are prohibited from directly regulating the federal government, absent express congressional authorization (something no one contends has occurred here)—is neither unsettled nor difficult. And in any event, as Virginia acknowledges, to obtain a stay it must demonstrate "a strong showing of likely success" on appeal, Mot. 10. That may not require Virginia "to establish that reversal is certain," Mot. 12, but it requires more than a showing that the legal issue is debatable or that courts might disagree on its proper resolution.

Courts are also not "divided" on this issue. *Contra* Mot. 12. A unanimous Ninth Circuit panel held as a matter of law that California's similar identification

requirements violated the intergovernmental immunity doctrine. *United States v. California*, 173 F.4th 1060 (9th Cir. 2026). The Northern District of New York reached the same conclusion in enjoining New York's similar statute purporting to bar federal officers from wearing facial coverings and requiring them to display identification. *United States v. New York*, No. 26-CV-1360, 2026 WL 2225423, at *5-12 (N.D.N.Y. Aug. 3, 2026). The Eastern District of Pennsylvania enjoined a Philadelphia ordinance purporting to impose similar masking prohibitions and identification requirements. *United States v. City of Philadelphia*, --- F. Supp. 3d ---, No. 26-4208, 2026 WL 1906075, at *8-11 (E.D. Pa. July 2, 2026).

Virginia places great emphasis on the Central District of California's decision denying a preliminary injunction as to California's identification requirements while granting an injunction against a facial covering ban solely because that provision discriminated against federal officials. In reaching these conclusions, the Central District of California applied "a functional approach" in deciding whether the regulations at issue "interfer[e] with or control[] the operations of the Federal Government." *United States v. California*, 819 F. Supp. 3d 1109, 1117-18, 1126-30 (C.D. Cal. 2026) (alterations in original) (quotation marks omitted). But the Ninth Circuit expressly rejected the Central District of California's "functional" approach analysis, finding that the district court "asked the wrong question." *California*, 173 F.4th at 1068. The Ninth Circuit correctly noted that "[b]y looking to the degree [the

challenged law] interfered with the activities of the United States, the district court applied a standard pertaining to States' regulation of federal contractors and third-party employers, not the standard applicable to direct regulation of governmental activities of the United States." *Id.*

To be clear, a division of opinion among courts would not itself be a basis for a stay. But there is no such division.

**b.** Virginia concedes that its law purports to regulate the federal government, but contends that its law "regulates a narrow subject." Mot. 1; *see also* Mot. 13 ("single subject"). There is no narrow or single-subject exception to the prohibition against state regulation—nor would such a standard even be susceptible of principled application. Virginia relatedly contends that "the statute regulates only the masking and identification features specified in its text." Mot. 13. That is simply a truism—the statute regulates only what it regulates. But Virginia is not entitled to regulate the federal government on some subjects simply because the statute does not regulate the federal government on other subjects.

Virginia also denies that its attempted regulation of the federal government is "direct" by purporting to draw a distinction between "direct regulation [and] neutral rule[s] of general application." Mot. 10. But if a law regulates the federal government directly, it is invalid even if that regulation comes in the form of a law of general application—the driver's license law at issue in *Johnson*, for example,

was not specific to the federal government. And regulation is "direct" if it applies to the federal government itself—as opposed to third parties with whom the federal government deals—which this law unquestionably does.

In any event, the Mask/ID Law is not a law of general application. It regulates law enforcement—a distinctly governmental activity—and applies only when a law enforcement officer is "engaged in the performance of his official duties." *See supra* p. 3. To the extent Virginia is arguing that its law does not *discriminate* against federal officials—because it supposedly applies equally to state and local officials, Mot. 13—that is irrelevant even if it is true. The doctrine "prohibit[s] state laws that *either* regulate the United States directly *or* discriminate against the Federal Government or those with whom it deals." *United States v. Washington*, 596 U.S. 832, 838 (2022) (alterations and quotation marks omitted).

**c.** Relatedly, Virginia invokes the Supreme Court's decision in *Johnson* for the proposition that its law is a permissible "neutral regulation of the manner of public conduct." Mot. 13. In so doing, Virginia treats *Johnson* as if the Court upheld a state effort to regulate federal officials. But the holding of *Johnson* was the opposite. The Court held that a State may not require a Post Office employee to obtain a license from the State. 254 U.S. at 55. As the Court explained, "the immunity of the instruments of the United States from state control in the performance of their duties extends" to a requirement to satisfy the state regarding

their qualifications. *Id.* at 57. This case is easier than that one. Maryland simply sought to require postal drivers to obtain a license that other drivers were required to obtain, and the Court held that even that was impermissible. And the Court took as a given "the immunity of the instruments of the United States from state control in the performance of their duties." *Id.* Here, Virginia seeks precisely to assert control over federal officials in the performance of their duties.

Virginia seeks support not in *Johnson*'s holding but in tentative, unexplained dicta. In the course of its analysis, the Supreme Court suggested that federal officers might be subject to "general rules that might affect incidentally the mode of carrying out the employment—as, for instance, a statute or ordinance regulating the mode of turning at the corners of streets." *Johnson*, 254 U.S. at 56.

To our knowledge, this dictum has not been relied upon by the Supreme Court in the 106 years since to permit a state to regulate federal employees engaged in the performance of federal functions. In any event, the Court's offhand observation that such state laws might in some circumstances apply to federal employees—and the Court did not even take a definitive view on that point, *see Johnson*, 254 U.S. at 56 ("It very well may be . . . .")—appears simply to reflect circumstances where the federal government itself expects its employees to comply with local laws. *Johnson* stated that such state authority, if it existed at all, would apply only "when the United States has not spoken." *Id.* In practice, the issue does not come up because the federal

government generally instructs federal officials to follow local traffic law. *See, e.g.*, U.S. Postal Serv., *Employee and Labor Relations Manual* § 831.332(c) (Mar. 2024), https://perma.cc/N326-9USK. But beyond that, *Johnson* itself makes clear that it did not mean to create a gaping exception to the general rule that states cannot regulate federal officers carrying out federal functions. As noted, *Johnson* held that even routine requirements to obtain a driver's license could not validly be applied to postal drivers. And the Court there noted that "even the most unquestionable and most universally applicable of state laws"—including state murder laws—"will not be allowed to control the conduct of a marshal of the United States acting under and in pursuance of the laws of the United States." *Johnson*, 254 U.S. at 56-57.

In any event, the Mask/ID Law is not a "general" law that only "incidentally" affects the carrying out of federal employment. A "general" law, like a speed limit or "a statute or ordinance regulating the mode of turning at the corners of streets," *Johnson*, 254 U.S. at 56, is a rule that applies to everyone, and that regulates conduct engaged in by the general public. And such a rule "incidentally" affects federal employment when it does so by happenstance, precisely because it applies to conduct engaged in by both private, state, and federal actors. The Mask/ID Law is obviously not such a statute. It applies expressly to federal law enforcement operations and purports to regulate an inherently governmental function. Neither *Johnson* nor any other case from the Supreme Court, this Court, or any other court

(other than the decision from the Central District of California with which the Ninth Circuit disagreed) remotely suggests that such a law is valid.

**d.** Virginia contrasts its law with supposed laws regulating the "substance of federal enforcement." Mot. 13, 18, 20. This purported distinction has no basis in law and it is unclear what it means or how it would be administered. To take just a few (of countless possible) examples, could a state under this standard:

- Prescribe how bright law-enforcement uniforms should be?
- Demand that law-enforcement officials wear pink to distinguish them from other officials?
- Restrict use of K9 teams based on animal-rights (or other) considerations?
- Require law-enforcement officials to conduct some (or all) operations on horseback rather than in cars?

Most of these hypothetical conditions (and many others) at least arguably could be characterized as not stripping federal officers of their "discretion over whom to stop or arrest, what force to use, the target and objective of the operation, and how personnel are deployed." Mot. 13.

**e.** Virginia contends that federal law requires officer identification in certain circumstances. Mot. 16. The federal statute Virginia invokes is inapplicable here. *See* 10 U.S.C. § 723(a) (applying only to members of the armed forces and federal law enforcement personnel providing support to federal authorities to respond to a

civil disturbance who wear a uniform in the regular performance of their duties or are not engaging in undercover operations). And Virginia does not identify any relevant federal provisions prohibiting use of facial coverings by federal law enforcement officials.

In any event, this argument is irrelevant. The prohibition on states directly regulating the federal government does not require a conflict with federal law—that is the domain of conflict preemption. And "[a] state or local law that directly regulates the conduct of the federal government or discriminates against it is invalid, even if it is no more restrictive than federal law." *United States v. City of Arcata*, 629 F.3d 986, 991-92 (9th Cir. 2010). Virginia notes that the district court in *New York* stated that "there exist federal laws and regulations which require visible identification in certain circumstances." Mot. 17 (quotation marks omitted); 2026 WL 2225423, at *5. But the court in that case then correctly pointed out that these laws were irrelevant to the intergovernmental immunity inquiry. 2026 WL 2225423, at *6.

**f.** Virginia insists that the United States did not establish a need for masking and withholding of identification. Mot. 15-16. There is no requirement that the United States identify any such need. In any event, as discussed below, the United States' declarations thoroughly explained why safety concerns for federal officials—

including doxxing, threats, harassment, and targeted bounties—warrant personal-identity protections under at least some circumstances. *See infra* pp. 19-21.

**g.** Virginia criticizes the district court's opinion and the United States' position for lacking a limiting principle, because it supposedly treats "federal silence" as a grant of immunity from state regulation. Mot. 17. But this is simply the settled rule that has governed since virtually the dawn of the Republic: "the activities of the Federal Government are free from regulation by any state." *Mayo*, 319 U.S. at 445. The cases laying out this principle are legion. *See supra* p. 7. Thus, it is Virginia that seeks to upset settled law; Virginia fails to identify other state regulations of federal officials that have been upheld.

**h.** Finally, Virginia contends this Court should "at a minimum" stay the injunction as to the facial covering prohibition, contending that this prohibition and the identification requirement "present analytically distinct questions." Mot. 27. That is incorrect. Both are straightforwardly invalid under the intergovernmental immunity doctrine because they directly regulate the federal government. And the only reason the Ninth Circuit in *California* did not address a facial covering ban is that the district court there *granted* an injunction as to that provision—albeit on narrow grounds. And the Ninth Circuit's analysis—that no direct regulation is permitted and burden analysis does not come into play—extends equally to a facial covering ban, and Virginia does not make any meaningful argument otherwise.

### B. The other injunction factors strongly favor the government.

**1.** Although Virginia's unlikelihood of success itself requires denial of its motion, Virginia also wholly fails to demonstrate irreparable harm from leaving the injunction in place pending appeal. Indeed, Virginia's claimed irreparable harm reduces almost entirely to a generalized interest in enforcing its own laws. Mot. 20-23. That asserted interest is entitled to no weight given the district court's correct conclusion that the law is invalid—and certainly does not outweigh the United States' interest in remaining free of unlawful state regulation.[3]

**2.** By contrast, the district court correctly held that the United States is the one facing irreparable harm if the Mask/ID Law is allowed to go into effect.

**a.** Irreparable harm necessarily results from the enforcement of a law contrary to the Supremacy Clause. *See New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 366-67 (1989) (irreparable injury may be established "by a showing that the challenged state statute is flagrantly and patently violative of . . .

---

[3] Virginia cites media reports and suggests that a "masked law enforcement officer may have criminally assaulted a Virginian" on August 10. Mot. 22. This incident was not before the district court when it issued the injunction. In any event, Virginia does not even claim that it is investigating this incident or that it has attempted to learn the officer's identity, let alone described how the injunction has hindered any investigation of this incident. As to Virginia's contention that masking and withholding identification supposedly impede oversight and risk unlawful impersonation, *id.*, Virginia develops no meaningful argument concerning these assertions, which in any event would not be a basis for allowing Virginia to enforce an unconstitutional law.

the express constitutional prescription of the Supremacy Clause" (citations and quotation marks omitted)). Virginia has conceded as much. *See* Dkt. No. 91 at 33 ("[A] violation of the Supremacy Clause would, if proved, constitute irreparable injury." (footnote omitted)); Mot. 25 (Virginia not disputing in this Court "that a proven Supremacy Clause violation would be irreparable injury.").

**b.** That is not all. Because the United States will not comply with the challenged provisions, federal officers face a credible threat of prosecution. That independently qualifies as irreparable harm. *See Georgia Latino All. for Hum. Rts. v. Governor of Georgia*, 691 F.3d 1250, 1269 (11th Cir. 2012). In addition, it is difficult to imagine a more obvious sovereign irreparable harm than a state criminally prosecuting federal officials based on a policy disagreement with the federal government about how the federal government conducts law enforcement operations.

**c.** Finally, although not necessary for this Court to deny a stay, the district court correctly credited the United States' declarations establishing that personal-identity protections are necessary to protect the safety of federal officers. As ICE's declarant explained, "immigration activists and other members of the public, routinely photograph, film, and publish online ICE [Enforcement and Removal Operations] enforcement actions to include the personal identities of ICE officers and other federal task force personnel," they do so "for the sole purpose of

intimidating and harassing government employees," and those personal identities "are directly used by members of local organized crime and transnational criminal organizations in serious and potentially deadly ways." Dkt. No. 9-1 ¶ 34. Those opposed to enforcement of immigration laws also regularly take pictures of ICE officers' faces, run them through facial recognition software, locate the homes of the agents, and post personally identifiable information to anti-ICE websites to facilitate further harassment. *Id.* ¶ 40. The Department of Homeland Security has also "obtained credible intelligence indicating that Mexican criminals, in coordination with domestic extremist groups, have placed targeted bounties for the murders of ICE and CBP personnel in a tiered bounty system," with $2,000 offered for "gathering intelligence or doxxing" agents, "$5,000–$10,000 for kidnapping or non-lethal assaults on standard ICE/CBP officers/agents," and "up to $50,000 for the assassination of high-ranking officials." *Id.* ¶ 37.

These threats, harassment, and other dangers are not limited to ICE. *See* Dkt. No. 9-2 ¶ 16 (DEA declarant providing example of the image of a DEA Special Agent was posted on the social network BlueSky, with a caption "[t]rying to identify any of these FBI, Homeland Security, and [Bureau of Alcohol, Tobacco, Firearms and Explosives] goons who invaded a Minneapolis community to kidnap and terrorize its members" followed by another BlueSky user identifying the agent by name and title (quotation marks omitted)); Dkt. No. 9-3 ¶ 13 (explaining that "FBI

Special Agents around the country have been targeted for harm, including harassment, assault, and murder"); Dkt. No. 9-4 ¶ 9 (CBP declarant providing numerous examples of threats and harassment directed at CBP agents).

Virginia's response is feeble. It contends that its statute accounts for doxxing and related concerns by supposedly allowing officers to display unique identifiers rather than their names. Mot. 24. But even if that is true, the facial-covering ban still facilitates identification of individual officers (and as noted above, activists have in fact used facial recognition software to identify, harass, and threaten federal officers). Virginia also touts the statute's exceptions. But putting aside that those exceptions are left to individual Commonwealth Attorneys to interpret, none of those exceptions—covering things like tactical operations, physical hazards, and undercover and surveillance work—is remotely coextensive with the concerns set forth above.

Finally on this point, Virginia invokes a declaration it submitted in the district court. Mot. 22-23. The court explained in painstaking detail why that declaration was conclusory, not responsive to the United States' submissions, and otherwise unhelpful. Dkt. No. 91 at 16-20. Among other defects, that declaration did not in any meaningful sense "refute the substance of the declarations offered by the United States that show increase in doxxing, threats, assaults, or the bounty system." *Id.* at 17.

**3.** The Ninth Circuit concluded that the United States was entitled to an injunction pending appeal against California's law, and its reasoning *a fortiori* supports the more modest conclusion that Virginia's request for a stay should be denied because the balance of equities and the public interest favor the United States. Because the challenged laws are invalid, they are not in the public interest. *See California*, 173 F.4th at 1069. And by seeking to directly regulate the United States and criminally prosecute its officials based on the performance of their official duties, Virginia has set up a direct conflict between state and federal authority. The public interest—and rule of law—support the district court's injunction against Virginia's unconstitutional law before Virginia escalates the situation further. That is particularly so here, where a stay pending appeal would disrupt rather than maintain the status quo. Dkt. No. 91 at 39 ("Here, the status quo is no Mask/Identity Law.").

## CONCLUSION

The Court should deny Virginia's motion for a stay pending appeal.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. MCARTHUR
*Deputy Assistant Attorney General*

MARK R. FREEMAN
DANIEL TENNY

*/s/ Andrew M. Bernie*
ANDREW BERNIE
*Attorneys, Appellate Staff*
*Civil Division*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-3511*
*andrew.bernie@usdoj.gov*

AUGUST 2026

## CERTIFICATE OF COMPLIANCE

This response complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,183 words. This response also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in 14-point Times New Roman font.

*/s/Andrew M. Bernie*
ANDREW M. BERNIE