**No. 26-1874**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FOURTH CIRCUIT**

---

THE UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

THE COMMONWEALTH OF VIRGINIA; JAY JONES, in his official capacity as Attorney General of Virginia,

Defendants-Appellants.

---

On Appeal from the United States District Court
for the Eastern District of Virginia

---

# BRIEF FOR UNITED STATES

---


BRETT A. SHUMATE
*Assistant Attorney General*

MEGAN LACY OWEN
*Principal Deputy Assistant Attorney General*

MARK R. FREEMAN
DANIEL TENNY
ANDREW M. BERNIE
*Attorneys, Appellate Staff*
*Civil Division*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-3511*

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................ 1

STATEMENT OF JURISDICTION........................................................................ 3

STATEMENT OF THE ISSUE ........................................................................... 3

STATEMENT OF THE CASE ............................................................................ 4

A. Statutory Background ........................................................................ 4

B. Factual Background ........................................................................... 7

SUMMARY OF ARGUMENT ........................................................................... 8

STANDARD OF REVIEW ............................................................................. 11

ARGUMENT ............................................................................................. 11

I. The district court correctly held that the United States is likely to prevail on the merits.. ............................................................................ 12

A. The Mask/ID Law directly regulates the United States in violation of the intergovernmental immunity doctrine. ..................... 12

B. Virginia's contrary arguments are incorrect.. .................................. 17

II. The other injunction factors strongly favor the government ........................ 35

CONCLUSION ........................................................................................... 46

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Abbott v. Perez*,
585 U.S. 579–03 (2018) .................................................................... 42-43

*Arizona v. California*,
283 U.S. 423 (1931) ........................................................................... 13

*Colorado v. Symes*,
286 U.S. 510 (1932) ........................................................................... 22

*DHS v. Texas*,
144 S. Ct. 715 (2024) ......................................................................... 27

*Georgia Latino All. for Hum. Rts. v. Governor of Ga.*,
691 F.3d 1250 (11th Cir. 2012) .......................................................... 36

*Goodyear Atomic Corp. v. Miller*,
486 U.S. 174 (1988) ........................................................................... 12

*Graves v. New York ex rel. O'Keefe*,
306 U.S. 466 (1939) ...................................................................... 19, 22

*Hancock v. Train*,
426 U.S. 167 (1976) ........................................................................... 12

*Johnson v. Maryland*,
254 U.S. 51 (1920) ........................................................ 9, 12, 23, 24, 25, 27

*Mayo v. United States*,
319 U.S. 441 (1943) ........................................................... 1, 12, 13, 20

*McCulloch v. Maryland*,
17 U.S. (4 Wheat.) 316 (1819) .......................................................... 12

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*,
915 F.3d 197 (4th Cir. 2019) ............................................................. 11

*Neagle, In re*,
135 U.S. 1 (1890) ............................................................................... 13

*New Orleans Pub. Serv., Inc. v. Council of New Orleans*,
491 U.S. 350 (1989) ........................................................................... 35

*North Carolina v. Ivory*,
906 F.2d 999 (4th Cir. 1990) .......................................................................... 25

*North Dakota v. United States*,
495 U.S. 423 (1990) ........................................................................... 12, 14

*Northern Va. Hemp & Agric., LLC v. Virginia*,
125 F.4th 472 (4th Cir. 2025) ........................................................................ 11

*Tennessee v. Davis*,
100 U.S. 257 (1879) ................................................................................ 21

*Texas v. DHS*,
123 F.4th 186 (5th Cir. 2024) ................................................................. 26, 27

*United States v. California*:
173 F.4th 1060 (9th Cir. 2026) ......................... 13, 15, 16, 17, 19, 29, 32, 44, 45
819 F. Supp. 3d 1109 (C.D. Cal. 2026) ............................................................ 15

*United States v. City of Arcata*,
629 F.3d 986 (9th Cir. 2010) ............................................................... 13, 31

*United States v. City of Philadelphia*, --- F. Supp. 3d ----,
No. 26-4208, 2026 WL 1906075 (E.D. Pa. July 2, 2026) ................................ 15

*United States v. New York,*
No. 26-CV-1360, 2026 WL 2225423 (N.D.N.Y. Aug. 3, 2026) ....................... 15

*Winter v. Natural Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ................................................................................... 11

**Statutes:**

28 U.S.C. § 1292(a)(1) ........................................................................ 3

28 U.S.C. § 1331 ..................................................................................... 3

28 U.S.C. § 1345 ..................................................................................... 3

Va. Code § 1-214 ..................................................................................... 4

Va. Code § 9.1-102(75) ............................................................................ 6

Va. Code § 15.2-1627(B) .......................................................................... 6

Va. Code. § 18.2-422 ....................................................................................28

Va. Code § 19.2-83.6:2 .................................................................................. 4

Va. Code § 19.2-83.6:2(A) ......................................................................... 4, 5

Va. Code § 19.2-83.6:2(B) ........................................................................ 4, 14

Va. Code § 19.2-83.6:2(C)..............................................................................14

Va. Code § 19.2-83.6:2(C)(1)-(7) .....................................................................5

Va. Code § 19.2-83.6:2(C)(8) ..........................................................................5

Va. Code § 19.2-83.6:2(D) .........................................................................5, 14

Va. Code § 19.2-83.6:2(E)................................................................................6

**Regulation:**

8 C.F.R. § 287.8(c)(2)(iii) ....................................................................... 40, 44

**Rule:**

Fed. R. App. P. 12.1 ...................................................................................... 34

**Legislative Material:**

2026 Special Session I Budget Amendments - HB30 (Governor's Recommendations) (June 6, 2026), https://perma.cc/9WR7-47RE ..................... 6

**Other Authorities:**

Governor of Va.: Abigail D. Spanberger, *Governor Spanberger Acts on Legislation, Responds to Increased, Aggressive Federal Immigration Enforcement with Executive Order* (May 20, 2026), https://perma.cc/Y2Z3-WF5C ...........................................................................29

*Regulate*, Black's Law Dictionary (12th ed. 2024) ............................................ 14

U.S. Postal Serv., Employee & Labor Relations Manual § 831.332(c) ..................25

## INTRODUCTION

For more than 200 years, the Supreme Court has repeatedly held that, absent express congressional authorization, states have no authority to directly regulate the federal government. Without such authorization, "the activities of the Federal Government are free from regulation by any state." *Mayo v. United States*, 319 U.S. 441, 445 (1943). That prohibition applies without exception, and is not subject to balancing tests, burden analysis, or any other qualification. *See id.* ("No other adjustment of competing enactments or legal principles is possible."). This principle is so clear and has been emphatically stated so many times that most modern intergovernmental-immunity cases involve federal contractors and other non-federal parties, since the prohibition against regulation of the federal government itself is so well-established.

This case involves a straightforward application of that principle. Virginia passed a statute that purports to prohibit "any fulltime or part-time employee of a federal law-enforcement agency," while "engaged in the performance of his official duties," from wearing a facial covering, require such federal officers (also while "engaged in the performance of his official duties") to visibly display identification, set forth a comprehensive list of exceptions, and subject federal officers who do not comply to criminal penalties. Virginia is free to impose these requirements on its own officials. But it has no authority to impose them on federal officials.

The district court thus correctly granted a preliminary injunction prohibiting Virginia from enforcing these requirements against federal officers, employees, and agencies involved in federal immigration enforcement. In just the last few months, a unanimous Ninth Circuit panel reached the same conclusion as the district court here in a challenge to a materially identical California statute, as did district courts in New York and Pennsylvania. Those decisions are plainly correct, and so is the district court's decision here.

Virginia insists that its law is permissible because it "regulates one thing: whether and how an officer who exercises coercive authority in public conceals or displays his identity," and because it purportedly "regulates" only "the public-facing manner of an encounter." Opening Br. 31-32. Even assuming those characterizations are correct, there is no narrow, single-subject, or "public-facing" exception to the prohibition against state regulation of the federal government.

As the district court concluded, the other preliminary injunction factors favor the federal government as well. Any regulation that violates the Supremacy Clause causes irreparable harm to the United States—especially an attempt by a State to impose regulations, backed by criminal penalties, on how the United States conducts law enforcement operations. Indeed, Virginia conceded in district court that a violation of the Supremacy Clause would establish irreparable injury. And although that is itself sufficient, the United States also explained in thorough declarations the

hostile circumstances that can require protection of the personal identity of law enforcement. In particular, the record reflects severe, persistent threats to federal agents that necessitate existing personal-identity protections, including bounties placed on federal officials by Mexican criminals and doxxing of federal agents. And it is wholly untenable to allow a State to threaten arrest and criminal prosecution of federal officials based on a policy disagreement with the federal government about how those officials should perform their federal duties.

This Court should affirm.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1345 because this case arises under federal law and because the United States is the plaintiff. The district court issued its order granting a preliminary injunction on June 30, 2026, and a memorandum opinion on July 2, 2026. JA7-8. Virginia timely appealed on July 6, 2026. JA410. This Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUE

1. Whether the district court correctly held that the United States is likely to succeed in its contention that the challenged Virginia statute—which purports to prohibit federal officers from wearing a facial covering and requires such federal officers to visibly display identification "while such law-enforcement officer is engaged in the performance of his official duties," subject to exceptions specified by

the State and backed by criminal penalties—directly regulates the United States in violation of the Supremacy Clause and the intergovernmental-immunity doctrine.

2. Whether the district court acted within its discretion in weighing the equitable requirements for injunctive relief and granting an injunction.

## STATEMENT OF THE CASE

### A. Statutory Background

On May 20, 2026, Governor Spanberger signed Senate Bill 352, which added a new section to the Virginia Code, § 19.2-83.6:2, *Prohibition on wearing of facial coverings; penalty* (Mask/ID Law or Law). The Mask/ID Law, which was scheduled to take effect on July 1, 2026, *see* Va. Code § 1-214, defines "law-enforcement officer" to include "any full-time or part-time employee of a federal law-enforcement agency," *id.* § 19.2-83.6:2(A). And it provides that "no law-enforcement officer shall wear a facial covering that conceals, obscures, or otherwise covers his face while such law-enforcement officer is engaged in the performance of his official duties." *Id.* § 19.2-83.6:2(B). As Governor Spanberger stated in signing it (and Virginia has not disputed in this case), the Law flows from Virginia's disagreement with federal immigration enforcement practices. *See infra* p. 29.

The Mask/ID Law contains exceptions related to health and safety, such as face coverings to protect against diseases, toxins, gas, smoke, severe weather conditions, helmets, protective eyewear, or tactical team (Special Weapons and

Tactics (SWAT)) facial coverings. Va. Code § 19.2-83.6:2(C)(1)-(7). Another exception relates to "a law-enforcement officer who is assigned to an undercover, drug, gang, or surveillance unit where the protection of such law-enforcement officer's identity is necessary as determined by the law-enforcement agency overseeing such unit or other responsible law-enforcement agency." *Id.* § 19.2-83.6:2(C)(8). Virginia has urged that this exception applies to federal officials, although the statutory text suggests otherwise. *See id.* § 19.2-83.6:2(A) (seemingly defining "law-enforcement agency," unlike the definition of "law-enforcement officer," as limited to state and local agencies); JA19-20 (district court noting that, contrary to Virginia's representation, this exception does not appear to apply to federal officials). Since the injunction must be affirmed regardless of this issue, we do not discuss it further.

A separate provision of the law provides that "a law-enforcement officer, while engaged in the performance of his official duties, shall visibly display (i) a badge or insignia bearing such law-enforcement officer's name or other individual identifier unique to that particular law-enforcement officer and (ii) the name of the law-enforcement agency that employs such law-enforcement officer." Va. Code § 19.2-83.6:2(D). Virginia notes that there are several exceptions to the identification requirement but—as Virginia acknowledges—those exceptions are effective only through June 30, 2028. Opening Br. 13. The original version of the

statute contained no exceptions to the identification requirement but, at Governor Spanberger's request on June 26,[1] the exceptions were added by the legislature, apparently on June 29, *see* Opening Br. 13—one day before the district court issued its injunction and three days before it issued its memorandum opinion explaining the injunction. The court did not address these new exemptions, which were not brought to its attention but, as discussed below, they do not affect the court's analysis or our arguments on appeal.

Violation of the Mask/ID Law constitutes "a Class 1 misdemeanor unless the law-enforcement agency that employs such law-enforcement officer has adopted and established a written policy for the use of facial coverings, using as guidance the model policy established by the Department of Criminal Justice Services under § 9.1-102." Va. Code § 19.2-83.6:2(E). Assuming that this provision applies to federal agencies, it would be available only if federal agencies establish a written policy that parrots the specific prohibition and exceptions set forth in Virginia's statute, *id.* § 9.1-102(75), which no federal agency has done. Each Commonwealth Attorney can enforce the law. *Id.* § 15.2-1627(B).

---

[1] *See* 2026 Special Session I Budget Amendments - HB30 (Governor's Recommendations) (June 6, 2026), https://perma.cc/9WR7-47RE.

### B. Factual Background

The United States brought this suit on June 11, 2026, and, on June 17, moved for a preliminary injunction against the provisions discussed above as applied to the federal government. Following briefing and oral argument, the district court issued a preliminary injunction on June 30, and a memorandum opinion on July 2.[2] JA14-16 (injunction), JA17-56 (memorandum opinion).

The district court concluded that the Mask/ID Law violates principles of intergovernmental immunity, because it "requires that federal law enforcement officers satisfy additional requirements . . . which are not required under federal law, and which the federal authorities specifically say they need not meet." JA43. The court rejected Virginia's contention that the statute was a generally applicable law, noting that the statute refers specifically to law enforcement officers and regulates an activity—law enforcement—in which ordinary citizens cannot engage. JA45.

The district court concluded that the United States had demonstrated irreparable harm warranting an injunction because "[i]t seems rather clear that being subjected to a state law that regulates an activity that is constitutionally delegated to the federal government is an infringement of the Supremacy Clause that constitutes

[2] Following the injunction, the Virginia Code Commission renumbered the challenged law and, with this Court's permission, the district court modified the preliminary injunction to refer to the correctly numbered statute. We cite the injunction and memorandum as modified.

an irreparable injury," a proposition that Virginia conceded at oral argument. JA49. Although that was itself sufficient, the court also examined in detail, and credited, the United States' declarations concerning the safety issues necessitating personal-identity protections, including doxxing, threats and assaults against federal agents, intelligence showing that cartels have placed targeted bounties on federal agents, and specific examples of harassment of Immigration and Customs Enforcement (ICE), Drug Enforcement Administration (DEA), Federal Bureau of Investigation (FBI), and U.S. Customs and Border Protection (CBP) officials. JA50-53. The court further concluded that the balance of the equities and public interest supported an injunction. JA55.

The district court denied Virginia's motion for a stay pending appeal. JA427. A divided motions panel denied Virginia's motion for a stay pending appeal in this Court. Dkt. No. 21.

## SUMMARY OF ARGUMENT

I. The district court correctly held that the United States is likely to succeed on the merits.

A. The Supreme Court for more than two centuries has repeatedly stated that, absent express Congressional authorization, states have no authority to directly regulate the federal government. This is an absolute rule, unqualified by burden analysis, balancing tests, and other case-specific factors. Under that settled

framework, the Mask/ID Law is invalid as applied to the federal government, its agencies, and its officers. The Law regulates the United States directly—it prohibits federal officers from wearing facial coverings and requires them to display identification when conducting law-enforcement activities, sets forth the required contents of that identification, prescribes a purportedly exhaustive list of exceptions to that requirement of the State's choosing, and backs those requirements with criminal penalties. The Mask/ID Law thus purports to regulate federal officers' performance of a federal function. And no one claims that Congress has expressly authorized the statute at issue here.

B. Virginia's contrary arguments do not withstand scrutiny. Virginia emphasizes what it sees as the narrow subjects of its regulation, but States are not permitted to regulate the federal government, whether that regulation is broad or narrow. And although Virginia denies that its regulation is "direct," *any* regulation that operates on the United States itself necessarily is direct, and regulation of federal officers' performance of federal functions is a regulation of the United States. Virginia also relies heavily on dicta from a 1920 case in which the Supreme Court stated that States *might* have authority to apply "general rules that might affect incidentally the mode of carrying out the employment" to the federal government. *Johnson v. Maryland*, 254 U.S. 51, 56 (1920). But the holding of that case was that States could not require postal drivers to obtain a driver's license, and it is the

holding, and not the tentative dictum, that controls here. And even that tentative dictum lends no support to Virginia's law here.

II. The remaining preliminary-injunction factors overwhelmingly favor the United States. Irreparable harm necessarily follows when a plaintiff demonstrates a constitutional violation—and from a Supremacy Clause violation specifically—and Virginia conceded in district court that a violation of the Supremacy Clause would establish irreparable harm. The irreparable harm is particularly acute here, where Virginia asserts a right to arrest and prosecute federal officials based on Virginia's policy disagreements with how they perform their official duties—and where, as the district court held (and Virginia does not dispute), federal officials face a credible threat of prosecution. Although this is itself sufficient, the United States also submitted detailed declarations from four different law enforcement agencies explaining persistent violence, threats, and similar hostile acts to federal officers that necessitate existing personal-identity protections, as well as operational considerations that under various circumstances require federal officials to conceal their name and affiliation with federal law enforcement.

There is no need to consider Virginia's asserted countervailing interests, since no interest of the State could possibly justify allowing its facially invalid law to go into effect. In any event, Virginia's asserted interests in enforcing that law against the federal government are at best marginal. Indeed, apart from gesturing vaguely to

purported "public safety" and "accountability" interests that it makes virtually no effort to explain, Virginia's claimed irreparable harm reduces almost entirely to a generalized interest in enforcing its laws. That asserted interest is entitled to no weight given the district court's correct conclusion that the law is invalid—and certainly does not outweigh the United States' interest in remaining free of unlawful state regulation.

## STANDARD OF REVIEW

This Court reviews the district court's ultimate decision to grant an injunction for abuse of discretion, *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 213 (4th Cir. 2019), though questions of law are reviewed de novo, *Northern Va. Hemp & Agric., LLC v. Virginia*, 125 F.4th 472, 489 (4th Cir. 2025).

## ARGUMENT

"A plaintiff seeking a preliminary injunction must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). As the district court correctly concluded, all of those factors support the United States here.

## I. The district court correctly held that the United States is likely to prevail on the merits.

### A. The Mask/ID Law directly regulates the United States in violation of the intergovernmental immunity doctrine.

The Supreme Court has long held that "the activities of the Federal Government are free from regulation by any state." *Mayo v. United States*, 319 U.S. 441, 445 (1943). States "have no power" to "in any manner control[] the operations of the constitutional laws enacted by Congress to carry into execution the powers vested in the general government." *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 317, 436 (1819). This prohibition on direct state regulation has been repeated by the Supreme Court time and time again. *See, e.g.*, *North Dakota v. United States*, 495 U.S. 423, 435 (1990) (state law invalid "if it regulates the United States directly"); *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 180 (1988) ("It is well settled that the activities of federal installations are shielded by the Supremacy Clause from direct state regulation unless Congress provides 'clear and unambiguous' authorization for such regulation."); *Hancock v. Train*, 426 U.S. 167, 179 (1976) (stating that "where Congress does not affirmatively declare its instrumentalities or property subject to regulation, the federal function must be left free of regulation" (quotation marks omitted)). Thus, Maryland could not tax the Bank of the United States, *McCulloch*, or enforce its driver's-license laws against federal postal workers delivering mail, *Johnson v. Maryland*, 254 U.S. 51 (1920), California could not

prosecute a Deputy U.S. Marshal for his actions protecting a Supreme Court Justice, *In re Neagle*, 135 U.S. 1, 75 (1890), and Arizona could not superimpose its own approval process on a congressionally authorized dam construction project, *Arizona v. California*, 283 U.S. 423 (1931).

Those cases establish that this prohibition is absolute unless Congress expressly authorizes the relevant state regulation (something no one contends Congress has done here). Courts cannot apply balancing tests or ask how great the intrusions on federal operations are; "[n]o other adjustment of competing enactments or legal principles is possible." *Mayo*, 319 U.S. at 445; *see also United States v. California*, 173 F.4th 1060, 1067 (9th Cir. 2026). States cannot control federal operations even if state regulation would not meaningfully impair federal functions—and indeed, as the Ninth Circuit has held, even if it would simply replicate federal requirements. *See United States v. City of Arcata*, 629 F.3d 986, 991-92 (9th Cir. 2010) ("A state or local law that directly regulates the conduct of the federal government or discriminates against it is invalid, even if it is no more restrictive than federal law."). Simply put, "[t]he United States may perform its functions without conforming to the police regulations of a state." *Arizona*, 283 U.S. at 451.

That settled framework makes this the easiest of cases. There can be no serious dispute that the Mask/ID Law, which imposes requirements and prohibitions on

federal officers while performing "official duties," Va. Code § 19.2-83.6:2(B), (D), directly regulates the federal government. *See Regulate*, Black's Law Dictionary (12th ed. 2024) (defining "regulate" as "[t]o control (an activity or process) esp. through the implementation of rules"). In particular, the law purports to prohibit the wearing of a facial covering, Va. Code § 19.2-83.6:2(B), and likewise purports to require federal law enforcement officers to display identification, *id.* § 19.2-83.6:2(D), dictates the content of that identification, and sets forth what purports to be a comprehensive list of exceptions, *id.* § 19.2-83.6:2(C).

And that regulation is "direct." It applies to federal officers engaged in the performance of federal functions, not merely to third parties who interface with the federal government. *Cf. North Dakota*, 495 U.S. at 436-37 ("There is no claim in this case, nor could there be, that North Dakota regulates the Federal Government directly. Both the reporting requirement and the labeling regulation operate against suppliers, not the Government . . . ." (citations omitted)).

It should thus come as little surprise that, over the last several months, other courts have concluded that materially identical laws are invalid. As noted, a unanimous Ninth Circuit panel held as a matter of law in *California*, in a published opinion, that California's similar identification requirements violated the intergovernmental immunity doctrine because the law "directly regulates inherently governmental conduct of federal officers carrying out their duties *under federal*

*authority*." *California*, 173 F.4th at 1068. The Northern District of New York reached the same conclusion in enjoining New York's similar statute purporting to bar federal officers from wearing facial coverings and requiring them to display identification. *United States v. New York*, No. 26-CV-1360, 2026 WL 2225423, at *5-12 (N.D.N.Y. Aug. 3, 2026). The Eastern District of Pennsylvania enjoined a Philadelphia ordinance purporting to impose similar masking prohibitions and identification requirements. *United States v. City of Philadelphia*, --- F. Supp. 3d ---, No. 26-4208, 2026 WL 1906075, at *8-11 (E.D. Pa. July 2, 2026).

Virginia stresses the Central District of California's decision denying a preliminary injunction as to California's identification requirements while granting an injunction against a facial covering ban solely because that provision discriminated against federal officials. Opening Br. 38-39. But in reaching these conclusions, the Central District of California applied "a functional approach" in deciding whether the regulations at issue "interfer[e] with or control[] the operations of the Federal Government." *United States v. California*, 819 F. Supp. 3d 1109, 1117-18, 1126-30 (C.D. Cal. 2026) (alterations in original) (quotation marks omitted). The Ninth Circuit expressly and correctly rejected the Central District of California's "functional" approach analysis, finding that the district court "asked the wrong question." *California*, 173 F.4th at 1068. The Ninth Circuit correctly noted that "[b]y looking to the degree [the challenged law] interfered with the activities of

the United States, the district court applied a standard pertaining to States' regulation of federal contractors and third-party employers, not the standard applicable to direct regulation of governmental activities of the United States." *Id.*

Virginia emphasizes that the Ninth Circuit did not determine the legality of California's separate facial covering ban—because the district court in that case enjoined it as discriminatory. Opening Br. 38-39. That does nothing to justify Virginia's identification requirement. Regardless, the basis for the Ninth Circuit's conclusion is plainly correct and applies equally to a facial-covering ban. Among that Court's correct observations:

- "[t]he Supremacy Clause prohibits States from enacting a law that directly regulates federal operations even if the law regulates state operations in the same manner"
- there is no "de minimis exception to the doctrine of intergovernmental immunity"
- a direct regulation is invalid "even if it is no more restrictive than federal law"
- Such a regulation "is void irrespective of whether the regulated activities are essential to federal functions or operations, and irrespective of the degree to which the state law interferes with federal functions or operations,"

173 F.4th at 1067 (quotation marks omitted). Indeed, although Virginia notes that California's facial-covering ban was not before the Ninth Circuit—again, only because the district court granted an injunction, and the United States could not have appealed an order granting it the relief it sought—it provides no meaningful explanation of how the Ninth Circuit's analysis would apply any differently to such a ban. And as other district courts in addition to the district court in this case have correctly held, that analysis applies with equal force to the Virginia facial-covering ban at issue. The entirety of the Mask/ID Law is a "direct regulation that regulates the government *qua* government; it controls how the government conducts specifically governmental functions." *Id.*

### B. Virginia's contrary arguments are incorrect.

Virginia's arguments in defense of the Mask/ID Law are wrong.

**1.** Virginia downplays the extent of the Law, stating that it "regulates only the manner in which covered officers present themselves to the public," Opening Br. 7, regulates "only the public-facing manner in which officers conceal or display their identities," Opening Br. 19, and only "regulates one thing," Opening Br. 32. But there is no narrow or single-subject exception to the prohibition against state regulation; the driver's license requirement in *Johnson* was arguably a narrow and single-subject regulation. As to Virginia's claim that it regulates "the public-facing manner of an encounter, not the federal function," Opening Br. 31, this is also a

contrived distinction. The federal government does many public-facing things, and that does not grant every state carte blanch to regulate such functions. One could just as easily claim that the challenged ordinance in *Arcata*—which purported to prohibit the federal government from recruiting minors to join the military but left actual military operations entirely untouched—regulated only the "public-facing manner" in which military recruiters "present[ed]" themselves to minors. Or, one could say the same thing about a state law directing that federal immigration officers wear pink uniforms, or interact with individuals only in certain types of vehicles. Virginia is not permitted to do any of these things—and it is not permitted to do this either.

Virginia also relatedly emphasizes the things its law does *not* do, declaring that "[n]othing in the law regulates whom an officer may stop or arrest, what force he may use, or how he is trained or deployed." Opening Br. 13; *see also* Opening Br. 19 (listing other things law does not do). It should go without saying that Virginia is not entitled to regulate the federal government on some subjects simply because it does not purport to regulate the federal government on other subjects.

**2.** More broadly, Virginia's contention appears to be that whether a regulation counts as "direct" depends on *what* it regulates. Virginia contends that "[a] direct regulation is one that controls the federal function, that selects federal personnel, imposes qualifications for federal work, requires federal officers to obtain a state license or permission, or gives a state official authority to override a substantive

federal decision." Opening Br. 31. Initially, Virginia fails to sufficiently explain why it should prevail even under that test. The Law here "controls the federal function of law enforcement"; it purports to instruct federal officers to conduct their law-enforcement activities in conformity with Virginia's dictates. And it overrides a substantive federal decision—"[i]t purports to override the federal government's power to determine whether, how, and when to publicly identify its officers." *California*, 173 F.4th at 1067.

In any event, this Court need not consider how Virginia's byzantine standard would apply here, because that standard is entirely manufactured. As the term "direct" suggests, a state law directly regulates the United States if it regulates the United States itself—as opposed to federal contractors or other third parties who do business with the federal government, or federal employees in ways that do not involve their performance of federal functions (such as, for example, state income taxes on the earnings of federal employees, *see Graves v. New York ex rel. O'Keefe*, 306 U.S. 466, 486-87 (1939)). As the Ninth Circuit explained in *California*, "a direct regulation regulates the government *qua* government; it controls how the government conducts specifically governmental functions." 173 F.4th at 1067. Similarly, here, the Mask/ID Law is a direct regulation because it imposes conditions and prohibitions on performance of a governmental function (law enforcement). It thus regulates the performance of "governmental action[s]" which are "carried on

by the United States itself." *Mayo*, 319 U.S. at 448. And the Supreme Court would not have repeatedly announced a per se rule against direct state regulation if what it had in mind was fact-bound inquiries in every case about the type of state regulation at issue.

**3.** Virginia repeatedly frames its defense of the Mask/ID Law by asserting in various ways that it has authority to apply its laws to federal employees. Opening Br. 22 (asserting that Virginia has authority to apply "neutral rules that only affect how federal employees do their work"); *id.* (asserting that "a neutral rule governing the manner of an officer's public conduct"); Opening Br. 24 (asserting that "general state rules that federal employees must follow while doing their jobs and that merely affect the manner in which the work is performed" are permissible); Opening Br. 27 (contending that it may "regulate[] the manner of conduct" so long as it does not "control[] its substance"); *id.* (asserting that it may tell a federal "driver how to drive" so long as it does not tell him "whether he may drive or where he may go").

These formulations are extremely general, some of them are quite broad, and they would collectively be impossible to apply. Under these various formulations, could Virginia, for example, prohibit federal law enforcement officers from driving certain types of vehicles? What about directing them to perform certain law enforcement activities by foot or on horseback? Or restricting use of K9 teams? These and countless other hypothetical state regulations would at least arguably not

control the "substance" of federal work. What about state laws purporting to prescribe the conditions under which federal officers and others may carry their weapons? The conditions under which they may draw their weapons? Would these hypothetical regulations constitute "state control of the federal function" or "neutral rules that only affect how federal employees do their work"? Opening Br. 22. Would the answer to these questions depend on a court's assessment of the reasonableness of these conditions, or the existence and scope of any exceptions?

Thankfully, there is no reason to ponder these questions because none of this represents the law. The Federal Government "can act only through its officers and agents, and they must act within the States." *Tennessee v. Davis*, 100 U.S. 257, 263 (1879). So, the notion that states have authority to regulate "how federal employees do their work," Opening Br. 22, is incorrect. A regulation of how federal officers perform their federal responsibilities *is* a regulation of the United States.

Virginia highlights its inability to articulate any workable standard—much less a standard that has any precedential support—by describing the relevant inquiry as "whether the challenged state rule takes control of a federal function or instead regulates conduct that occurs while federal employees perform their work." Opening Br. 26-27. Instructing federal employees what conduct is permitted while they perform their work is a way of taking control of a federal function.

Virginia of course is right that the Supremacy Clause "does not cloak federal employees in general immunity from state law." Opening Br. 7. But that simply means that states may impose their general regulations on federal employees where that regulation does not amount to a regulation of the United States itself. As noted above, federal employees are subject to state-income tax laws because application of such tax laws does not regulate the federal government. *See Graves*, 306 U.S. at 486-87. Similarly, certain applications of other general state laws to federal employees may be permissible if such applications do not operate as a regulation of federal activities. For example, states may apply their general criminal statutes, such as state murder statutes, to federal officers where the officer was acting on his own rather than as part of his federal responsibilities. *Colorado v. Symes*, 286 U.S. 510 (1932). For a federal officer to obtain immunity from state prosecution under these circumstances, "[i]t must appear that the prosecution has arisen out of the acts done by him under color of federal authority and in enforcement of federal law, and he must by direct averment exclude the possibility that it was based on acts or conduct of his, not justified by his federal duty." *Id.* at 519 (alterations and quotation marks omitted).

The absence of cases upholding comparable state regulations only underscores that Virginia's position is untenable. Virginia claims, again, that states (and localities) have broad authority to apply neutral rules "affect[ing] how federal

employees do their work" or regulate the "manner" of federal operations so long as the regulation does not affect its "substance" (whatever that means). Opening Br. 22, 27. If that were true, Virginia would presumably be able to point to many examples where courts have permitted states and localities to impose requirements and prohibitions governing how federal officers perform their federal responsibilities, over the federal government's objection. But Virginia cannot point to any such case, from any court (other than the decision from the Central District of California with which the Ninth Circuit disagreed on appeal).

**4.** That leaves Virginia's reliance on *Johnson*, a case it cites on the very first page of its brief and more than twenty times thereafter. In so doing, Virginia treats *Johnson* as if the Court upheld a state effort to regulate federal officials. But the holding of *Johnson* was the opposite. The Court held that a State may not require a Post Office employee to obtain a driver's license from the State. 254 U.S. at 55. As the Court explained, "the immunity of the instruments of the United States from state control in the performance of their duties extends" to a requirement to satisfy the state regarding their qualifications. *Id.* at 57. That Virginia thinks that *Johnson* is its *best* case highlights that there is no legal support for Virginia's position.

And indeed, this case is even easier than that one. Maryland simply sought there to require postal drivers to obtain a license that other drivers were required to obtain. After this one-time event, the State would exercise no further control over

how postal drivers performed their federal responsibilities. The Supreme Court held that *even that* was impermissible. And the Court took as a given "the immunity of the instruments of the United States from state control in the performance of their duties." *Johnson*, 254 U.S. at 57. Here, Virginia seeks precisely to assert control over federal officials by placing conditions and prohibitions on how they perform their federal duties.

Largely ignoring the holding of the principal case on which it relies, Virginia fixates on the Supreme Court's statement that "[i]t very well may be that, when the United States has not spoken, the subjection to local law would extend to general rules that might affect incidentally the mode of carrying out the employment—as, for instance, a statute or ordinance regulating the mode of turning at the corners of streets." *Johnson*, 254 U.S. at 56; *see* Opening Br. 18, 23, 26. But even before dissecting the meaning of "general rules that might affect incidentally the mode of carrying out the employment," there are at least three threshold problems.

First, this language in *Johnson* is dicta. Second, it is not even dicta that actually opined on anything, but rather merely stated that "[i]t very well may be" certain local laws could apply, explicitly leaving the question open. *Johnson*, 254 U.S. at 56. And third, the Supreme Court limited even that highly hedged dictum to situations "when the United States has not spoken." *Id.* Best read, this language thus likely simply reflects doubt on the part of the Supreme Court that the federal

government should be understood to have authorized its officials to violate traffic regulations or other similar generally applicable ordinances absent specific direction otherwise. *Johnson* itself, after all, involved a "general" rule; the state sought to enforce its law requiring postal drivers to obtain a driver's license and pay a small fee, requirements imposed on all commercial drivers. Yet the Supreme Court held that impermissible because it "require[d] qualifications in addition to those that the Government has pronounced sufficient." *Id.* at 57. And the Court there noted that "even the most unquestionable and most universally applicable of state laws"—including state murder laws—"will not be allowed to control the conduct of a marshal of the United States acting under and in pursuance of the laws of the United States." *Id.* at 56-57.

That reading of the *Johnson* dictum aligns with common sense and real-world practice. To the extent federal officers performing federal functions must follow, for example, state and local speeding ordinances, that is simply because the federal government generally instructs federal officials to follow local traffic law, *see, e.g.*, U.S. Postal Serv., Employee & Labor Relations Manual, § 831.332(c)—not because there is any widely accepted norm that states are permitted to enforce such laws against federal employees performing federal functions over the federal government's objection. And this reading is consistent with this Court's decision in *North Carolina v. Ivory*, 906 F.2d 999, 1001-02 (4th Cir. 1990), where a federal

officer who had been instructed to obey all local laws had "not alleged a defense of federal immunity" and thus was not entitled to remove his criminal prosecution to federal court.

By contrast, a state would not be permitted to, for example, apply its general speeding laws to federal officers chasing criminal suspects under circumstances where the federal government has directed that officers need not comply with such laws. Similarly, if a state prohibited cars with right-side drive, the better reading of *Johnson*'s dictum is that it could not enforce such a "general" rule against federal postal carriers if the United States objected.

Given all of these points, it is at best highly doubtful that this language in *Johnson* should even be read to recognize any additional state regulatory authority, at least insofar as federal employees performing federal functions have not been instructed by the federal government to follow local laws. Indeed, in the 106 years since *Johnson*, we have located no case from the Supreme Court or this Court relying on that decision to uphold any state regulation of federal officials' performance of their official duties.[3]

---

[3] The closest Virginia comes to identifying such a case is the Fifth Circuit's divided panel decision in *Texas v. DHS*, 123 F.4th 186 (5th Cir. 2024), holding that the Administrative Procedure Act (APA) waived sovereign immunity for a suit seeking to enjoin the government's cutting of concertina wire fence that Texas placed along its border with Mexico, based on state tort claims for conversion and trespass to chattels. That decision was incorrect—indeed, the Supreme Court vacated a previous

*Continued on next page.*

But even assuming for the sake of argument that the tentative *Johnson* dictum should in fact be treated as if it were a holding that states may enforce some general laws that incidentally affect federal operations against federal officers over the federal government's objection, Virginia would still not prevail. The Mask/ID Law is not general, and its effect is not incidental. It is not a "general" law such as (to take the example the Court gave in *Johnson*) "a statute or ordinance regulating the mode of turning at the corners of streets." *Johnson*, 254 U.S. at 56. Rather, it is a law specifically targeted at law enforcement, a uniquely governmental function.

---

injunction in that case the only time the issues were presented to that Court. *See DHS v. Texas*, 144 S. Ct. 715 (2024). In any event, it is easily distinguishable on multiple grounds and just underscores how extreme and boundless Virginia's position in this case is. For one, the divided panel's holding in that case was that Congress in the APA waived the United States' sovereign immunity for Texas's suit challenging federal agency action, the APA's definition of which expressly includes destruction of property. *Texas*, 123 F.4th at 199. Virginia, by contrast, does not claim that Congress has affirmatively authorized enforcement of its statute here in any respect. The Fifth Circuit's analysis also rested principally on its view that Texas was "seeking, not to 'regulate' Border Patrol, but only to safeguard its own property." *Id.* at 192, 205 ("Texas is acting as a proprietor, not a regulator."). That is not the case here because there is no property interest involved. And in addition, the Fifth Circuit's analysis rested heavily on its conclusion—based on a factual finding by the district court to which the Fifth Circuit deferred—that federal officials were not in fact enforcing federal law in cutting the concertina wire. *Id.* at 207 (stating that "agents were 'cutting multiple holes in the concertina wire for no apparent purpose other than to allow migrants easier entrance further inland'"). By contrast, no one disputes here that ICE and other federal agencies are in fact engaged in law enforcement in Virginia. And even if, as the Fifth Circuit mistakenly held, a state is allowed to apply the common-law tort of trespass to the federal government, that does not mean that the state can create a regulation specific to law enforcement and enforce it against the federal government.

Virginia attempts to suggest otherwise with regard to the facial-covering provision (but not the identification provision) by identifying a generally applicable restriction on wearing facial coverings for purposes of concealing identity, subject to certain exceptions. *See* Opening Br. 28 (citing Va. Code. § 18.2-422). But Virginia did not merely apply that general law to law-enforcement, but created a separate, differently worded law, with different exceptions, specific to law enforcement. That is by no means a general law. And the Mask/ID Law does not merely affect the carrying out of federal functions "incidentally"—*i.e.*, unintentionally or by chance. It is a law that applies only to law enforcement officials, and only in the performance of law enforcement functions.

There is relatedly no merit to Virginia's repeated criticism of the district court for applying an "ordinary citizen" test, asking whether the state is regulating conduct private individuals may perform. Opening Br. 1, 16, 18-19, 26-29. Virginia's central argument on appeal is that it is permitted to apply "general" rules to federal law enforcement officers performing federal functions. *See supra* pp. 23-27. As noted above, there is no such general exception of the sort Virginia posits to begin with—*Johnson*, if anything, demonstrates the opposite by holding that states may not apply their driver's-license laws to the federal government. But even if there were such an exception, it would apply at most to laws of general application that sweep in federal officers by happenstance (like a speed limit law), not a law that expressly and

intentionally applies to federal officers acting in the scope of their official duties, to an activity (law enforcement) that is reserved to sovereigns. Indeed, the Ninth Circuit itself observed as much, making the same observation the district court did. *California*, 173 F.4th at 1068 (noting that California's law could not be permissible under *Johnson* because it "does not regulate conduct that any ordinary citizen could perform").

It also bears mentioning that regulating the federal government was the entire purpose of the Law. As noted, the Law expressly applies to federal officers. In signing the Law, Governor Spanberger explained that she was "protect[ing] all Virginia residents from threats to their safety, security, and legal rights posed by increased and aggressive federal immigration enforcement actions."[4] In the district court, Virginia acknowledged that the Law was a response to federal practices with which Virginia disagrees, JA23, an acknowledgment it repeats in this Court, Opening Br. 34. Virginia protests (Opening Br. 35) that the direct-regulation test requires no analysis of purpose, such that the law's validity does not depend on the legislature's motives. That is certainly true on the *United States'* view of the relevant legal standard—direct regulation is direct regulation, states cannot directly regulate the federal government, and there are no exceptions to that prohibition. But it is

[4] *See* Governor of Va.: Abigail D. Spanberger, *Governor Spanberger Acts on Legislation, Responds to Increased, Aggressive Federal Immigration Enforcement with Executive Order* (May 20, 2026), https://perma.cc/Y2Z3-WF5C.

*Virginia*'s argument that this case involves a supposedly permissible "general" law that only "incidentally" applies to federal law enforcement—yet Virginia simultaneously claims that it makes no difference that the law expressly applies to federal officers and that the very purpose of the law was to regulate federal operations. That combination of arguments of course cannot be right.

Virginia fares no better in suggesting that its "General Assembly was concerned with both ICE enforcement practices and the possibility that state and local law enforcement might adopt [ICE's] behavior." Opening Br. 34. The application of a law to state law-enforcement officers might be relevant to a discrimination claim, but it has no relevance to direct regulation. And Virginia's insistence that its statute "reflects a legislative effort to balance" what it describes as its interests in "public recognition of lawful authority, accountability, and reducing confusion" "against officer safety," Opening Br. 52, is beside the point. Virginia is free to decide when its own officers conducting law enforcement must identify themselves and when its own officers may conceal their faces. But as to the federal government, these are simply not Virginia's decisions to make.

This argument is of a piece with Virginia's general effort to read the *Johnson* dictum so broadly as to permit any regulation of the federal government that is not discriminatory. Opening Br. 19 (decrying rule that "would exempt federal officers from every evenhanded rule governing conduct unique to police work simply

because ordinary citizens do not police"). That would replace the well-established framework governing intergovernmental immunity—under which *both* direct regulation of and discrimination against the federal government are proscribed—by eliminating the prohibition against direct regulation. There is no basis for Virginia to leverage a narrow hypothetical carve-out into a repudiation of a core principle of our federal system that has been recognized since *McCulloch v. Maryland* (including in the very case on which Virginia relies).

Relatedly, Virginia is mistaken to rely on the absence of a federal requirement to wear face coverings. Opening Br. 29. As Virginia properly points out, such a federal requirement would give rise to a claim of preemption, not of intergovernmental immunity. The relevant point is that the federal government has not instructed its officials to comply with state or local law in this area and thus has not consented to the state regulation at issue here. Even if federal officials may happen to wear face coverings in some instances (or even be required by federal law in limited circumstances to do so), in no instance has the federal government left it to Virginia to make that determination or to enforce any such requirement. And indeed, even if federal policy *prohibited* the wearing of masks, that would not allow Virgina to subject federal officers to state criminal procedures and penalties. *See Arcata*, 629 F.3d at 991-92.

**5.** Virginia faults the district court for supposedly not separately analyzing the Law's facial covering prohibition and identification display requirements, claiming the two call for "separate analysis." Opening Br. 39-40. Much of the court's merits discussion analyzed the two provisions together because they are invalid for the same reason: they directly regulate the federal government. Virginia contends that the Ninth Circuit's decision in *California* addressed "affirmative disclosure, asking whether compelled identification interferes with federal operations." *Id.* But the Ninth Circuit's holding did not depend on any such analysis. Instead, the Ninth Circuit held that state regulation of the federal government "is void irrespective of whether the regulated activities are essential to federal functions or operations, and irrespective of the degree to which the state law interferes with federal functions or operations." *California*, 173 F.4th at 1067. That logic applies equally to a facial-covering ban.

Virginia also spills a great deal of ink attempting to establish that the validity of a facial-covering ban represents an issue of first impression that the Ninth Circuit did not address in *California*—indeed, Virginia appears to suggest that the injunction should be vacated as to the facial-covering ban *because* the Ninth Circuit did not address such a law. Opening Br. 36 (contending that enjoining the facial-covering prohibition was error because "[t]he masking prohibition presents a question no court of appeals has decided"). This is a strange claim. As discussed above, the Ninth

Circuit's analysis—that no direct regulation is permitted and burden analysis does not come into play—extends equally to a facial covering ban. And in any event, even if this precise case has not arisen before, the district court's decision is correct under longstanding principles.

**6.** Virginia also contends that the injunction is not sufficiently tailored in various respects. It asserts that the district court erred by simply enjoining the Law's application to federal officials, rather than "identif[ying] which applications, masking or identification, routine or tactical, actually offend intergovernmental immunity." Opening Br. 40. That would perhaps be a valid criticism if certain applications of the Law to the federal government were impermissible, and others permissible. But the Mask/ID Law as applied to the federal government is invalid in all applications because it is direct regulation of the federal government that Congress has not authorized. Indeed, Virginia appears to acknowledge that whether the Law directly regulates the United States is a pure legal question. Opening Br. 17. And it does not explain why the outcome of this simple inquiry might differ as to various possible applications of the Law.

Virginia also appears to contend that an injunction should be limited to provisions and applications that injure the United States. Opening Br. 40. But the injury to the United States is the threat that its officials will be subject to obligations

or potential criminal penalties under state law. That injury cannot be cabined to any particular application of the law.

Finally on this point, Virginia faults the district court for addressing an earlier version of the Law that did not contain the current exceptions to the identification provisions. Opening Br. 13, 41. None of these exceptions save the law, as the principles discussed above do not vary based on the presence or absence of exceptions. And the court cannot be faulted for failing to discuss the exceptions specifically, because Virginia never brought the exceptions to the court's attention. The Virginia legislature added the exceptions (on June 29) *one day* before the court issued its injunction. Virginia did not alert the court in advance that eleventh-hour changes to that Law were expected before it went into effect, and it did not inform the court of the change during the brief window after the changes and before the injunction issued. If Virginia believes the exceptions are relevant, it is free to seek an indicative ruling from the court based on the exceptions, *see* Fed. R. App. P. 12.1, or to dismiss its appeal and to seek relief from the injunction directly from the court. But as noted, the exceptions are plainly irrelevant and certainly do not lend support to Virginia's arguments in this Court. The question in this case is not whether Virginia's identification scheme is reasonable. The question is *who decides* when and how federal officers must identify themselves. And there can only be one answer to that question.

## II. The other injunction factors strongly favor the government.

**1.** As the district court concluded, *see* JA47, the United States would unquestionably suffer irreparable harm if the Mask/ID Law were allowed to go into effect.

**a.** Irreparable harm necessarily results from the enforcement of a law contrary to the Supremacy Clause. *See New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 366-67 (1989) (irreparable injury may be established "by a showing that the challenged state statute is flagrantly and patently violative of . . . the express constitutional prescription of the Supremacy Clause" (citations and quotation marks omitted)). Indeed, Virginia conceded that a violation of the Supremacy Clause would constitute irreparable injury. JA49. That concession was correct but, in any event, the district court did not abuse its discretion in concluding, in line with that concession, that the United States had established irreparable harm. And in this Court, Virginia continues to acknowledge that a violation of the Supremacy Clause would establish irreparable injury—it simply repeats its argument that there is no violation because, in Virginia's view, its statute is lawful. Opening Br. 42 ("The asserted constitutional injury rises or falls with the merits."). So, if this Court agrees with the district court that the United States is likely to succeed in showing that the Mask/ID Law violates the Supremacy Clause, no one disputes that this conclusion would also resolve the irreparable-harm inquiry.

**b.** This is not all. Because the United States will not comply with the Mask/ID Law, federal officers face a credible threat of prosecution. Virginia does not claim otherwise. As the district court noted, "Virginia declined to disavow enforcement of the Mask/Identity Law once it became effective on July 1, 2026, and there is no reason to believe Virginia will not enforce the law it passed in May." JA40. That independently qualifies as irreparable harm. *See Georgia Latino All. for Hum. Rts. v. Governor of Ga.*, 691 F.3d 1250, 1269 (11th Cir. 2012). In addition, it is difficult to imagine a more obvious sovereign irreparable harm than a state criminally prosecuting federal officials based on a policy disagreement with the federal government about how the federal government conducts law-enforcement operations.

**c.** The Court need not go further, since the harms discussed above are more than sufficient to affirm the district court's injunction. In granting an injunction pending appeal in *California*, the Ninth Circuit saw no need to consider the United States' additional evidence of harms from the law challenged in that case, and this Court need not do so here either.

But in any event, the district court also correctly credited the United States' declarations establishing that personal-identity protections are necessary for operational purposes and to protect the safety of federal officers. As ICE's declarant explained, "immigration activists and other members of the public, routinely

photograph, film, and publish online ICE [Enforcement and Removal Operations] enforcement actions to include the personal identities of ICE officers and other federal task force personnel," they do so "for the sole purpose of intimidating and harassing government employees," and those personal identities "are directly used by members of local organized crime and transnational criminal organizations in serious and potentially deadly ways." JA163. Those opposed to enforcement of immigration laws also regularly take pictures of ICE officers' faces, run them through facial recognition software, locate the homes of the agents, and post personally identifiable information to anti-ICE websites to facilitate further harassment. JA164-165. The Department of Homeland Security has further "obtained credible intelligence indicating that Mexican criminals, in coordination with domestic extremist groups, have placed targeted bounties for the murders of ICE and CBP personnel in a tiered bounty system," with $2,000 offered for "gathering intelligence or doxxing" agents, "$5,000–$10,000 for kidnapping or non-lethal assaults on standard ICE/CBP officers/agents," and "up to $50,000 for the assassination of high-ranking officials." JA163-164.

These threats, harassment, and other dangers are not limited to ICE. JA174 (DEA declarant providing example of the image of a DEA Special Agent that was posted on the social network BlueSky, with a caption "[t]rying to identify any of these FBI, Homeland Security, and [Bureau of Alcohol, Tobacco, Firearms and

Explosives] goons who invaded a Minneapolis community to kidnap and terrorize its members" followed by another BlueSky user identifying the agent by name and title (quotation marks omitted)); JA179 (explaining that "FBI Special Agents around the country have been targeted for harm, including harassment, assault, and murder"); JA183-184 (CBP declarant providing numerous examples of threats and harassment directed at CBP officers and agents).

As ICE's declarant further explained, "[i]n addition to mitigating safety risks, protecting the personal identities of federal immigration officials is necessary for operational purposes to effectively accomplish DHS's immigration enforcement mission." JA165. "ICE routinely conducts investigations and surveillance in plain clothes to locate and apprehend illegal aliens, particularly in public or community areas where targets may attempt to evade detection." JA165. "The visible identification requirement would . . . undermine ICE's ability to apprehend individuals who pose significant risks . . . ." JA166. And "[f]acial coverings also prevent suspects from identifying officers who may be involved in future enforcement actions." JA166. DEA special agents also do "not always visibly identify themselves as DEA, because to effectively execute many of their duties, the Special Agent's law enforcement identity must be protected." JA173. The existence of photographs and videos of their faces on public websites could undermine their ability to conduct surveillance, meet with informants, and engage in undercover

operations. JA173; *see also* JA179 (explaining similar concerns for FBI, including the need for investigators to remain undetected or unidentified); JA188 (noting that "[i]f images of a CBP officer or agent's face become widely distributed, then that officer or agent will be less safe and effective when conducting surveillance, plainclothes operations, or undercover operations").

Virginia's response to all of this is feeble. As to officer safety, it acknowledges that the United States "showed that a danger exists," Opening Br. 46, but contends that "the law does not force officers to expose themselves in the situations the United States identifies as most safety sensitive"—namely, "tactical operations, hazardous environments, and undercover, drug, gang, and surveillance work." Opening Br. 44. Even putting aside that those exceptions are left to individual Commonwealth Attorneys to interpret, the concerns the United States discussed above—namely, doxxing, harassment, targeted bounties and other reprisals directed at those who enforce federal law, particularly immigration laws—apply generally to public servants who are targeted for faithfully enforcing federal immigration law (and who do not deserve the threats they face for doing so). The concerns are not remotely limited to the situations covered by these exceptions.

Virginia also gestures vaguely towards alternative solutions, contending "that evolving risks, including those from facial-recognition technology, can be met through written policies, supervisory risk assessments, protective equipment, and

targeted exceptions." Opening Br. 45. It is not clear what any of this means in practice. The United States' evidence straightforwardly showed that activists have publicly identified federal officers, including by using facial recognition software to identify, harass, and threaten them. Any effective response to this problem obviously must include robust attempts to protect federal officers' identities. *See* JA92 (noting that "[f]acial coverings are a necessity in preventing agitators from identifying and tracking officers, especially those using facial recognition or other tools" and that "personal identifiers . . . allow agitators to identify and harass individual officers in their official and personal capacities"). Federal officers will often identify themselves, particularly when making arrests, *see* 8 C.F.R. § 287.8(c)(2)(iii), and facial coverings may not invariably be necessary. But the salient point is that responsible officials must be able to determine for themselves when personal identity protections are necessary.

As to the Law's interference with federal operations, Virginia again gestures towards the Law's exceptions, such as for undercover and surveillance work. Opening Br. 44. But this does not engage fully with the point made by multiple of the United States' declarants, which is that mandated disclosure of federal officers' identities and law enforcement affiliation even in contexts when they are not engaged in surveillance or undercover work undermines their effectiveness *when they do* conduct surveillance and engage in undercover operations. In any event,

these and other exceptions leave key terms undefined. And the difficulties that federal officials would face in attempting to conform federal operations to state regulation and guess at how dozens of state law enforcement agencies and state prosecutors might interpret unclear statutory terms is itself a wholly unjustified intrusion on federal authority and itself qualifies as irreparable harm.

Finally on this point, Virginia invokes a declaration it submitted in the district court. Opening Br. 45. The district court explained in painstaking detail why that declaration was conclusory, not responsive to the United States' submissions, and otherwise unhelpful. JA32-36. Among other defects, that declaration did not in any meaningful sense "refute the substance of the declarations offered by the United States that show increase in doxxing, threats, assaults, or the bounty system." JA33. The declaration consists in substantial part of the declarant's policy views. The declarant acknowledged, for example, doxxing and threats of federal officers—including that he was personally doxxed and threatened while working for ICE—but opined that such abuses "should be balanced against the risks and harms of having anonymous, masked agents in public." JA260-261. The declaration also asserts that "routine use of identity-concealing masks and removal of visible individual identifiers during ordinary public-facing immigration enforcement was not standard ICE practice before 2025," JA242, but the obvious reason for the change (which the declaration acknowledges, *see* JA252) is the significant increase in interior

immigration enforcement and resulting threats to federal officers by those opposed to such enforcement. The declarant further acknowledged "that facial recognition software has increased the risk to officers and agents of being identified off-duty," JA259, but identified no concrete solutions to address this risk that do not involve facial coverings, instead contending vaguely that it should be "dealt with through policy, application of risk-management standards by supervisors, issuance of appropriate body armor, and other ordinary law enforcement management tools." JA259.

**2.** These considerations make it unnecessary to consider Virginia's asserted countervailing interests. Simply put, no reasonable analysis of the equitable factors can permit a state to enforce a facially invalid statute that purports to directly and unconstitutionally regulate the United States through criminal prosecutions of federal officials, all based on the state's policy disagreement with the federal government. In any event, Virginia's asserted interests are almost entirely conclusory.

Indeed, Virginia's claimed irreparable harm reduces principally to a generalized interest in enforcing its own laws. Opening Br. 49-51. That asserted interest is entitled to no weight given the district court's correct conclusion that the law is invalid—and certainly does not outweigh the United States' interest in remaining free of unlawful state regulation. *Cf. Abbott v. Perez*, 585 U.S. 579, 602–

03 (2018) (noting that an injunction preventing implementation of a State statute may "seriously and irreparably harm" the State "[*u*]*nless that statute is unconstitutional*" (emphasis added)).

Virginia also alludes to what it describes as its "public-safety interest." Opening Br. 51. But while faulting the district court for supposedly giving insufficient weight to that purported interest, Virginia never meaningfully explains what that interest is or how the injunction undermines it. This Court thus could simply treat any such argument as forfeited.

In any event, the apparent argument makes little sense. Virginia alludes to concerns about impersonation, claiming it has a substantial interest in "reducing confusion over whether an armed person asserting governmental power is a legitimate officer." Opening Br. 52. But if a federal officer is in uniform, that should itself provide sufficient assurance that the individual is in fact a federal officer. And whether in uniform or not, it is hard to see how an officer wearing a facial covering in any way interferes with—or is even relevant to—the public's ability to tell they are a law enforcement officer. And as to the identification requirements, criminals already intent on impersonating law enforcement can easily wear fake badges; indeed, one of Virginia's examples of impersonation it offered in the district court involved the use of a fake ICE badge. JA423. In any event, federal regulations already require that, when making immigration arrests, the designated immigration

officers must identify themselves as immigration officers, "as soon as it is practical and safe to do so," 8 C.F.R. § 287.8(c)(2)(iii), and it is often in federal officers' interests to provide proof of their law-enforcement status when making arrests and detentions (thereby conveying that targets may not lawfully resist).

For these reasons, even if a court were required to "balance" the United States' irreparable harm against Virginia's asserted interests in enforcing an invalid state law against the federal government, *but see California*, 173 F.4th at 1069 (rejecting this argument), the balance of the equities and public interest would support the district court's injunction under any plausible analysis.

**3.** Finally, in its discussion of the equitable factors, Virginia complains that the district court did not give it sufficient time to oppose the preliminary injunction motion. Opening Br. 46-48. It would be extraordinary to hold that the court's management of its own docket was a sufficient abuse of discretion to justify reversing a preliminary injunction issued after full briefing and argument, and Virginia does not come close to doing so. Although Virginia repeatedly characterizes the briefing schedule as "compressed," Opening Br. 46-47, it had a week to prepare its response, JA190, hardly an unusual or dramatically accelerated briefing schedule in this context. As the court noted, Virginia was offered the opportunity for a less condensed schedule if it agreed to stay enforcement of the law against the federal government while the preliminary-injunction motion was litigated—something

California agreed to in the litigation challenging its similar statute—but Virginia rejected that proposal. JA54. And Virginia has never demonstrated prejudice; it neither sought reconsideration below, attempted to supplement the record in the more than two months since the injunction, nor explained at any point what additional evidence or information it would have provided if it were afforded additional time.

In any event, none of this matters. As to the merits, the Mask/ID Law violates principles of intergovernmental immunity as a matter of law; Virginia acknowledges that "[w]hether [its] Mask/Identity Law directly regulates the United States is a legal question this Court decides de novo." Opening Br. 17. As to the equitable factors, as we have discussed, Virginia does not dispute that a violation of the Supremacy Clause, if established, would establish irreparable injury to the United States. And even if Virginia had made a more compelling showing of injury to its own interests, consistent with the Ninth Circuit's analysis in *California*, any such injuries would not be a basis for allowing Virginia to enforce its invalid law against the United States. *See* 173 F.4th at 1069 ("California nonetheless contends that even if we determined that § 10 of the No Vigilantes Act likely violates the Supremacy Clause, we would still need to balance the equities. California specifically urges us to consider the public safety concerns which spurred the Act's enactment. We decline to do so."). The district court's decision to issue an injunction was correct, and no

amount of additional time for Virginia to prepare its response would have made a difference.

## CONCLUSION

The injunction should be affirmed.

Respectfully submitted,


BRETT A. SHUMATE
*Assistant Attorney General*

MEGAN LACY OWEN
*Principal Deputy Assistant Attorney General*

MARK R. FREEMAN
DANIEL TENNY

*/s/ Andrew M. Bernie*
ANDREW BERNIE
*Attorneys, Appellate Staff*
*Civil Division*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-3511*
*andrew.bernie@usdoj.gov*


September 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 10,708 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Times New Roman 14-point font.

*s/ Andrew M. Bernie*
Andrew M. Bernie

## CERTIFICATE OF SERVICE

I hereby certify that on September 18, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*s/ Andrew M. Bernie*
Andrew M. Bernie