Nos. 26-1874 (L), 26-2258 (Consolidated)

IN THE

# United States Court of Appeals for the Fourth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

THE COMMONWEALTH OF VIRGINIA, *et al.*,

*Defendants-Appellants*.

**On Appeal from the United States District Court for the Eastern District of Virginia**

## Supplemental Opening Brief of Defendants-Appellants

JAY JONES
*Attorney General*

TRAVIS G. HILL
*Chief Deputy Attorney General*

TILLMAN J. BRECKENRIDGE
*Solicitor General*

ETHAN P. FALLON
*Deputy Solicitor General*

R. TRENT TAYLOR
*Deputy Solicitor General*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-2071 – Telephone
(804) 786-1991 – Facsimile
SolicitorGeneral@oag.state.va.us

September 25, 2026

*Counsel for Defendants-Appellants*

## TABLE OF CONTENTS


Table of Authorities .......... iii

Introduction .......... 1

Jurisdictional Statement .......... 3

Issues Presented .......... 4

Statement of the Case .......... 5

Standard of Review .......... 12

Summary of Argument .......... 13

Argument .......... 17

I. The district court turned voluntary, state law dependent agreements into constitutionally protected federal entitlements. .......... 17

A. The 287(g) Law does not implicate the Contracts Clause. .......... 17

B. The 287(g) Law does not substantially impair any reasonable federal contractual expectation. .......... 24

C. Virginia acted to advance significant and legitimate public purposes. .......... 30

D. The 287(g) Law reasonably advances those public purposes. .......... 34

II. The district court's intergovernmental-immunity theory confuses regulating the federal government with declining to supply it with state and local officers .......... 40

A. The statutory command runs to Virginia law-enforcement agencies, not the federal government. 40

B. Congress expressly preserved Virginia's authority over whether and how its officers participate. 43

C. *McHenry*, not *CoreCivic*, addresses the critical distinction here. 46

D. The district court's theory has no limiting principle and collides with the very voluntariness Congress prescribed. 49

III. The federal government's alternative Supremacy Clause theories cannot sustain the injunction. 50

A. Federal law does not preempt Virginia's decision to limit its own participation in § 287(g). 50

B. The 287(g) Law does not discriminate against the federal government. 55

IV. The remaining *Winter* factors do not rescue an injunction built on the district court's merits errors. 58

A. The federal government did not independently establish irreparable harm. 58

B. The balance of equities and public interest do not support the injunction. 61

Conclusion 65

Certificate of Compliance 67

Certificate of Service 68

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Perez*,
585 U.S. 579 (2018) ....................................................................62

*Allied Structural Steel Co. v. Spannaus*,
438 U.S. 234 (1978) ..............................................................20, 21

*American-LaFrance & Foamite Industries v. Arlington County*,
164 Va. 1 (1935)........................................................................28

*Arizona v. United States*,
567 U.S. 387 (2012) ..............................................................51, 53

*Baltimore Teachers Union v. Mayor & City Council of Baltimore*,
6 F.3d 1012 (4th Cir. 1993) ........................................................33

*City of Charleston v. Public Service Commission of West Virginia*,
57 F.3d 385 (4th Cir. 1995) ........................................................26

*City of El Cenizo v. Texas*,
890 F.3d 164 (5th Cir. 2018) ......................................................53

*City of New York v. United States*,
179 F.3d 29 (2d Cir. 1999)..........................................................54

*CoreCivic, Inc. v. Governor of New Jersey*,
145 F.4th 315 (3d Cir. 2025) ...................................... 15, 46, 47, 48

*Dawson v. Steager*,
586 U.S. 171 (2019) ....................................................................55

*Di Biase v. SPX Corp.*,
872 F.3d 224 (4th Cir. 2017) ......................................................12

*Energy Reserves Group, Inc. v. Kansas Power & Light Co.*,
459 U.S. 400 (1983) .................................................. 24, 26, 31, 34

*Home Building & Loan Association v. Blaisdell*,
290 U.S. 398 (1934) ........................................................... 18, 20

*Kansas v. Garcia*,
589 U.S. 191 (2020) ............................................................... 51

*League of Women Voters of N.C. v. North Carolina*,
769 F.3d 224 (4th Cir. 2014) .............................................. 12, 64

*Leslie Miller, Inc. v. Arkansas*,
352 U.S. 187 (1956) (per curiam) ............................................. 49

*Maryland v. King*,
567 U.S. 1301 (2012) (Roberts, C.J., in chambers) ........................ 62

*McHenry County v. Raoul*,
44 F.4th 581 (7th Cir. 2022) .................. 15, 22, 29, 45–46, 48, 52, 56

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*,
915 F.3d 197 (4th Cir. 2019) ..................................................... 59

*New York v. United States*,
505 U.S. 144 (1992) ............................................................... 49

*Nixon v. Missouri Municipal League*,
541 U.S. 125 (2004) ............................................................... 29

*Nken v. Holder*,
556 U.S. 418 (2009) ............................................................... 61

*Pashby v. Delia*,
709 F.3d 307 (4th Cir. 2013) .............................................. 13, 58

*Pierce v. North Carolina State Board of Elections*,
97 F.4th 194 (4th Cir. 2024) ...................................................... 62

*Printz v. United States*,
521 U.S. 898 (1997) ............................................................... 50

*Public Utilities Commission v. United States*,
355 U.S. 534 (1958) ............................................................... 49

*Reynolds v. Sims*,
377 U.S. 533 (1964) ........................................................................29

*Sinclair v. New Cingular Wireless PCS, LLC*,
283 Va. 567 (2012)..................................................................28, 38

*Stone v. Mississippi*,
101 U.S. 814 (1880) ........................................................................22

*Sveen v. Melin*,
584 U.S. 811 (2018) ...........................................................20, 21, 24

*Trenton v. New Jersey*,
262 U.S. 182 (1923) ...................................................................22, 29

*U.S. Trust Co. of New York v. New Jersey*,
431 U.S. 1 (1977) .............................................21, 23, 24, 34, 35

*United States v. California*,
921 F.3d 865 (9th Cir. 2019) .................................44, 45, 52, 64

*United States v. King County*,
122 F.4th 740 (9th Cir. 2024)......................................................49, 57

*United States v. New York*,
2026 WL 2225423 (N.D.N.Y. Aug. 3, 2026) ....................................34

*United States v. Virginia*,
139 F.3d 984 (4th Cir. 1998) ..............................................................48

*United States v. Washington*,
596 U.S. 832 (2022) ...................................................................40, 55

*Von Hoffman v. City of Quincy*,
71 U.S. (4 Wall.) 535 (1867) ...............................................................23

*Washington v. United States*,
460 U.S. 536 (1983) ........................................................................55

*Winter v. Natural Resources Defense Council, Inc.*,
555 U.S. 7 (2008) .......................................... 13, 58, 61, 63, 64, 65

*Ysursa v. Pocatello Education Ass'n*,
555 U.S. 353 (2009) .................... 22, 29

**Constitutional Provisions**

U.S. Const. art. I, § 10 .................... 17–18

U.S. Const. amend. X .................... 38

Va. Const. art. IV, § 14 .................... 37

Va. Const. art. VII, § 2 .................... 37

**Statutes**

8 U.S.C. § 1357 .................... 52–53

8 U.S.C. § 1357(g) .................... *passim*

28 U.S.C. § 1292(a)(1) .................... 4

28 U.S.C. § 1331 .................... 3

28 U.S.C. § 1345 .................... 3

Va. Code § 2.2-4311.1 .................... 38

Va. Code § 15.2-1726 .................... 5, 55

Va. Code § 15.2-1726.1 .................... *passim*

Va. Code § 15.2-1727 .................... 55

**Rules**

Fed. R. App. P. 4(a)(1)(B) .................... 4

## INTRODUCTION

This appeal begins and ends with the fact that Section 287(g) agreements are terminable at will, and given that, it is an affront to Virginia's sovereignty to forbid it from telling its subdivisions to terminate them. Yet the district court did just that. It turned voluntary cooperation into a constitutionally protected federal entitlement.

287(g) agreements allow states and localities to assist the federal government with its immigration enforcement duties. Congress provided that state and local officers may exercise this delegated federal immigration authority only "to the extent consistent with State and local law." 8 U.S.C. § 1357(g)(1). Virginia law allowed its localities to enter into these agreements. But in response to federal overreach, the people of Virginia chose new leadership, and Virginia law changed. The district court held that Virginia cannot change that law once one of its political subdivisions has entered a § 287(g) agreement. And although everyone agrees that Virginia could prohibit its localities from entering such agreements in the first place, the court held that Virginia directly regulates the federal government when it places conditions on their

continued participation. Nothing in the Contract Clause, the Supremacy Clause, or § 287(g) supports that remarkable result.

The federal government conceded below that the agreements "were made voluntary by statute" and that a state or locality's decision not to enter one is not an obstruction of federal law. SA 524. The agreements themselves likewise contemplate withdrawal. Every Virginia agreement permits termination or suspension, although some require advance notice that was provided by a three-month period in which Virginia law gave localities the option to terminate or re-negotiate. SA 397.

No matter, according to the district court. Once Virginia gave localities the power to enter into the agreements, it gave away its sovereign power to regulate its own subdivisions in this realm forever. The court reached that result through two independent constitutional theories, and both invert the governing law. On the Contract Clause, the court treated a voluntary and terminable agreement as an "obligation of contract." That elides the definition of "obligation." Everyone agrees there is no obligation to continue with the 287(g) agreements. On intergovernmental immunity, the court treated the option of re-negotiation as a command regulating federal operations. That makes no

sense. And it would turn *every* contractual negotiation between the federal government and a state or local authority into a violation of the intergovernmental-immunity principle.

The remaining preliminary-injunction factors do not cure those errors. The federal government remains free to enforce federal immigration law in Virginia with federal officers, federal authority, and federal resources. What the injunction preserves is additional state and local assistance that Congress chose not to require (and cannot require). Meanwhile, it prevents Virginia from enforcing a duly enacted law governing the powers, resources, and conduct of Virginia law-enforcement agencies. And the injunction goes further still, barring Virginia from "in any way" interfering with existing § 287(g) agreements. SA 18. The Court should vacate the preliminary injunction.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. § 1331 because the federal government's claims arise under the Constitution and laws of the United States, and under 28 U.S.C. § 1345 because the United States is the plaintiff.

On August 31, 2026, the district court entered an order granting the federal government's motion for a preliminary injunction as to Va. Code § 15.2-1726.1. SA 16–19. On September 3, 2026, the court issued a memorandum opinion explaining that order. SA 20–72. The preliminary injunction bars the Commonwealth and Attorney General from enforcing § 15.2-1726.1 against covered federal officers, employees, and agencies and from "in any way" interfering with performance of existing § 287(g) agreements. SA 18. Defendants-Appellants timely filed a notice of appeal on September 8, 2026. SA 683–685; *see* Fed. R. App. P. 4(a)(1)(B).

This Court has jurisdiction under 28 U.S.C. § 1292(a)(1), which authorizes appeals from interlocutory orders granting injunctions.

## ISSUES PRESENTED

1. Whether the district court erred in holding that Va. Code § 15.2-1726.1 likely violates the Contract Clause.

2. Whether the district court erred in holding that the 287(g) Law likely violates the Supremacy Clause.

3. Whether the federal government satisfied the remaining requirements for preliminary injunctive relief.

## STATEMENT OF THE CASE

Section 287(g) of the Immigration and Nationality Act authorizes the federal government to enter written agreements with States and political subdivisions under which specially trained state or local officers may perform certain immigration-officer functions. *See* 8 U.S.C. § 1357(g). Those agreements allow participating state or local officers to perform defined functions relating to the investigation, apprehension, or detention of non-citizens, but only under the terms Congress prescribed. Among other things, participating officers act "at the expense of the State or political subdivision" and only "to the extent consistent with State and local law." *Id.* § 1357(g)(1). Congress also made participation voluntary: "Nothing in this subsection shall be construed to require any State or political subdivision of a State to enter into an agreement" under § 1357(g). *Id.* § 1357(g)(9).

Virginia law historically permitted localities, in their discretion, to enter reciprocal agreements with federal agencies exercising police powers "for such periods and under such conditions as the contracting parties deem advisable, for cooperation in the furnishing of police services." Va. Code § 15.2-1726(A). But the power to enter into

agreements existed only because the General Assembly conferred it. *See* SA 394–396.

The 287(g) agreements in the record fall into several operational models. The Jail Enforcement Model permits trained local correctional officers to perform immigration-processing functions for individuals already in local custody. SA 83–84. The Warrant Service Officer model permits certain local officers to serve immigration documents prepared by ICE. SA 84. The Task Force Model permits trained state or local officers to perform broader field-level immigration-enforcement functions under ICE supervision. SA 84–85.

In 2026, the General Assembly enacted Virginia Code § 15.2-1726.1, the statute at issue here. Subsection B regulates the use of Virginia law-enforcement personnel and resources outside the agreement provisions. Subject to specified exceptions, it provides that a Virginia law-enforcement officer may not "assist, cooperate with, or use any law-enforcement resources to facilitate any operation" seeking to identify, arrest, or impose a penalty for a federal civil immigration violation without a judicial warrant or subpoena. Va. Code § 15.2-1726.1(B). The subsection expressly preserves investigations and assistance concerning

state or federal crimes, including operations conducted through joint state-federal task forces. *Id.*

Subsection C separately regulates the conditions under which a Virginia "law-enforcement agency" may "maintain, renew, or enter into any federal immigration enforcement agreement." Va. Code § 15.2-1726.1(C). Subsection C requires any such agreement to include specified terms addressing matters such as advance notice, compliance with Virginia law, identification during operations, sensitive locations, information requests, surveillance, warrants or judicial process, and accountability for specified incidents. *Id.* § 15.2-1726.1(C)(1)–(12). Subsection D addresses existing agreements and provides that any law-enforcement agency with an agreement in effect on July 1, 2026, must obtain a modified agreement by September 1, 2026, that complies with subsection C or the existing agreement is terminated. *Id.* § 15.2-1726.1(D). Subsections E and F address enforceability and authorize the Attorney General to seek appropriate relief. *Id.* § 15.2-1726.1(E), (F).

The federal government filed this case on June 11, 2026, challenging both Virginia's Mask/Identity Statute and the 287(g) Law. JA 57. It moved for a preliminary injunction on June 17, 2026. JA 115.

The Court bifurcated the preliminary-injunction proceedings, first addressing the Mask/Identity Statute and then ordering separate briefing and argument on the 287(g) Law. *See* JA 190; SA 73. Virginia opposed preliminary relief as to the 287(g) Law on July 13, 2026, and the federal government replied on July 20, 2026. SA 74; SA 258.

After argument on August 3, 2026, the Court directed supplemental briefing. The Court ordered Virginia to identify the authority under which Virginia localities entered the § 287(g) agreements, to provide copies of all 287(g) agreements, and to address their status. SA 285, SA 393–94. The Court also directed the federal government to address how termination of § 287(g) agreements would obstruct federal purposes. SA 285, SA 524. In response, the federal government acknowledged that it "does not take the position that any declination to enter a 287(g) agreement is an obstruction of federal law" because § 287(g) agreements "were made voluntary by statute." SA 524. Virginia responded that this concession undercut the federal government's central theory because, if federal law permits States and localities to decline § 287(g) participation, federal law cannot forbid a state from exercising that prerogative through

generally applicable legislation governing its own political subdivisions. SA 534–537.

Virginia also filed copies and status information for the known Virginia locality agreements. *See* SA 393–523. It later supplemented that filing with the Shenandoah Police Department agreement and represented that it had filed all known § 287(g) agreements with Virginia localities. SA 576–578. The supplemental filings show that the record has continued to evolve. As of August 31, 2026, Virginia had learned that Craig County and Pittsylvania County were no longer listed on ICE's publicly available spreadsheet of active § 287(g) agreements. Virginia also filed supplemental authority identifying a recent decision from the District of Minnesota rejecting related federal challenges to state and local immigration-cooperation limits.

On August 20, 2026, the Court held continued argument on the federal government's motion. *See* SA 579. During that hearing, Virginia emphasized that the § 287(g) agreements are terminable arrangements and that the federal government accepts that individual localities may terminate them. SA 582–583. The Court focused heavily on the relationship between localities and the Commonwealth, the existing

contracts between localities and the federal government, and the analytical significance of Virginia's authority over local contracting power. SA 583–587.

On August 31, 2026, the Court granted the federal government's motion for a preliminary injunction as to Virginia Code § 15.2-1726.1. SA 16–17. The order also contains one limitation: it excludes from the injunction the statute's application to localities or local law-enforcement officers that have not previously entered § 287(g) agreements and seek to enter such agreements for the first time, which the Court described as "preserving the status quo ante so that COUNTS III, IV, V, and VI can be resolved on their merits." SA 17–18. Otherwise, the Court found that the federal government had shown a likelihood of success on Count III, the Contract Clause claim, because the Court concluded that the statute substantially impairs existing contracts between the federal government and Virginia localities and is not drawn in an appropriate and reasonable way to advance a significant and legitimate public purpose. SA 17. The Court also found a likelihood of success on Count V, concluding that the statute directly regulates federal law-enforcement conduct in the

enforcement of federal immigration laws and therefore violates intergovernmental immunity. SA 17–18.

In its September 3 memorandum opinion, the Court declined to decide whether the federal government was also likely to succeed on Count IV, its preemption claim, or Count VI, its discriminatory intergovernmental-immunity claim, concluding that those theories were insufficiently developed and unnecessary to the preliminary-injunction ruling. SA 62–63.

The injunction bars the Commonwealth, its officers, agents, servants, employees, and attorneys, and Attorney General Jones in his official capacity, from enforcing Virginia Code § 15.2-1726.1 against any federal officer, employee, or agency involved in enforcing federal immigration laws and regulations, even though that Code section does not require anything from the federal government. SA 18. It also enjoins them from "in any way" interfering with the performance of existing § 287(g) agreements by any party to those agreements. SA 18. The Court required no bond and directed the Commonwealth to distribute the order to its Commonwealth's Attorneys. SA 19.

## STANDARD OF REVIEW

This Court reviews the grant of a preliminary injunction for abuse of discretion, reviewing findings of fact for clear error and conclusions of law de novo. *Di Biase v. SPX Corp.*, 872 F.3d 224, 229 (4th Cir. 2017). A district court necessarily abuses its discretion when its ruling rests on an error of law, including when it "misapprehends or misapplies the applicable law." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 235 (4th Cir. 2014).

The principal questions here are legal and therefore receive de novo review. They include whether the 287(g) Law substantially impairs contractual rights protected by the Contract Clause, whether it directly regulates or discriminates against the federal government under the intergovernmental-immunity doctrine, and whether federal law preempts Virginia's regulation of state and local participation in § 287(g). The interpretation of § 1357(g) likewise presents a question of law reviewed de novo.

The ultimate decision to grant preliminary relief remains discretionary, but that discretion must be exercised within the governing rules of law and equity. The federal government bore the burden to

establish all four preliminary-injunction requirements. It had to show that it is likely to succeed on the merits, likely to suffer irreparable harm absent preliminary relief, that the balance of equities favors relief, and that an injunction serves the public interest. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20, 22 (2008); *see also Pashby v. Delia*, 709 F.3d 307, 319, 321 (4th Cir. 2013). Failure to establish any one of those requirements requires denial of preliminary relief.

## SUMMARY OF ARGUMENT

The preliminary injunction rests on a fundamental misunderstanding of § 287(g) and contract law. Congress created a voluntary program through which states and localities may lend their officers and resources to federal immigration enforcement. Congress expressly provided that delegated authority exists only "to the extent consistent with State and local law," 8 U.S.C. § 1357(g)(1), and that nothing in the statute requires any state or political subdivision to participate, *id.* § 1357(g)(9). The contract itself states that it can be terminated at any time for any reason or no reason, and the Commonwealth and several of its subdivisions have done just that with no claim by the federal government that termination was not allowable.

The district court nevertheless transformed that optional cooperation memorialized in a contract that can be terminated at will into a federal entitlement once a Virginia locality entered an agreement. Neither the Contract Clause nor the Supremacy Clause supports that result.

*First*, the 287(g) Law does not violate the Contract Clause. The federal government entered these agreements against a legal backdrop that expressly preserves state law, with Virginia political subdivisions whose contracting authority derives from the Commonwealth, and under agreements that permit termination or suspension. Those circumstances eliminate any reasonable expectation that Virginia law would remain frozen for the federal government's benefit, and they establish that there is no obligation to continue with the contract that Virginia impaired. The district court's contrary rule produces a one-way ratchet. Virginia may prevent a locality from entering its first § 287(g) agreement, and a participating locality may terminate an existing agreement, but the General Assembly supposedly loses authority to change the conditions of participation once a locality signs. The Contract Clause creates no such federal entitlement. And even if the statute substantially impaired existing agreements, Virginia acted for significant public purposes

involving law-enforcement resources, public safety, accountability, transparency, liability, and community trust. Because the Commonwealth itself is not a party to the agreements, its legislative judgment is entitled to the deference the district court denied it.

*Second*, the 287(g) Law does not directly regulate the federal government. Subsection C's operative command runs to Virginia law-enforcement agencies. It provides that those agencies may maintain, renew, or enter § 287(g) agreements only if the agreements contain specified terms. ICE remains free to reject those terms and enforce federal immigration law with federal authority and resources. A condition on Virginia's participation is not a freestanding command to ICE. *McHenry County v. Raoul* confirms the distinction. There, Illinois could withdraw state and local detention assistance altogether without directly regulating the federal government. *CoreCivic* did not reject that reasoning. It expressly distinguished *McHenry* and described its own holding, involving private federal contractors, as narrow. The district court's contrary rule also has no workable limit. If requiring certain terms before contracting with the federal government violates the Supremacy Clause, then literally *any* contractual negotiation with the

federal government is unlawful. That cannot be reconciled with basic contract law and practice, nor is it consistent with Congress's express preservation of state choice.

*Third*, the federal government's alternative Supremacy Clause theories provide no basis to affirm. Conflict preemption cannot turn a program Congress made voluntary into one the Constitution effectively makes mandatory. Federal law may encourage cooperation, but it does not require Virginia to make its political subdivisions available to ICE. Nor does the statute discriminate against the federal government. Ordinary police mutual-aid arrangements are not similarly situated to § 287(g) agreements, which delegate federal civil immigration functions to state and local officers under a distinct system of federal training and supervision. Virginia may regulate materially different governmental activities differently without discriminating against federal status.

*Finally*, the remaining preliminary-injunction factors do not independently sustain the injunction. The federal government's principal irreparable harm theory depends on the constitutional violations it has failed to establish. Its operational injury is the loss of additional state and local assistance, not the loss of federal immigration

authority. ICE remains free to enforce federal law with or without an injunction. Virginia, while enjoined, is required to expend resources to enforce federal law and prevented from implementing a duly enacted state law governing its own officers, resources, agencies, and political subdivisions. Calling the pre-enactment arrangement the "status quo" does not alter that balance. Once the district court's merits errors are corrected, the federal government cannot satisfy the remaining requirements for extraordinary preliminary relief. The Court should vacate the preliminary injunction and remand.

## ARGUMENT

### I. The district court turned voluntary, state law dependent agreements into constitutionally protected federal entitlements.

#### A. The 287(g) Law does not implicate the Contracts Clause.

The 287(g) Law does not implicate the Contracts Clause because it does not impair an obligation of contract and because it does not involve private contract rights that the clause was intended to protect. A threshold requirement to a claim under the Contract Clause is that state action actually impairs an obligation under the contract. Article I, Section 10 states that "No state shall . . . pass any . . . Law impairing the

Obligation of Contracts." To establish the basic right in any factual scenario, the party asserting a protected contract must prove the state somehow controverted an existing contractual obligation.

*Home Building and Loan Association v. Blaisdell*, 290 U.S. 398 (1934), was a seminal case discussing the history, and establishing the bounds, of the Contract Clause. There, Minnesota enacted a law allowing a moratorium on foreclosures of mortgages that existed when the law was enacted. *Id.* at 415–16. The Supreme Court began its analysis by noting that "[t]he statute does not impair the integrity of the mortgage indebtedness" but "the mortgage contained a valid power of sale to be exercised in case of default" that was abrogated. *Id.* at 424–25. Thus, the obligation to vacate the premises on default was impaired.

To determine whether the Contract Clause covered the law, the Court first provided the history. *Id.* at 427–28. The Contract Clause was a reaction to "legislative schemes for the defeat of creditors and the invasion of contractual obligations" after the Revolutionary War. *Id.* at 427. And it was designed to ensure that private debt would be respected so that there could be public faith in such debt so that there would no longer be a threat to the very existence of credit. *Id.* at 428.

Thus, the court determined that "[t]he obligation of a contract is the law which binds the parties to perform their agreement." *Id*. at 429. And "[t]he obligations of a contract are impaired by a law which renders them invalid, or releases or extinguishes them." *Id*. at 431. The Court then engaged with weighing the impairment against the state's interests—the question that ultimately became the *third* hurdle for a party asserting a Contract Clause claim to clear. *Id*. at 434 *et. seq*.

The base requirement of impairing an obligation was evident in the dissent as well, where even the argument for a stronger Contract Clause did not fathom a successful claim where no obligation was impaired. The four-Justice dissent asserted that the statute at issue "either impairs the obligation of contracts or it does not. If it does not, the occasion to which it relates becomes immaterial." *Id*. at 474 (Sutherland, J., dissenting). All nine Justices recognized that the impairment of an obligation was a base requirement; once established, the only question was whether there were ways a state could justify the impairment consistent with the Contract Clause.

From there, the Supreme Court established the relevant test, *assuming* there was an impairment of a contractual obligation: If there

is an impairment, is it substantial; then, if it is substantial, is it outweighed by the state's interests. *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244 (1978). Now, courts sometimes skip straight to the test and hold that the Contract Clause is not violated, *e.g.* *Sveen v. Melin*, 584 U.S. 811, 819 (2018), but that does not change the base requirement—plainly stated in the constitutional text—that an obligation of contract must be impaired for a state law to violate the Contract Clause.

In this case, the ineluctable conclusion is that no obligations of a 287(g) contract are impaired here—and thus, the Contract Clause has no place in this litigation—because the 287(g) law does not, as to any *obligations* "render[] them invalid, or release[] or extinguish[] them." *Blaisdell*, 290 U.S. at 431. The parties thus agree that no locality is *obligated* to continue participating indefinitely. SA 397, SA 526. That much is further evident from the fact that there were no repercussions to Virginia or any of its terminating subdivisions after sending their termination notices. And the 287(g) Law does not release or extinguish any obligation or debt owed prior to termination—the federal government has not identified any such obligation, nor can it.

The cases relied on by the district court do not suggest otherwise. Neither of them holds that the Contract Clause inhibits a law where the law does not impair any obligation. *Sveen*, 584 U.S. at 819 (Minnesota's revocation-on-divorce statute *did not* violate the Contract Clause because the law did not substantially impair pre-existing contractual arrangements); *Allied Structural Steel*, 438 U.S. at 244 (Minnesota's law *did* retroactively impair a contractual obligation). The 287(g) law does not impair any obligation of contract, and that resolves the Contract Clause claim at the outset.

Moreover, the 287(g) Law does not implicate the Contracts Clause because it does not involve private contract rights. The contractual interest asserted by the federal government is not one that the Contract Clause permits a state to make irrevocable. The Supreme Court distinguishes ordinary financial obligations from purported contractual restrictions on the state's sovereign authority. When a public contract is invoked to constrain future exercises of governmental power, the initial question is whether the state could surrender that authority by contract in the first place. As the Supreme Court explained in *United States Trust Company of New York v. New Jersey*, "the Contract Clause does not

require a State to adhere to a contract that surrenders an essential attribute of its sovereignty." 431 U.S. 1, 23 (1977). The same principle underlies the longstanding rule that a "legislature cannot bargain away the police power of a State." *Stone v. Mississippi*, 101 U.S. 814, 817 (1880).

Here, the federal government does not seek payment of an accrued debt or enforcement of some proprietary promise made by Virginia. It seeks continued access to Virginia's governmental resources. Its asserted contractual right depends on Virginia continuing to authorize state-created political subdivisions to commit public officers, detention capacity, and law-enforcement resources to federal civil immigration enforcement. But those subdivisions possess no independent sovereignty against the Commonwealth. Their authority is derivative of state law, and Virginia retains the sovereign power to determine what governmental functions they may perform and on what terms. *See Ysursa v. Pocatello Education Ass'n*, 555 U.S. 353, 362 (2009); *Trenton v. New Jersey*, 262 U.S. 182, 187–88 (1923); *McHenry Cnty. v. Raoul*, 44 F.4th 581, 590–92 (7th Cir. 2022). A locality's agreement with the federal government cannot convert Virginia's delegation of governmental

authority into an irrevocable limitation on the General Assembly's power over its own instrumentalities.

The Supreme Court's public-contract cases reinforce that distinction. *U.S. Trust* involved a financial covenant protecting bondholders, which the Court characterized as a financial obligation. 431 U.S. at 24. And *Von Hoffman v. City of Quincy* involved municipal bonds purchased for value and an existing statutory pledge of taxing authority to satisfy that debt. 71 U.S. (4 Wall.) 535 (1867). Neither case supports a constitutional entitlement to the continued exercise of delegated governmental power on unchanged terms. Here, there is no debt, accrued payment obligation, or comparable proprietary right. The supposed "obligation" is continued state and local participation in an intergovernmental-enforcement arrangement that federal law makes voluntary, that operates only to the extent consistent with state law, and that the agreements themselves permit the parties to terminate. The Contract Clause does not constitutionalize that earlier allocation of Virginia governmental authority.

### B. The 287(g) Law does not substantially impair any reasonable federal contractual expectation.

Even if the federal government could establish the threshold fact that the 287(g) Law impairs a contractual obligation, it still could not meet its burden of proving a likelihood of success, given Virginia's power to inhibit contractual obligations when appropriate. The Contract Clause's prohibition has never been read with literal exactness in a manner that extinguishes the States' reserved police powers. *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 410 (1983); *U.S. Trust*, 431 U.S. at 21–23. The inquiry instead asks first whether state law substantially impairs a contractual relationship. *Sveen*, 584 U.S. at 819. In answering that question, courts consider whether the law undermines the contractual bargain, interferes with the parties' reasonable expectations, and prevents a party from safeguarding or reinstating its rights. *Id.* If there is a substantial impairment, the court then asks whether the law serves a significant and legitimate public purpose and whether the adjustment of contractual rights is reasonable and appropriate to that purpose. *Energy Reserves*, 459 U.S. at 411–12.

The district court went wrong at each step.

Here, there is no reasonable expectation interfered with or right to further cooperation to safeguard or reinstate. The federal government has no reasonable expectation of continued contractual relations, given the contract is subject to at-will termination. Three features of the § 287(g) framework make any such expectation implausible. *First*, federal law expressly subjects § 287(g) participation to state law. Congress provided that a participating state or local officer may perform delegated immigration functions only "at the expense of the State or political subdivision *and* to the extent consistent with State and local law." 8 U.S.C. § 1357(g)(1) (emphasis added). And Congress separately commanded that "[n]othing in this subsection shall be construed to require any State or political subdivision of a State to enter into" a § 287(g) agreement. *Id.* § 1357(g)(9).

Those define the bargain Congress authorized and the federal government's reasonable expectations. The federal government invited states and their subdivisions to participate, but it did not guarantee their participation or displace the state law governing it. A federal agency cannot enter agreements under a statute that expressly makes state law

relevant and then claim a constitutionally protected expectation that state law will remain frozen for its benefit.

That is not a novel proposition. In *Energy Reserves*, the Supreme Court found no substantial impairment where the contracts themselves recognized that contractual rights remained subject to existing and future law. 459 U.S. at 416. This Court likewise has treated an express reservation of state regulatory authority as an important factor supporting its conclusion that state action did not substantially impair the contracts. *City of Charleston v. Public Service Commission of West Virginia*, 57 F.3d 385, 392–94 (4th Cir. 1995). A party that bargains against a backdrop expressly reserving governmental authority has correspondingly limited expectations that the legal backdrop will never change.

*Second*, the agreements themselves sharply limit any reasonable expectation that continued performance would remain insulated from later changes in state law and establish there is no right to future performance. The Task Force Model and Jail Enforcement Model agreements provide that they remain in effect only until either party terminates or suspends them. The Warrant Service Officer agreements

likewise permit termination, subject to 90 days' written notice. SA 397. Virginia localities have in fact terminated § 287(g) agreements in the past with no protest from the federal government. SA 394, SA 526.

The district court responded that termination provisions do not eliminate impairment because the parties remain entitled to contractual performance until termination becomes effective. SA 48. That does not answer the reasonable-expectations inquiry. Virginia does not contend that a termination clause erases contractual obligations before termination. The point is narrower; the federal government entered voluntary, terminable intergovernmental agreements under a federal statute that expressly makes delegated authority dependent on state and local law. Those features sharply limit any reasonable expectation that existing performance would remain immune from a later change in the state law governing the local participants.

The federal government's contrary position effectively treats the existing contractual terms as constitutionally protected against state-law change until each locality independently elects to terminate. Neither the contracts nor § 1357(g) promises that.

*Third*, the identity and legal authority of the contracting parties matter to any contract. The relevant agreements are not ordinary private contracts between independent sovereign actors. They are intergovernmental arrangements through which Virginia-created entities supply Virginia and local officers, facilities, detention capacity, and law-enforcement resources to aid a federal program. Under Virginia law, local governments are "created by the Commonwealth" and possess "no element of sovereignty." *Sinclair v. New Cingular Wireless PCS, LLC*, 283 Va. 567, 576 (2012). They "have such powers to contract, and only such powers, as the legislature grants to them." *American-LaFrance & Foamite Industries v. Arlington County*, 164 Va. 1, 5 (1935). When the General Assembly permits contracting only subject to specified restrictions, a locality cannot contract around them. *Id.* at 5–6.

No one disputes that the Virginia localities possessed authority to enter these agreements to the extent they did. SA 395. But that does not give those localities a permanent constitutional entitlement to retain the same contracting authority forever. And it certainly does not give their federal counterparty a stronger right to control Virginia's governmental structure than the localities themselves possess.

Federal constitutional law reflects the same understanding. Political subdivisions "never were and never have been considered as sovereign entities"; they are instead "subordinate governmental instrumentalities" created by the state. *Ysursa*, 555 U.S. at 362 (quoting *Reynolds v. Sims*, 377 U.S. 533, 575 (1964)). A municipality is "merely [a] department[] of the State," whose delegated powers the State may grant, withhold, or withdraw. *Id.* (quoting *Trenton*, 262 U.S. at 187). And federal law is read against the "working assumption" that Congress does not interpose federal authority between a state and its political subdivisions absent a clear statement. *Nixon v. Missouri Municipal League*, 541 U.S. 125, 140–41 (2004). *McHenry* applied those principles in the immigration-cooperation context, rejecting the argument that federal authorization of agreements with a "State . . . or political subdivision" makes a locality's contracting authority independent of its State. 44 F.4th at 590. The federal government therefore contracted with Virginia-created governmental entities whose authority remained derivative of Virginia law, a circumstance that bears directly on the contractual expectations the federal government could reasonably acquire.

The district court's contrary rule produces a bizarre anomaly. The Governor could, and did, terminate § 287(g) participation by Virginia executive agencies. An individual county could terminate its own agreement. Virginia could prohibit a locality that has never participated from entering its first agreement, as the district court's own injunction expressly recognizes. Yet once a locality has signed, the General Assembly supposedly loses the power to alter that locality's continued authority to participate without violating the federal government's contract rights.

That is not Contract Clause doctrine. It is a one-way ratchet. It gives Virginia's political subdivisions greater power against the Commonwealth after signing a federal agreement than they possessed before signing it. Nothing in § 287(g), the contracts, or the Constitution supports that result.

### C. Virginia acted to advance significant and legitimate public purposes.

Even if Virginia's 287(g) Law substantially impaired existing agreements, it is not invalid. The Contract Clause does not prohibit every substantial impairment—a state may adjust contractual relationships to address a "significant and legitimate public purpose," including "a broad

and general social or economic problem." *Energy Reserves*, 459 U.S. at 411–12. The purpose requirement distinguishes legislation serving the general welfare from legislation conferring a narrow private benefit. *Id.* at 412 & n.13.

Virginia easily satisfies that standard. The Commonwealth identified several related public interests, including preserving state and local law-enforcement resources, keeping officers focused on state and local public-safety responsibilities, maintaining community trust necessary for effective policing, limiting liability exposure, preserving transparency under Virginia law, and establishing safeguards governing the circumstances in which Virginia officers and resources participate in federal civil immigration enforcement. SA 84–87, SA 108–09. These interests concern the allocation and accountability of public police power.

The record confirms that those interests were at the forefront of this legislation. Before the General Assembly enacted § 15.2-1726.1, the Governor rescinded the prior executive directive encouraging § 287(g) participation because Virginia agencies had been required or encouraged to divert "their limited resources" to federal civil immigration enforcement. SA 213. She explained that Virginia public safety requires

state and local officers to focus on "investigating and deterring criminal activity, staffing jails, and community engagement," and concluded that the prior policy was "not an appropriate use of state or local resources." SA 213. The statute itself likewise speaks directly to the "use [of] any law-enforcement resources" in federal civil immigration operations. Va. Code § 15.2-1726.1(B).

The record also identified concrete concerns associated with § 287(g) participation. Virginia explained that the program consumes personnel, administrative resources, detention capacity, and training time; creates litigation and liability exposure for local agencies; and places federal restrictions on disclosure of records produced or held by Virginia law-enforcement bodies, creating tension with Virginia's transparency regime. SA 82, SA 85–87. The amicus record further documented concerns that entangling local police with civil immigration enforcement can deter victims and witnesses from reporting crimes and cooperating with police, thereby affecting the effectiveness of local law enforcement itself. SA 246–247.

The district court nevertheless discounted those interests in substantial part because Virginia's legislation also reflected

disagreement with federal immigration-enforcement practices. SA 50–53. But political disagreement with federal policy does not strip an otherwise legitimate state interest of constitutional protection. Indeed, it is a perfectly valid justification for withholding its resources. This Court's decision in *Baltimore Teachers Union v. Mayor & City Council of Baltimore* confirms the point. There, the city reduced compensation required by existing collective-bargaining agreements to respond to fiscal constraints. 6 F.3d 1012, 1014–15 (4th Cir. 1993). The Court expressly recognized that "ensuring the financial integrity of the city is a significant public purpose" and ultimately rejected the Contract Clause challenge. *Id.* at 1019–22.

Virginia's interests are at least as substantial. They encompass not merely cost, but public safety, police accountability, transparency, liability, victim cooperation, and the effective deployment of state and local officers. The district court cited no Contract Clause authority holding that a state's disagreement with federal policy renders otherwise legitimate, record-supported interests—such as conserving state resources, protecting public safety, and regulating state officers—constitutionally illegitimate.

The Northern District of New York's recent decision in *United States v. New York* is likewise instructive. There, the court considered a state law that went further than Virginia's by terminating existing § 287(g) agreements and barring new ones. No. 1:26-cv-1360, 2026 WL 2225423, at *3 (N.D.N.Y. Aug. 3, 2026). It rejected the federal government's contention that conserving local law-enforcement resources was a post hoc or illegitimate justification and concluded that protecting public safety and local law-enforcement resources served a broad societal purpose. *Id.* at *20–23. If those interests can justify New York's complete withdrawal from § 287(g), they cannot become constitutionally illegitimate when Virginia takes the more modest course of conditioning continued participation by its own subdivisions.

**D. The 287(g) Law reasonably advances those public purposes.**

Once a legitimate public purpose exists, the remaining question is whether the adjustment of contractual rights rests on "reasonable conditions" of a character appropriate to that purpose. *Energy Reserves*, 459 U.S. at 412 (quoting *U.S. Trust*, 431 U.S. at 22). Where the state is not itself a contracting party, courts ordinarily defer to legislative

judgment concerning the reasonableness and necessity of the measure. *Id.* at 412–13.

That distinction is important here. The Commonwealth of Virginia is not a party to the challenged § 287(g) agreements. SA 61 n.22. The agreements are between the federal government and Virginia localities or local law-enforcement entities. SA 61 n.22. This is therefore not the paradigm that prompted heightened concern in *U.S. Trust*, where states repudiated their own contractual undertaking and stood to benefit from doing so. 431 U.S. at 25–26.

Virginia also did not simply cancel the agreements to escape an obligation or capture a financial benefit. The General Assembly established substantive conditions designed to govern the manner in which Virginia-created law-enforcement agencies may continue lending officers and resources to federal civil immigration enforcement. Among other things, subsection C addresses compliance with Virginia law, identification during operations, enforcement at sensitive locations, information sharing, surveillance, judicial process, entry into residences, and accountability following specified serious incidents. Va. Code § 15.2-1726.1(C)(1)–(12). Those provisions correspond directly to the interests

Virginia identified in transparency, accountability, liability, community policing, and the permissible use of Virginia officers and resources.

The federal government may dislike those conditions. It may refuse to accept them. That does not make them constitutionally irrational. Section 287(g) is a cooperative program requiring agreement on both sides. Virginia has defined the terms on which its political subdivisions are authorized to supply their side of that cooperation. If ICE will not agree, the consequence is that the cooperation ends. That is Virginia's prerogative.

The federal government asserted below that some of Virginia's safeguards impermissibly regulate matters involving federal agents or ICE. But that is plain wrong for the reasons stated in Section II. In any event, the Contract Clause does not permit a court to declare Virginia's broader public purposes illegitimate because the federal government disputes the validity of individual contract terms under another constitutional doctrine, and the district court cited no cases holding otherwise.

Ultimately, the district court's Contract Clause ruling gives the federal government something neither Congress nor the agreements

provide. Before a locality signs, Virginia may determine whether and on what terms that locality can participate. The locality itself may later terminate. Yet after execution, the injunction treats the Commonwealth's earlier grant of contracting authority as effectively frozen for the federal government's benefit. This violates Virginia's sovereignty.

The Virginia Constitution confers on the General Assembly authority over "all subjects of legislation not herein forbidden or restricted," and provides that "a specific grant of authority in this Constitution upon a subject shall not work a restriction of its authority upon the same or any other subject." Va. Const. art. IV, § 14. By virtue of Article VII, Section 2, moreover, the General Assembly is empowered to "provide by general law for the organization, government, [and] powers . . . of counties, cities, towns, and regional governments." By virtue of these constitutional provisions, it is well within the General Assembly's authority to regulate contract practices by local governments—to authorize them and then to remove authority to enter into or continue in contracts.

Indeed, the General Assembly routinely imposes mandatory contract clauses for political subdivisions, including in the Virginia Public Procurement Act. *See, e.g.*, Va. Code § 2.2-4311.1. The Commonwealth has not identified any principle of state law limiting the General Assembly's authority to require localities to renegotiate or exit contracts that are abhorrent to state policy. If such a principle existed, it would effectively empower localities to enter into all manner of contracts in perpetuity and purport to bind themselves to conduct or adopt policies that are repugnant to the Commonwealth. That view would be incongruous with the bedrock principle that localities in Virginia are merely political subdivisions "created by the Commonwealth" with "no element of sovereignty." *Sinclair*, 283 Va. at 576 (citations omitted).

It would be especially odd to claim that localities could exercise such power in the context of a contract that is purely voluntary, allows either party to terminate the contract at will, and is governed by a federal statute that authorizes participating state officials to act only "to the extent consistent with State and local law." 8 U.S.C. § 1357(g)(1); *see id.* § (g)(9). Moreover, it would contravene the Tenth Amendment if the

federal government could commandeer a state's local law-enforcement resources under conditions that the state opposes.

The district court acknowledged the consequences of Dillon's Rule and state sovereignty by recognizing that the Commonwealth could instruct localities not to enter into 287(g) agreements. SA 62. It went awry, though, in ruling, in purely conclusory fashion and with no citation to authority, that "Dillon's Rule does not operate to alter the intergovernmental-immunity doctrine or to somehow authorize states to regulate the federal government in an area entrusted to it by the Constitution." SA 62. That tautology misses the issue. Dillon's Rule means the Commonwealth can take away the authority it granted to localities to engage in contractual relationships. Indeed, even home-rule jurisdictions often exercise the power to preempt local powers. This might be a closer case if the Commonwealth forced a locality to *breach* a contract, but given the contracts were terminable, it is an affront to the Commonwealth's sovereignty to assert that it somehow lost the power to force localities to terminate the agreements just because they happen to have the federal government as the counterparty.

The Contract Clause protects reasonable contractual expectations. It does not constitutionalize an earlier allocation of state governmental power merely because the federal government happens to be the counterparty. The federal government therefore failed to establish a likelihood of success on its Contract Clause claim.

## II. The district court's intergovernmental-immunity theory confuses regulating the federal government with declining to supply it with state and local officers.

### A. The statutory command runs to Virginia law-enforcement agencies, not the federal government.

Intergovernmental immunity prevents a state from regulating the federal government. But it does not require a state to assist it. The Supreme Court has distilled the doctrine into two prohibitions: States may not regulate the United States directly or "discriminate against the Federal Government or those with whom it deals." *United States v. Washington*, 596 U.S. 832, 838–39 (2022) (alterations and citations omitted).

The district court concluded that Virginia directly regulates the federal government because subsection C requires § 287(g) agreements that localities execute to contain terms addressing conduct by ICE and federal agents. SA 58–60. In the court's view, those contractual

provisions are "commands and prohibitions" issued "directly to ICE, its agents and other federal agents," and Virginia therefore is indirectly accomplishing what it could not impose directly. SA 59. The court went so far as to say that all twelve provisions of subsection C are "explicit commands" to federal authorities and that, if this does not constitute direct regulation, "then none there would ever be." SA 60–61.

That analysis misunderstands fundamental contract law. It mistakes a condition on Virginia localities' participation in a voluntary agreement for a command to the federal government. The law does not command the federal government to do *anything*. It tells Virginia law-enforcement agencies the terms on which they may lend Virginia officers and resources to help ICE.

Start with the text the district court's analysis largely skipped. Subsection C does not begin, "ICE shall." It begins: "No law-enforcement agency shall maintain, renew, or enter into any federal immigration enforcement agreement unless such agreement includes the following provisions." Va. Code § 15.2-1726.1(C).

And "law-enforcement agency" is expressly defined to mean a state or local agency that employs Virginia law-enforcement officers, including

Virginia sheriff's offices, police departments, correctional facilities, the Department of State Police, and other state and local agencies. *Id.* § 15.2-1726.1(A). The entity Virginia law commands is therefore a Virginia governmental entity.

What follows are terms that must appear in any agreement that such an entity chooses to maintain, renew, or enter. Some terms concern ICE or federal agents. For example, an agreement must provide that ICE give advance notice identifying participating federal personnel, that federal agents operating pursuant to the agreement comply with specified requirements, and that ICE accept other conditions of participation. *Id.* § 15.2-1726.1(C)(1)–(12). But those terms do not become freestanding state law commands merely because the federal government is one contracting party.

That is not direct regulation. It is a refusal to cooperate on terms Virginia no longer authorizes. The district court reached the opposite conclusion by isolating the individual provisions required in the agreement from the statutory mechanism through which those provisions operate. SA 60–61. But one cannot identify whom a statute regulates by skipping its operative command. The fact that Virginia

requires its agencies to insist on contractual protections involving federal conduct does not transform the state's regulation of its own agencies into a state code of conduct independently binding federal officers.

Nor is that distinction peculiar to § 287(g). A government or a private party may condition its own participation in a contractual relationship on the counterparty's agreement to terms concerning records, liability, oversight, indemnification, or other matters. The counterparty is not thereby subject to a freestanding command; it may accept the terms or decline the arrangement. Intergovernmental immunity does not give the federal government a constitutional right to contracts with Virginia political subdivisions on federally preferred terms.

### B. Congress expressly preserved Virginia's authority over whether and how its officers participate.

The district court's theory cannot be reconciled with § 287(g) either. Congress did not create an unconditional federal entitlement to state and local law-enforcement assistance. It authorized the federal government to enter agreements under which state and local officers may perform immigration functions "at the expense of the State or political subdivision and to the extent consistent with State and local law." 8 U.S.C.

§ 1357(g)(1). Congress then removed any possible doubt about voluntariness: "Nothing in this subsection shall be construed to require any State or political subdivision of a State to enter into an agreement" under § 287(g). *Id.* § 1357(g)(9).

The federal government conceded below that, because Congress made the agreements voluntary, it "does not take the position that any declination to enter a 287(g) agreement is an obstruction of federal law." SA 524. That concession should have resolved the issue. If Virginia may categorically withhold its officers from the federal program, it is exceedingly difficult to see how Virginia directly regulates the federal government by offering those same officers subject to conditions.

The Ninth Circuit's reasoning in *United States v. California* is instructive. There, California restricted the extent to which its state and local law-enforcement agencies could assist federal immigration authorities. 921 F.3d 865, 876–77 (9th Cir. 2019). The federal government argued that those restrictions would complicate immigration enforcement, require more federal personnel, and make arrests less safe and efficient. *Id.* at 887–88. The court accepted that federal enforcement would become harder. *Id.* But that did not give the federal government

a right to California's assistance. Federal law gave states and localities "the *option*, not the *requirement*, of assisting federal immigration authorities," and California was entitled to "make[] that choice for California law enforcement agencies." *Id.* at 889 (emphasis in original).

The court put the point more directly: "refusing to help is not the same as impeding." *Id.* at 888 (citation omitted). Otherwise, federal supremacy could become a means of commandeering state resources. *Id.* at 888–90. "Federal schemes are inevitably frustrated when states opt not to participate in federal programs or enforcement efforts." *Id.* at 890. But where a state retains the right to refuse, the federal government may expect cooperation; it may not constitutionally require it. *Id.* at 890–91. Intergovernmental immunity should not be used to produce by constitutional implication the compulsory state participation that Congress could not command directly and § 1357(g) expressly disclaims. *See McHenry*, 44 F.4th at 591 n.4; *California*, 921 F.3d at 891.

The same principle applies with greater force here because Congress itself wrote voluntariness and state law consistency into the particular federal program at issue. Section 1357(g) does not merely

tolerate state choice as a matter of background constitutional law. It expressly incorporates it.

The district court repeatedly emphasized that immigration enforcement lies within federal authority. SA 60–62. Of course it does. But that answers the wrong question. Enforcing federal immigration law is a federal function. Supplying Virginia officers to help perform that function is not. The former belongs to the federal government. The latter remains Virginia's choice.

### C. *McHenry*, not *CoreCivic*, addresses the critical distinction here.

The district court relied heavily on the Third Circuit's decision in *CoreCivic, Inc. v. Governor of New Jersey*, 145 F.4th 315 (3d Cir. 2025), and concluded that *McHenry County*, 44 F.4th 581, failed to account for *CoreCivic*'s supposedly more functional understanding of intergovernmental immunity. SA 56–60.

But *CoreCivic* did not reject *McHenry*. It expressly distinguished it. *See CoreCivic*, 145 F.4th at 327 (quoting *McHenry*, 44 F.4th at 593); *see also id.* at 324 (citing *McHenry* as "drawing this same distinction"). In *McHenry*, Illinois prohibited state and local governments from entering or maintaining agreements to detain individuals for federal civil

immigration enforcement. 44 F.4th at 585–86. The Seventh Circuit held that the statute imposed "no direct regulation on any federal official or agency" even though "*the* intended consequence" was that the federal government could no longer use cooperative agreements with Illinois state or county facilities. *Id.* at 593 (emphasis in original). That is the critical point here—a state does not directly regulate the federal government merely because its regulation of state and local entities predictably deprives the federal government of assistance those entities previously provided.

*CoreCivic* involved something materially different. New Jersey prohibited *private* detention companies from contracting with the federal government for immigration detention. 145 F.4th at 319–20. The as-applied challenge concerned the private operator of the only remaining facility in New Jersey capable of satisfying ICE's asserted detention needs. *Id.* at 320. The Third Circuit held that the state could not eliminate every *private* counterparty in a market through which the federal government carried out its own detention function. *Id.* at 325–28.

Virginia's law falls on the *McHenry* side of that distinction. Section 15.2-1726.1 does not regulate private contractors that ICE has chosen to perform federal work. It regulates Virginia law-enforcement agencies and the circumstances in which Virginia governmental resources may be committed to federal civil immigration enforcement. If those agencies do not participate, ICE's independent authority remains untouched.

The other direct-regulation authorities do not bridge the gap between this case and *CoreCivic*. *United States v. Virginia*, 139 F.3d 984 (4th Cir. 1998), invalidated Virginia licensing and registration requirements imposed on private investigators hired by the FBI. Those requirements subjected individuals selected by the federal government to state qualifications beyond those the FBI deemed sufficient. *Id.* at 986–90. The present law does not tell the federal government whom it may hire or what qualifications federal personnel must possess. It simply tells Virginia political subdivisions when they may commit Virginia officers to a cooperative federal program.

The federal-contractor cases on which *CoreCivic* relied are different for the same reason. Those cases prevented states from second-guessing the federal government's selection or use of private parties to perform

federal functions. *See Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187, 188–90 (1956) (per curiam); *Public Utilities Commission v. United States*, 355 U.S. 534, 543–45 (1958); *United States v. King County*, 122 F.4th 740, 756 (9th Cir. 2024). A Virginia sheriff's office is not a private contractor independently selected by the federal government. It is a governmental entity, the authority of which derives from Virginia law.

These cases all reflect the same distinction. A state may not dictate how federal officials or the federal government's chosen private contractors perform federal functions. That does not mean a state must make its own governmental entities available to perform those functions. The district court incorrectly treated those propositions as interchangeable.

### D. The district court's theory has no limiting principle and collides with the very voluntariness Congress prescribed.

The district court's theory has no rational limit—any state choice to not provide resources to the federal government violates the intergovernmental-immunity doctrine. That reading violates the anticommandeering principle, though. The federal government may not "impress into its service" state officers to administer federal programs.

*Printz v. United States*, 521 U.S. 898, 922, 935 (1997); *see New York v. United States*, 505 U.S. 144, 161–66, 188 (1992). Section 287(g)(9) respects that constitutional division by making participation expressly voluntary.

Intergovernmental immunity prevents Virginia from controlling federal operations. Anti-commandeering prevents the federal government from controlling Virginia's governmental machinery. Neither doctrine gives one sovereign a right to the other's personnel or resources.

There is a straightforward line that respects both doctrines. Virginia cannot directly regulate what ICE does when ICE exercises federal authority with federal personnel and resources. Virginia can regulate whether Virginia agencies, Virginia officers, and Virginia resources will assist ICE through a voluntary cooperative program. Congress drew that line itself, but the district court's rule erased it.

## III. The federal government's alternative Supremacy Clause theories cannot sustain the injunction.

### A. Federal law does not preempt Virginia's decision to limit its own participation in § 287(g).

The district court did not decide the federal government's remaining Supremacy Clause theories, but neither theory provides an

alternative basis to affirm. Both depend on the same mistaken premise as the claims the district court accepted. Congress authorized voluntary state assistance. The federal government treats that authorization as though Congress guaranteed the assistance.

Conflict preemption applies when compliance with federal and state law is impossible or when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona v. United States*, 567 U.S. 387, 399 (2012) (citation omitted). But preemption analysis must begin with the federal statute Congress actually enacted, not with a judicially re-constructed version of the program the Department of Homeland Security might have preferred. *See Kansas v. Garcia*, 589 U.S. 191, 208 (2020).

Section 287(g) leaves no mystery about Congress's design. State and local participation is voluntary, 8 U.S.C. § 1357(g)(9), so a state cannot possibly be in conflict with Section 287(g) by withholding participation.

The federal government's obstacle-preemption theory cannot be squared with that provision. It argues that Virginia frustrates Congress's objective of encouraging cooperation because Virginia's

requirements may prevent § 287(g) agreements from continuing on ICE's preferred terms. SA 528–31. But Congress created a mechanism through which willing States and localities may assist federal immigration enforcement. It did not command them to do so.

A federal statute premised on voluntary state cooperation cannot sensibly be read to prohibit the state from withholding that cooperation. That is the reasoning of *McHenry County v. Raoul*. Illinois barred state and local entities from entering immigration-detention agreements with the federal government. 44 F.4th at 585–86. The court rejected obstacle preemption because the federal scheme contemplated cooperation but did not require it. *Id.* at 591–92. As the court explained, "[i]t would make no sense to hold that a federal statute premised on state cooperation preempts a state law withholding that cooperation." *Id.* at 592.

*United States v. California* reinforces the point. California restricted state and local cooperation with federal immigration authorities even though the restrictions made federal enforcement more difficult and required additional federal resources. 921 F.3d at 887–90. The Ninth Circuit held that federal law gives states "the *option*, not the *requirement*, of assisting federal immigration authorities." *Id.* at 889

(emphasis in original). The court agreed that "refusing to help is not the same as impeding" and explained that a state's choice to refrain from participation cannot become invalid through obstacle preemption where the state retains the right to refuse. *Id.* at 888–90.

The Fifth Circuit has said the same thing about § 1357 itself. Federal law does not show an intent "to prevent states from regulating *whether* their localities cooperate in immigration enforcement." *City of El Cenizo v. Texas*, 890 F.3d 164, 178 (5th Cir. 2018) (emphasis in original). "Section 1357 does not require cooperation at all." *Id.*

The federal government conceded the same premise below. It acknowledged that, because § 287(g) agreements "were made voluntary by statute," a state or locality's decision not to enter one is not itself an obstruction of federal law. SA 524. Its preemption theory nevertheless says Virginia obstructs federal law when the General Assembly exercises that same choice for Virginia's political subdivisions.

Federal law cannot make cooperation voluntary for each locality but constitutionally compulsory for the state that created those localities and defines their powers. The federal government's reliance on *Arizona v. United States* does not change the analysis. Arizona asserted

independent state authority to enforce federal immigration law outside the framework Congress prescribed. 567 U.S. at 407–10. Virginia has done the opposite. It has limited when state and local officers will lend themselves to federal enforcement through a program Congress expressly made optional.

Nor does *City of New York v. United States*, 179 F.3d 29 (2d Cir. 1999), help the federal government. That case involved federal statutes expressly prohibiting state and local restrictions on specified immigration-status information sharing. *Id.* at 32–33. There, Congress affirmatively prohibited a form of noncooperation. Here, Congress expressly disclaimed any requirement that a state enter a § 287(g) agreement and made delegated authority subject to state and local law. The statutory choices point in opposite directions.

The federal government's impossibility theory fares no better. It argues that some required contractual terms conflict with federal law and therefore make compliant § 287(g) agreements impossible. SA 279–280, SA 528. But Virginia law does not require ICE to enter an agreement containing a term it considers unlawful. ICE may refuse. The

consequence is that the Virginia agency cannot continue participating under state law.

### B. The 287(g) Law does not discriminate against the federal government.

The federal government's discriminatory immunity theory fails for a related reason. Intergovernmental immunity prohibits a state from singling out the federal government or those with whom it deals for unfavorable treatment. *United States v. Washington*, 596 U.S. 832, 839 (2022). A discrimination claim therefore requires a meaningful comparison with a similarly situated party who was treated differently. *See Dawson v. Steager*, 586 U.S. 171, 177 (2019); *Washington v. United States*, 460 U.S. 536, 544–45 (1983).

The federal government identifies Virginia's ordinary law-enforcement-cooperation statutes as comparators. It points to Va. Code §§ 15.2-1726 and 15.2-1727, which authorize reciprocal police-service and mutual-aid agreements with other localities, states, *and the federal government*, and argues that Virginia does not impose the same restrictions on those arrangements. SA 273.

But ordinary police mutual-aid agreements are not similarly situated to § 287(g) agreements merely because both involve

governmental cooperation. Section 287(g) agreements delegate federal civil immigration functions to state and local officers. Participating officers operate under federal training and supervision, and state or local jurisdictions supply personnel and resources for the program. 8 U.S.C. § 1357(g)(1)–(3). The agreements raise distinct questions involving civil immigration authority, detention, liability, information sharing, public-facing enforcement, and the relationship between federal supervision and Virginia law.

An agreement between neighboring police departments or between a police department and federal law enforcement to provide mutual aid in enforcing ordinary criminal law does not share those characteristics. The Seventh Circuit's decision in *McHenry* rejects the federal government's effort to avoid that contrast by emphasizing that immigration is exclusively federal. "Differential treatment is critical to a discrimination-based intergovernmental immunity claim," and "[t]he mere fact that [a law] touches on an exclusively federal sphere is not enough to establish discrimination." 44 F.4th at 594.

The fact that only the federal government engages in immigration enforcement further establishes how its comparison to the cooperation

statutes is inapt. Subsection B expressly preserves state and local assistance in investigations of state or federal crimes, including operations conducted with joint state-federal law-enforcement task forces. Va. Code § 15.2-1726.1(B). Virginia therefore continues to authorize broad cooperation with federal law enforcement. What it regulates specially is the use of Virginia officers and resources for federal civil immigration enforcement, an activity with distinct operational and state law consequences.

The Ninth Circuit's *King County* decision does not eliminate the comparator requirement. It illustrates it. There, King County barred airport service providers from servicing ICE deportation flights while permitting the same providers to service other charter flights. *United States v. King County*, 122 F.4th 740, 747–48, 756–58 (9th Cir. 2024). Contractors serving ICE were therefore treated differently from otherwise comparable contractors using the same airport for other customers. *Id.*

That is not this case. The federal government points to materially different categories of law-enforcement cooperation and asks the Court to ignore the features that caused Virginia to regulate § 287(g)

participation separately. Intergovernmental immunity does not require that result. Virginia may distinguish between materially different governmental activities without discriminating against the federal government merely because one of those activities involves federal immigration enforcement.

## IV. The remaining *Winter* factors do not rescue an injunction built on the district court's merits errors.

### A. The federal government did not independently establish irreparable harm.

A preliminary injunction requires a clear showing on all four *Winter* factors. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20, 22 (2008); *see also Pashby v. Delia*, 709 F.3d 307, 319, 321 (4th Cir. 2013). The district court's treatment of the remaining factors largely followed from its merits rulings. Having concluded that Virginia likely violated the Contract Clause and intergovernmental immunity, the court treated the asserted constitutional injuries as irreparable and relied on the same conclusions to resolve the balance of equities and public interest. SA 63–68. But because those merits conclusions are wrong, the remaining factors do not independently support the injunction.

The federal government had to make a "clear showing" that irreparable injury was likely absent preliminary relief. *Winter*, 555 U.S.

at 22. The threatened injury must be "neither remote nor speculative, but actual and imminent." *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 216 (4th Cir. 2019) (quotation omitted).

The district court found irreparable harm principally because it had already concluded that Virginia likely infringed federal constitutional and contractual rights. SA 65–67. That does not withstand scrutiny on the merits and therefore cannot preserve an injunction resting on the district court's erroneous merits conclusions. If Virginia has neither directly regulated the federal government nor unconstitutionally impaired its contracts, enforcement of Virginia law does not inflict the constitutional injuries on which the court relied.

The record does not establish a separate operational injury sufficient to fill that gap. Section 287(g) agreements supplement federal immigration enforcement. Virginia's evidence explained that a § 287(g) agreement "does not in any way affect ICE's own use of its personnel or authorities" in a participating jurisdiction, apart from the supervisory resources ICE devotes to the agreement. SA 148. ICE has instead described the program as a "force multiplier" that adds state and local

resources to the federal enforcement footprint and frees federal resources for other uses. SA 148.

Loss of a § 287(g) agreement therefore does not deprive ICE of federal immigration authority. It deprives ICE of additional assistance furnished by state and local governments.

The federal government argued below that ending existing agreements would hinder federal operations and require DHS to devote additional federal resources to work now performed with local assistance. JA 137–138. That may make enforcement less efficient or more expensive. But Congress expressly made that assistance optional. The federal government cannot establish irreparable harm merely by showing that it benefits from resources another sovereign remains free to withhold.

Indeed, the federal government conceded that a state or locality may decline to enter a § 287(g) agreement without obstructing federal law. SA 524. Existing agreements likewise permit termination or suspension. SA 397. It is difficult to see how the loss of optional assistance becomes an irreparable federal injury merely because Virginia

makes the participation decision at the statewide level rather than leaving each locality to make it independently.

ICE remains able to investigate, arrest, detain, and remove persons under federal immigration law using federal personnel and authority. The 287(g) Law does not diminish those powers. It determines when Virginia governmental entities will add their personnel and resources to the federal effort.

The resulting operational consequence is the one Congress built into a voluntary program. When § 287(g) assistance is unavailable, the federal government must rely on its own resources or other forms of cooperation that federal and state law permit. That does not establish the irreparable injury necessary for extraordinary preliminary relief.

### B. The balance of equities and public interest do not support the injunction.

The final two *Winter* factors require consideration of the competing injuries and the public consequences of preliminary relief. *Winter*, 555 U.S. at 24. Because governments stand on both sides, the balance of equities and public interest substantially overlap. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

Here too, the district court's conclusion flowed principally from its merits ruling. It reasoned that Virginia has no legitimate interest in enforcing an unconstitutional law and that the public interest favors protecting federal law from unconstitutional state interference. SA 67–68.

Those propositions do not resolve the balance when constitutionality itself remains contested. Given the district court was wrong on the merits, Virginia is not seeking an equitable interest in violating federal law. It is seeking to exercise its sovereign authority over Virginia law-enforcement agencies, officers, resources, and political subdivisions.

And the injury from preventing a state from exercising that authority is well recognized. This Court recently relied on *Maryland v. King* in explaining that enjoining a state from enforcing a duly enacted law inflicts "a form of irreparable injury." *Pierce v. North Carolina State Board of Elections*, 97 F.4th 194, 225 (4th Cir. 2024) (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)). The Supreme Court likewise has recognized that, unless the challenged enactment is unconstitutional, preventing a state from implementing it

can "seriously and irreparably harm" the state. *Abbott v. Perez*, 585 U.S. 579, 602–03 (2018).

That qualification is critical because Virginia's sovereign injury cannot be removed from the balance simply by assuming the correctness of the preliminary merits ruling that Virginia challenges on appeal. Otherwise the first *Winter* factor would effectively decide the remaining three whenever a plaintiff alleges a constitutional violation.

The injunction also reaches beyond an abstract inability to enforce a statute. It prevents Virginia from implementing its policy for when Virginia officers and resources may be devoted to federal civil immigration enforcement. And it prohibits Virginia from "in any way" interfering with performance of existing § 287(g) agreements. SA 18. That broad command necessarily affects the Commonwealth's continuing relationship with its own political subdivisions and the governmental resources those subdivisions employ.

On the other side of the balance, the federal government retains all of its federal immigration-enforcement authority absent an injunction. Its asserted interest is continued access to state and local assistance that Congress expressly declined to require. Federal enforcement may be

easier with that assistance. Ease of federal administration, however, cannot by itself outweigh a state's sovereign interest in controlling its own governmental machinery when Congress left participation voluntary.

*United States v. California* illustrates the distinction. California's restrictions purportedly forced federal immigration authorities to devote additional personnel and resources to federal enforcement. 921 F.3d 865, 887–90 (9th Cir. 2019). The Ninth Circuit nevertheless held that federal law gave the state the choice whether to provide assistance. *Id.* at 889–90. The fact that withholding state help makes federal enforcement more burdensome does not transform continued state assistance into a federal equitable entitlement.

Nor does describing the pre-enactment arrangement as the "status quo" change the balance. A preliminary injunction must satisfy *Winter*; preservation of a prior arrangement is not an independent equitable factor. *See League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014).

The General Assembly changed Virginia law. Freezing the prior regime therefore does not preserve a neutral state of affairs. It preserves

the federal government's preferred terms of cooperation while preventing Virginia's newly enacted policy from governing Virginia entities.

The injunction's own carveout underscores the point. Virginia remains free to apply the law to a locality seeking to enter its first § 287(g) agreement but cannot apply the same policy to existing participants. SA 16–17.

The equities thus run in opposite directions from the district court's analysis. ICE retains its federal authority and loses only assistance Congress made voluntary. Virginia remains judicially disabled from implementing a law governing the officers, resources, and political subdivisions for which it is responsible. Once the district court's merits errors are corrected, the remaining *Winter* factors do not support preliminary relief.

## CONCLUSION

For the foregoing reasons, the Court should vacate the preliminary injunction and remand for further proceedings.

Respectfully submitted,

COMMONWEALTH OF VIRGINIA and JAY JONES, in His Official Capacity as Attorney General for the Commonwealth of Virginia

/s/ *Ethan P. Fallon*

ETHAN P. FALLON
*Deputy Solicitor General*

JAY JONES
*Attorney General*

TRAVIS G. HILL
*Chief Deputy Attorney General*

TILLMAN J. BRECKENRIDGE
*Solicitor General*

R. TRENT TAYLOR
*Deputy Solicitor General*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-2071 – Telephone
(804) 786-1991 – Facsimile
SolicitorGeneral@oag.state.va.us

September 25, 2026

*Counsel for Defendants-Appellants*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), it contains 11,652 words. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook.

/s/ *Ethan P. Fallon*
ETHAN P. FALLON
*Deputy Solicitor General*

## CERTIFICATE OF SERVICE

I certify that on September 25, 2026, I electronically filed the foregoing brief with the Clerk of the Court using the appellate CM/ECF system, which will serve all parties or their counsel of record through the CM/ECF system.

/s/ *Ethan P. Fallon*
ETHAN P. FALLON
*Deputy Solicitor General*