**Nos. 26-1874 (L), 26-2258 (Consolidated)**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

THE UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

THE COMMONWEALTH OF VIRGINIA; JAY JONES, in his official capacity as Attorney General of Virginia,

Defendants-Appellants.

On Appeal from the United States District Court
for the Eastern District of Virginia

# SUPPLEMENTAL RESPONSE BRIEF FOR UNITED STATES

BRETT A. SHUMATE
*Assistant Attorney General*

MEGAN LACY OWEN
*Principal Deputy Assistant Attorney General*

MARK R. FREEMAN
DANIEL TENNY
RANDALL C. SMITH
*Attorneys, Appellate Staff*
*Civil Division*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-4027*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ iii

INTRODUCTION ........ 1

STATEMENT OF JURISDICTION ........ 5

STATEMENT OF THE ISSUES ........ 5

STATEMENT OF THE CASE ........ 6

A. Background ........ 6

B. Prior Proceedings ........ 11

SUMMARY OF ARGUMENT ........ 13

STANDARD OF REVIEW ........ 15

ARGUMENT ........ 16

I. The district court correctly concluded that the United States is likely to prevail on its claim that the 287(g) Law violates the Contracts Clause. ........ 16

A. The 287(g) Law substantially impairs a contractual relationship. ........ 16

B. The 287(g) Law is not drawn in an appropriate and reasonable way to advance a significant and legitimate public purpose ........ 28

C. The Commonwealth did not merely exercise control over its subdivisions ........ 34

II. The district court correctly held that the United States is likely to prevail on its intergovernmental-immunity claim ........ 37

III. The district court properly assessed the remaining *Winter* factors. ........ 41

A. The government established irreparable harm. ..........................42

B. The balance of the equities and public interest support the injunction.........................................................................................43

CONCLUSION .............................................................................................44

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Allied Structural Steel v. Spannaus*,
438 U.S. 234 (1978) .......... 16, 18, 19, 23, 32

*Arizona v. United States*,
567 U.S. 387 (2012) .......... 3, 6, 29

*Baltimore Tchrs. Union, Am. Fed'n of Tchrs. Loc. 340 v. Mayor & City Council of Balt.*,
6 F.3d 1012 (4th Cir. 1993) .......... 19, 23, 26, 28, 30, 32, 33

*City of Charleston v. Public Serv. Comm'n of W. Va.*,
57 F.3d 385 (4th Cir. 1995) .......... 27

*City of New Orleans v. New Orleans Waterworks Co.*,
142 U.S. 79 (1891) .......... 22

*City of Trenton v. New Jersey*,
262 U.S. 182 (1923) .......... 22

*City of Pawhuska v. Pawhuska Oil & Gas Co.*,
250 U.S. 394 (1919) .......... 22

*City of Worcester v. Worcester Consol. St. Ry. Co.*,
196 U.S. 539 (1905) .......... 22

*Commissioners of Laramie Cnty. v. Commissioners of Albany Cnty.*,
92 U.S. 307 (1875) .......... 22

*Connecticut State Police Union v. Rovella*,
494 F. Supp. 3d 210 (D. Conn. 2020) .......... 42

*CoreCivic, Inc. v. Governor of N.J.*,
145 F. 4th 315 (3d Cir. 2025) .......... 39, 40

*Donohue v. Mangano*,
886 F. Supp. 2d 126 (E.D.N.Y. 2012) .......... 42

*Energy Rsrvs. Grp. Inc. v. Kansas Power & Light Co.*,
459 U.S. 400 (1983) .................................................................... 16, 17, 27

*Fletcher v. Peck*,
10 U.S. (6 Cranch.) 87 (1810) ........................................................... 22

*Giovani Carandola, Ltd. v. Bason*,
303 F.3d 507 (4th Cir. 2002) ............................................................ 43

*Home Bldg. & Loan Ass'n v. Blaisdell*,
250 U.S. 398 (1934) .......................................................................... 18

*Johnston v. William E. Wood & Assocs., Inc.*,
787 S.E.2d 103 (Va. 2016) ................................................................ 26

*Keystone Bituminous Coal Ass'n v. DeBenedictis*,
480 U.S. 470 (1987) .......................................................................... 18

*Leaders of a Beautiful Struggle v. Baltimore Police Dep't*,
2 F.4th 330 (4th Cir. 2021) ............................................................... 43

*McCulloch v. Maryland*,
17 U.S. (4 Wheat.) 316 (1819) .......................................................... 38

*McHenry County v. Raoul*,
44 F.4th 581 (7th Cir. 2022) ............................................................. 41

*Miller v. City of Milwaukee*,
272 U.S. 713 (1927) .......................................................................... 40

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*,
915 F.3d 197 (4th Cir. 2019) ............................................................ 15

*New Orleans Pub. Serv., Inc. v. Council of New Orleans*,
491 U.S. 350 (1989) .......................................................................... 42

*Nolan v. Grewal*, No. A-4614-19,
2022 WL 221550 (N.J. Super. Ct. App. Div. Jan. 26, 2022) ......................... 36

*North Dakota v. United States*,
495 U.S. 423 (1990) .......... 38

*Northern Pac. Ry. Co. v. Minnesota*,
208 U.S. 583 (1908) .......... 22

*Stone v. Mississippi*,
101 U.S. 814 (1880) .......... 23, 24

*Sullivan v. Nassau Cnty. Interim Fin. Auth.*,
959 F.3d 54 (2d Cir. 2020) .......... 33-34, 37

*Sveen v. Melin*,
584 U.S. 811 (2018) .......... 16, 17, 19, 28

*Texaco, Inc. v. Short*,
454 U.S. 516 (1982) .......... 19

*Toll v. Moreno*,
458 U.S. 1 (1982) .......... 29

*Town of East Hartford v. Hartford Bridge Co.*,
51 U.S. 511 (1850) .......... 22

*U.S. Tr. Co. of N.Y. v. New Jersey*,
431 U.S. 1 (1977) .......... 17-18, 19, 23, 24, 35

*United Healthcare Ins. Co. v. Davis*,
602 F.3d 618 (5th Cir. 2010) .......... 26

*United States v. California*,
173 F.4th 1060 (9th Cir. 2026) .......... 42

*United States v. King County*,
122 F.4th 740 (9th Cr. 2024) .......... 40

*United States v. Washington*,
596 U.S. 832 (2022) .......... 38

**U.S. Constitution:**

Art. I:
§ 8, cl. 4 .......... 6
§ 10, cl. 1 .......... 16

**Statutes:**

Immigration and Nationality Act (INA):
8 U.S.C. § 1182 .......... 6
8 U.S.C. §§ 1225-1228 .......... 6
8 U.S.C. § 1225(d)(4) .......... 20
8 U.S.C. § 1226(a) .......... 10, 20
8 U.S.C. § 1228(a)(3)(B) .......... 7
8 U.S.C. § 1231 .......... 6
8 U.S.C. § 1231(a)(1)(B) .......... 7
8 U.S.C. § 1357(g) .......... 1
8 U.S.C. § 1357(g)(1) .......... 8, 27
8 U.S.C. § 1357(g)(8) .......... 8, 20
8 U.S.C. § 1373 .......... 20
8 U.S.C. § 1644 .......... 20

28 U.S.C. § 1292(a)(1) .......... 5

28 U.S.C. § 1331 .......... 5

28 U.S.C. § 1345 .......... 5

**Regulatory Materials:**

8 C.F.R. § 287.7(a) .......... 7

8 C.F.R. § 287.8 .......... 20

Va. Exec. Order No. 47 (Feb. 27, 2025) .......... 8, 9

**Other Authority:**

*Restatement (Second) of Contracts* (A.L.I. 1981) ............................................25

## INTRODUCTION

Federal law authorizes state and local authorities to enter into agreements with the federal government to assist in immigration enforcement. 8 U.S.C. § 1357(g). Commonly called "287(g) agreements," after the original section numbering in the Immigration and Nationality Act (INA), these agreements bolster the enforcement of federal immigration law by, among other things, allowing state and local correctional officers to facilitate the safe transfer of criminal aliens in their custody to federal authorities for deportation and allowing local police officers to participate in joint task forces with federal immigration officers. Consistent with that authorization, and with the encouragement of Virginia's then-governor, law enforcement agencies within the Commonwealth entered into more than two dozen 287(g) agreements with the federal government in 2025 and 2026.

This case concerns the Commonwealth's effort to void those agreements. In April 2026, Virginia's governor signed Senate Bill 783. Explicitly introduced to oppose the enforcement of federal immigration law, the law—hereafter called the "287(g) Law"—purports to void all 287(g) agreements in an effort to cajole the federal government into agreeing to a detailed set of regulations governing how U.S. Immigration and Customs

Enforcement (ICE) and its agents may enforce federal immigration law. The provisions, upon which Virginia insists if the 287(g) agreements are to remain enforceable, cover everything from how federal immigration officers must identify themselves, to where they may conduct immigration enforcement activities, to the types of information they may request, to the surveillance techniques and technology that they may use. They also contain provisions requiring that ICE and its agents consent to the jurisdiction of the Virginia courts for any civil or criminal proceedings relating to the performance of their official duties and agree that any shooting involving a federal agent performing official duties will be investigated by Virginia police and prosecuted by Virginia authorities. The law declares—twice—that any federal immigration-enforcement agreement that does not contain those detailed regulations "shall be void and unenforceable." JA 112.

The 287(g) Law violates the Contracts Clause of the U.S. Constitution. The Contracts Clause forbids state laws that substantially impair a contractual relationship, unless they are reasonably and appropriately drawn to advance a significant and legitimate public purpose. There can be no serious question that the 287(g) Law substantially impairs contracts: It expressly nullifies more than two dozen extant agreements unless they are

modified in ways that fundamentally alter the original arrangement, and to which the federal government could never agree because they are at odds with federal law. And it is not appropriately drawn to any legitimate public purpose: The actual purpose, apparent from the text of the law and confirmed by its legislative history, is to influence and undermine federal immigration enforcement. That purpose is plainly illegitimate—the "broad, undoubted" federal power to regulate immigration means that states "may not pursue policies that undermine federal law." *Arizona v. United States*, 567 U.S. 387, 394, 416 (2012). And though the Commonwealth has offered up various other supposed purposes for the law, these fail to save it: Not only are they plainly post-hoc, but the Commonwealth cannot show that the 287(g) Law is drawn in any reasonable or appropriate way to advance them. The district court correctly held, therefore, that the United States was likely to prevail on the merits of its claim that the 287(g) Law violates the Contracts Clause.

For similar reasons, the district court also correctly concluded that the United States was likely to prevail on its claim that the 287(g) Law violates the doctrine of intergovernmental immunity by directly regulating the federal government. The law applies directly to agreements entered into

with the federal government and declares them "void and unenforceable" unless they contain a detailed set of regulations governing how ICE and its agents perform their official duties. Virginia cannot accomplish indirectly, through the voiding of agreements unless they add certain terms, what it could not do directly.

The Commonwealth's main counter to all this rests on an argument about an alternative course of action that it did not take, but it insists it could have taken. Had it wanted, the Commonwealth asserts, it could have simply directed local entities to terminate the 287(g) agreements according to their own terms, because it enjoys plenary authority over them under Virginia law. Regardless of whether such an action would have been permissible, the Commonwealth's insistence that it could have achieved its ends through the more moderate course of simply directing its localities to terminate their agreements undermines, rather than supports, its defense of the more drastic nullification effected by the 287(g) Law. Virginia's choice to adopt that drastic approach had tangible effects, since it deprives the federal government of the benefit of provisions requiring advance notice of termination. More fundamentally, the Commonwealth cannot defend the

unconstitutional law it actually enacted by hypothesizing a different law it asserts it could have enacted.

Because the United States is likely to prevail on its constitutional challenge to the actual, existing 287(g) Law, and the district court properly assessed the other factors in issuing a preliminary injunction, this Court should affirm.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1345 because this case arises under federal law and because the United States is the plaintiff. The district court issued its order granting a preliminary injunction on August 31, 2026. SA 16-19. The Commonwealth timely appealed on September 8, 2026. SA 683-685. This Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

1. Whether the district court correctly held that the United States is likely to succeed in its claim that the 287(g) Law—which imposes a detailed set of regulations governing the conduct of federal immigration officers and declares any existing 287(g) agreement that does not incorporate those provisions "void and unenforceable"—violates the Contracts Clause.

2. Whether the district court correctly held that the United States is likely to succeed in its claim that the 287(g) Law also directly regulates the federal government in violation of the Supremacy Clause and the intergovernmental-immunity doctrine.

3. Whether the district court acted within its discretion in weighing the equitable requirements for injunctive relief and granting an injunction.

## STATEMENT OF THE CASE

### A. Background

The Constitution gives the federal government the power to "establish an uniform Rule of Naturalization." U.S. Const. art. I, § 8, cl. 4. That constitutional authority, coupled with the government's inherent power over the conduct of foreign relations, gives the national government "broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394 (2012).

Congress exercised its authority to regulate immigration by enacting the Immigration and Nationality Act. The INA contains detailed provisions relating to the investigation, detention, and removal of aliens unlawfully present in the United States. *See, e.g.*, 8 U.S.C. §§ 1182, 1225-1228, 1231. Though the federal government's role in the regulation of immigration is

preeminent, the INA contemplates a cooperative relationship with state and local authorities in the enforcement of immigration law and seeks to balance the prerogatives of the states with the federal government's sovereign interests in enforcing immigration law. For instance, to ensure that the federal government's enforcement of immigration law does not disrupt states' enforcement of their criminal laws, the INA provides that criminal aliens are not required to be removed until *after* they have been released from state custody. *Id.* § 1228(a)(3)(B); *see also id.* § 1231(a)(1)(B). Federal law also facilitates the process whereby federal authorities take custody of criminal aliens for removal upon their release from state or local custody. Regulations promulgated under the INA allow for the issuance of detainers to state and local law enforcement agencies, which inform those agencies that a person currently in their custody is sought for removal and request that the agencies advise federal authorities prior to that person's release, to enable a safe and orderly transfer to federal custody. *See* 8 C.F.R. § 287.7(a).

The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 sought to bolster the cooperative relationship between the federal government and state and local authorities. It allows the government to enter into 287(g) agreements with states and their political subdivisions

under which state and local officers may "perform a function of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States." 8 U.S.C. § 1357(g)(1). State and local officers acting under such agreements are subject to the direction and supervision of federal authorities and are "considered to be acting under color of Federal authority for purposes of determining the liability, and immunity from suit, of the officer or employee in a civil action brought under Federal or State law." *Id.* § 1357(g)(8).

In February 2025, in response to violent crimes committed by aliens unlawfully present in the United States, the Virginia governor issued an executive order. Va. Exec. Order No. 47 (Feb. 27, 2025), https://perma.cc/RS2T-MRGU. The executive order noted that nearly 1,000 inmates in the custody of the Virginia Department of Corrections had open immigration detainers, with the overwhelming majority being sought for removal due to violent crimes, including murder and rape, and indicated that 287(g) agreements promoted community safety by allowing the removal of dangerous illegal aliens. The executive order accordingly directed the Virginia Department of Corrections to enter into a "Jail Enforcement Model" agreement—a type of 287(g) agreement that "is designed to identify and

process removable immigrants who are incarcerated in state or local correctional facilities." *Id.* It also directed the Virginia State Police to enter into a "Task Force Model" agreement—a type of 287(g) agreement that allows local officers to "enforce limited immigration authority with ICE oversight during their routine police duties." *Id.* Finally, it directed Virginia's Secretary of Public Safety and Homeland Security to request confirmation of cooperation with ICE from officials in charge of local or regional jails within Virginia. *Id.*

Between March 2025 and May 2026, the federal government executed approximately 30 287(g) agreements with law-enforcement agencies in Virginia. SA 403-404. In addition to the Jail Enforcement Model and Task Force Model, these agreements include some reflecting the Warrant Service Model, which is similar to the Jail Enforcement Model and allows state and local officers to serve immigration charging documents on aliens that effect a formal transfer of custody to ICE, even as the aliens remain physically in state facilities. JA 161. Agreements reflecting the Jail Enforcement and Task Force Models have termination clauses that require 90-day advance notice if ICE terminates the agreement. *See, e.g.*, SA 426-427, SA 441-442, SA 456-457, SA 471-472, SA 486-487, SA 502-503, SA 517-518. Agreements fitting

into the Warrant Service Model require 90-day written notice by both parties prior to termination or suspension of the agreement. *See, e.g.*, SA 413-414.

Then, in April 2026, the Virginia Assembly adopted the 287(g) Law. It lists a dozen provisions—all of which are directed at ICE and its agents—that it says must appear in any agreement between a federal agency and any state or local law-enforcement agency. JA 111-112. Among other things, these provisions regulate what ICE agents must wear and how they may identify themselves; limit where ICE may conduct immigration enforcement activity; control the investigative techniques and processes federal agents may employ when conducting federal immigration enforcement, including by prohibiting the use of administrative warrants, even though federal law explicitly provides for their use, 8 U.S.C. § 1226(a); and require that ICE provide advance notice of immigration enforcement activities, including the identities of the agents to be involved. JA 111-112. The provisions also consent to the jurisdiction of the Virginia courts for liability purposes and agree that any shooting involving an agent in the performance of official duties will be investigated and prosecuted by Virginia officials. JA 111-112. The law requires that any existing agreement in effect on July 1, 2026, be modified to contain the required provisions by September 1, 2026. It provides

that "[a]ny federal immigration enforcement agreement that is not modified in accordance with the provisions of this subsection shall be deemed void and unenforceable." JA 112. The subsection that follows reiterates: "Any federal immigration enforcement agreement entered into or maintained in violation of this section shall be void and unenforceable." JA 112.

### B. Prior Proceedings

The United States brought this suit in June 2026. It challenged the Virginia 287(g) Law, as well as a related law that prohibited federal law-enforcement officers from wearing masks or other facial coverings and moved for a preliminary injunction against the enforcement of both laws. JA 57-189. The government alleged that the 287(g) Law violated the Contracts Clause of the U.S. Constitution, violated the doctrine of intergovernmental immunity by directly regulating and discriminating against the federal government, and was preempted by federal immigration law. JA 97-102.

The district court bifurcated its consideration of the two laws, JA 190-191, and ultimately issued preliminary injunctions against the enforcement of both, JA 14-56; SA 16-72. With regard to the 287(g) Law, the district court held that the United States was likely to prevail on the merits of its claims that the law violated the Contracts Clause and that, as to existing 287(g)

agreements, the law contravened intergovernmental immunity by directly regulating the federal government. SA 42-62. The district court did not enjoin enforcement of the law as to future 287(g) agreements. SA 16, SA 72.

As to the Contracts Clause, the court determined that the law substantially impaired existing 287(g) agreements by demanding extensive substantive changes to the agreements and voiding any agreement that is not modified to include those new terms. SA 42-49. And it held that the law was not drawn in a reasonable way to advance a legitimate public purpose: The Commonwealth's asserted public purpose of preserving state and local resources, the court concluded, was a post-hoc rationalization, meant to substitute for the real, illegitimate public purpose of altering federal immigration-enforcement policies. SA 50-54. As to intergovernmental immunity, the district court held that, in requiring a set of regulations on ICE and its agents as a condition for maintaining 287(g) agreements, the Commonwealth sought to do indirectly what it could not do directly. SA 59-60.

The court declined to reach the government's claims that the law violates intergovernmental immunity by singling it out for discrimination or its claim that the law is preempted by federal immigration law, instead

determining that further development of the record was necessary for those claims. SA 62-63. Finally, the court concluded that the United States had shown an immediate, irreparable harm absent injunctive relief, based on the invasion of federal sovereignty and impairment of the federal government's contract rights effected by the law, and that the public interest and balance of the equities weighed in favor of the United States. SA 63-69.

This timely appeal followed, which was consolidated with Virginia's appeal from the district court's grant of a preliminary injunction against the related masking law, although because briefing was already underway in the masking case, the cases are being briefed separately. Order (Sept. 17, 2026).

## SUMMARY OF ARGUMENT

The district court correctly held that the United States is likely to prevail on the merits of its claim that the 287(g) Law violates the Contracts Clause (*infra* Part I). The Contracts Clause forbids state laws that substantially impair contractual obligations, unless they are reasonably and appropriately drawn to advance a significant and legitimate public purpose. The 287(g) Law substantially impairs contracts because it explicitly declares "void and unenforceable" dozens of extant contracts, unless they are modified in ways that fundamentally distort the original agreement (*infra*

Part I.A). The law is also not reasonably and appropriately drawn to a legitimate public purpose (*infra* Part I.B). The actual purposes underlying the law—to undermine federal immigration enforcement and to impose regulations on federal immigration officers—are plainly not legitimate. And even if the various post-hoc rationalizations of the law that the Commonwealth has offered were credited, they would not warrant the drastic measure of nullifying contracts. Finally, the Commonwealth's arguments about its sovereign authority to control local authorities provide no basis to uphold the law (*infra* Part I.C). The 287(g) Law does not merely control the conduct of the Commonwealth's subdivisions; rather, it directly and expressly nullifies dozens of contracts with the federal government. The possibility that the Commonwealth could have achieved similar effects by pursuing the more moderate, alternative course of directing local entities to terminate their 287(g) agreements according to their own terms, even if true, undermines, rather than strengthens, its defense of the law, and provides no basis for upholding it.

The district court also correctly concluded that the United States is likely to prevail on the merits of its claim that the 287(g) Law violates the intergovernmental-immunity doctrine (*infra* Part II). The 287(g) Law

directly regulates the federal government by voiding contracts to which the federal government is a party unless they contain detailed provisions that control the conduct of federal authorities and officers within the federal realm of immigration enforcement.[1]

Finally, the district court correctly concluded that the other preliminary-injunction factors favor the federal government (*infra* Part III). The invasion of federal sovereignty and impairment of contracts effected by the 287(g) Law constitutes an irreparable injury (*infra* Part III.A). And neither equitable considerations nor the public interest warrant enforcement of a law that is likely to be declared unconstitutional (*infra* Part III.B). The Commonwealth's contrary arguments are largely dependent on their flawed views on the merits.

## STANDARD OF REVIEW

This Court reviews for abuse of discretion a decision to grant or deny a preliminary injunction. *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 213 (4th Cir. 2019).

---

[1] Although Virginia discusses the separate issues of intergovernmental immunity by discrimination and preemption in its brief, because the issues presented are distinct, we do not raise them here as alternate grounds for affirmance but reserve the right to raise them again for the district court to address in the first instance as appropriate.

# ARGUMENT

## I. The district court correctly concluded that the United States is likely to prevail on its claim that the 287(g) Law violates the Contracts Clause.

The Contracts Clause prohibits a state from "pass[ing] any … Law impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 1. The Supreme Court applies a "two-step test" to determine whether a law "crosses the constitutional line." *Sveen v. Melin*, 584 U.S. 811, 819 (2018). The Court asks first whether the state law "operate[s] as a substantial impairment of a contractual relationship." *Id.* (quoting *Allied Structural Steel Co. v. Spannaus*, 438 U.S 234, 244 (1978)). If the answer is yes, "the inquiry turns to the means and ends of the legislation," asking "whether the state law is drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose.'" *Id.* (quoting *Energy Rsrvs. Grp., Inc. v. Kansas Power & Light Co*, 459 U.S. 400, 411-12 (1983)).

### A. The 287(g) Law substantially impairs a contractual relationship.

**1.** The 287(g) agreements at issue establish contractual relationships. The agreements set forth "terms and conditions" that create mutual obligations and by which the parties "agree to abide." SA 419. They conclude with a provision that says: "By signing this MOA [Memorandum of

Agreement], each party represents it is fully authorized to enter into this MOA, accepts the terms, responsibilities, obligations, and limitations of this MOA, and agrees to be bound thereto to the fullest extent allowed by law." SA 414, SA 427, SA 442, SA 457, SA 472, SA 487, SA 503, SA 518. The Contracts Clause "applies to any kind of contract." *Sveen*, 584 U.S. at 818. The Commonwealth's own filings in the district court characterized the agreements as contracts. *See, e.g.*, SA 148. The 287(g) agreements, therefore, fall within the Contracts Clause's scope.[2]

The 287(g) Law impairs these contractual relationships. While the "[t]otal destruction of contractual expectations is not necessary for a finding of substantial impairment," *see Energy Rsrvs. Grp.*, 459 U.S. at 411, there is no question that it is sufficient: "A State could not 'adopt as its policy the … destruction of contracts.'" *U.S. Tr. Co. of N.Y. v. New Jersey*, 431 U.S. 1, 22

[2] The Roderick & Solange MacArthur Justice Center, as *amicus curiae*, points to a provision that says that the agreements do not "create any rights … enforceable at law by any person in any matter, civil or criminal" to argue that they do not qualify as contracts. Roderick & Solange MacArthur Justice Center Amicus Br. 20 (quotation marks omitted). That provision makes clear that the agreement does not create rights in third-party *persons*, but does not nullify the agreement itself, which makes clear that the *parties* to the agreement are "bound … to the fullest extent allowed by law." SA 414.

(1977); *see also Allied Structural Steel*, 438 U.S. at 247 (violation of Contracts Clause where "the statute in question … nullifies express terms of the company's contractual obligations"); *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 504 (1987) (law substantially impaired contracts where it nullified damages-waiver agreements); *Home Bldg. & Loan Ass'n v. Blaisdell*, 250 U.S. 398, 439 (1934) (Contracts Clause prohibits state from "adopt[ing] as its policy … the destruction of contracts or the denial of means to enforce them").

The 287(g) Law establishes just such a policy and thus represents a paradigmatic instance of contractual impairment. It declares that "[a]ny federal immigration enforcement agreement that is not modified in accordance with the provisions" of the law "shall be deemed void and unenforceable." JA 112. In case there were any ambiguity on that point, the law reiterates it in the very next provision: "Any federal immigration enforcement agreement entered into or maintained in violation of this section shall be void and unenforceable." JA 112.

It is no answer to say that the provision that voids existing contractual agreements only applies if the contracts are not modified to incorporate the dozen provisions that the 287(g) Law demands. Though the Commonwealth

attempted that argument in the district court, *see* SA 398, the district court rejected it, *see* SA 48-49, and Virginia does not offer it again. For good reason: The dozen terms that the law requires be added to existing 287(g) agreements to save them from being deemed void would fundamentally alter the contractual arrangement. This is not a situation in which that law merely imposes "minimal paperwork burdens," *Sveen*, 584 U.S. at 822, or where a party "may safeguard any contractual obligations or rights" by complying with a "minimal" procedural obligation, *Texaco, Inc. v. Short*, 454 U.S. 516, 531 (1982). Rather, the required terms would "grossly distort[]" the existing contractual relationships. *Allied Structural Steel*, 438 U.S. at 249; *see also U.S. Tr. Co.*, 431 U.S. at 19 (law substantially impaired bondholder contract where it "totally eliminated an important security provision").

This Court has held that, "*at the very least,* where the contract right or obligation impaired was one that induced the parties to enter into the contract and upon the continued existence of which they have especially relied, the impairment must be considered 'substantial' for purposes of the Contract Clause." *Baltimore Tchrs. Union, Am. Fed'n of Tchrs. Loc. 340 v. Mayor & City Council of Balt.*, 6 F.3d 1012, 1018 (4th Cir. 1993). That test is met here. Indeed, several of the required terms are directly at odds with

federal law, such that the United States could never have entered into an agreement that contained them. Specifically, the provision that prohibits ICE or its agents from "request[ing] information from any locality within the Commonwealth regarding the immigration or citizenship status of any person unless such request is made pursuant to a valid judicial warrant or judicial subpoena," JA 111, is in direct conflict with 8 U.S.C. § 1373, which bars restrictions on requests for information relating to "citizenship or immigration status." *See also id.* § 1644. It is also at odds with federal statutes authorizing administrative warrants and subpoenas. *See id.* §§ 1225(d)(4), 1226(a). And the provisions requiring consent to the jurisdiction of the Commonwealth's courts and consent to investigations by Virginia State Police and prosecution by the Virginia Attorney General are at odds with 8 U.S.C. § 1357(g)(8) and federal regulations relating to standards for immigration enforcement activities. *See* 8 C.F.R. § 287.8. The supposed possibility of renegotiation held out by the 287(g) Law, therefore, is illusory.

In sum, the 287(g) Law expressly nullifies 287(g) agreements unless they are modified in ways that fundamentally distort the original arrangement and that, as a practical matter, the government could never

accept, given that they violate federal law. The law, therefore, substantially impairs contracts.

**2.** Notwithstanding all of this, the Commonwealth maintains that its law does not impair contractual obligations at all, *see* Appellants Br. 17-23, or that, if it does, that impairment is not substantial, *see* Appellants Br. 24-30. In doing so, the Commonwealth does little to square its arguments with the language of the 287(g) Law, which explicitly declares existing arguments "void and unenforceable." JA 112. Tellingly, at no point in its 65-page brief does that phrase appear—the Commonwealth cannot manage to quote even once what the 287(g) Law declares twice, so obviously fatal is that language to the Commonwealth's argument that the 287(g) Law does not substantially impair any contractual obligations.

**a.** The Commonwealth first argues that the law does not implicate the Contracts Clause because it "does not involve private contract rights that the clause was intended to protect." Appellants Br. 17; *see also* Appellants Br. 21.[3] The earliest Contracts Clause cases, however, established that it applies

[3] The MacArthur Justice Center *amicus* offers a similar argument. It contends that the Contracts Clause only applies to agreements that "create[] vested private rights enforceable in a court of justice." Roderick & Solange MacArthur Justice Center Amicus Br. 10. But the early Contracts Clause

*Continued on next page.*

equally to "those contracts into which the state may enter." *Fletcher v. Peck*, 10 U.S. (6 Cranch.) 87, 138 (1810); *see also Northern Pac. Ry. Co. v. Minnesota*, 208 U.S. 583, 590 (1908) (not "open to question" that Contracts Clause applies to contracts entered into by government entities). Indeed, as

---

cases on which *amicus* relies all involve suits by subordinate municipal entities against the states that created them, in which the Court held that such subordinate entities could not invoke the Contracts Clause against the state at whose discretion they exist. *See City of Trenton v. New Jersey*, 262 U.S. 182, 187 (1923) ("A municipality is merely a department of the state, and the state may withhold, grant or withdraw powers and privileges as it sees fit . . . ."); *City of Worcester v. Worcester Consol. St. Ry. Co.*, 196 U.S. 539, 548 (1905) ("A municipal corporation is simply a political subdivision of the state, and exists by virtue of the exercise of the power of the state through its legislative department."); *City of Pawhuska v. Pawhuska Oil & Gas Co.*, 250 U.S. 394, 397 (1919) ("Municipal corporations are political subdivisions of the state" and their powers "rest[] in the absolute discretion of the state." (quotation marks omitted)); *City of New Orleans v. New Orleans Waterworks Co.*, 142 U.S. 79, 89 (1891) ("[T]he city, being a municipal corporation and the creature of the state legislature, does not stand in a position to claim the benefit of the constitutional provision in question, since its charter can be amended, changed, or even abolished at the will of the legislature."); *Commissioners of Laramie Cnty. v. Commissioners of Albany Cnty.*, 92 U.S. 307, 311 (1875) ("[C]ounties or towns[] are the auxiliaries of the State in the important business of municipal rule, and cannot have the least pretension to sustain their privileges or their existence upon any thing like a contract between them and the legislature of the State, because there in not and cannot be any reciprocity of stipulation . . . ."); *Town of East Hartford v. Hartford Bridge Co.*, 51 U.S. 511, 527 (1850) (the rights of municipal entities are "exclusively addressed to the power of the state which establishes them"). Those cases have no application here.

discussed further below, not only does the Contracts Clause apply to "[p]ublic contracts," but laws alleged to impair such contracts are "more scrupulously examined" because "'the State's self-interest is at stake.'" *Baltimore Tchrs. Union*, 6 F.3d at 1019; *Allied Structural Steel*, 438 U.S. at 244 (noting that Court "[e]valuat[es] with particular scrutiny a modification of a contract to which the State itself was a party"). The Contracts Clause does not prohibit states from invalidating contracts entered into by private parties, yet allow states to use their legislative power to renege on their own agreements. To the contrary, the Supreme Court has routinely held that the Contracts Clause prohibits states from enacting laws that impair their or their subdivisions' capacities to repay on their debts. *U.S. Tr. Co.*, 431 U.S. at 24 & n.22.

The "reserved powers" doctrine, a carve-out for certain state contracts, has no application here. *See* Appellants Br. 21-23. That doctrine is premised on the understanding that state legislatures cannot enter into certain types of contracts in the first place, lest they "bargain away the police power of a State." *Stone v. Mississippi*, 101 U.S. 814, 817 (1880). Accordingly, the premise of the doctrine is the contract was "invalid ab initio"; it "requires a determination of the State's power to create irrevocable contract rights in

the first place, rather than an inquiry into the purpose or reasonableness of the subsequent impairment." *U.S. Tr. Co.*, 431 U.S. at 23.

Here, the Commonwealth makes no argument that the agreements entered into by various law-enforcement agencies prior to the 287(g) Law were invalid ab initio. On the contrary, the Commonwealth has consistently conceded that, prior to the law's enactment, Virginia law permitted local jurisdictions, "in [their] discretion," to enter into 287(g) agreements. SA 394-395. It does so again here: "No one disputes that the Virginia localities possessed authority to enter these agreements to the extent they did." Appellants Br. 28. Furthermore, the Commonwealth makes no argument that the 287(g) agreements were irrevocable or that, through them, the local law enforcement entities sought to "bind the people of the State and all succeeding legislatures." *Stone,* 101 U.S. at 817. On the contrary, as the Commonwealth is elsewhere at pains to emphasize, the 287(g) agreements are terminable. The Commonwealth's reliance on the reserved powers doctrine cannot be reconciled with its proper concessions that the agreements were valid and consistent with Virginia law when made and do not purport irrevocably to bind successive legislatures.

**b.** In the alternative, the Commonwealth contends that, even if the 287(g) Law impairs contracts, that impairment is not substantial. To that end, the Commonwealth asserts that the agreements are "voluntary," that they are "subject to at-will termination," and that the federal government could have no reasonable expectations of continued performance because it "bargain[ed] against a backdrop expressly reserving governmental authority." Appellants Br. 25-27.

To begin, all contracts are, by their nature, "voluntary"—they require mutual assent and are voidable if induced by improper threats. *See* Restatement (Second) of Contracts §§ 17, 175 (A.L.I. 1981), Westlaw (database updated Oct. 2024). The Commonwealth cites no authority for the proposition that a "voluntary" contract cannot be substantially impaired under the Contracts Clause, which would erase the Clause altogether.

Equally unavailing are the Commonwealth's assertions that the contracts at issue are "subject to at-will termination." Factually, that assertion is not uniformly true of the contracts at issue here. As the Commonwealth elsewhere acknowledges, some of the 287(g) agreements are subject to provisions requiring 90-days' advance written notice by both parties before a termination takes effect, during which period the parties

may attempt to renegotiate the agreements. Appellants Br. 26-27; SA 413-14. Such agreements are not "terminable at will." *See, e.g.*, *Johnston v. William E. Wood & Assocs., Inc.*, 787 S.E.2d 103, 105 (Va. 2016) ("Imposing a requirement of reasonable advance notice is antithetical to the flexibility that lies at the heart of the at-will doctrine … .").

Furthermore, there is no basis for the assertion that any contract that is terminable (whether at-will or with advance notice) falls outside the protection of the Contracts Clause. Courts have rejected the assertion that contracts that are terminable at-will fall outside of the protection of the Contracts Clause. *See, e.g.*, *United Healthcare Ins. Co. v. Davis*, 602 F.3d 618, 628 (5th Cir. 2010). And courts have repeatedly applied the Contracts Clause to laws that seek to change the terms of agreements with government workers and labor unions, *see, e.g.*, *Baltimore Tchrs. Union*, 6 F. 3d at 1014, even though such agreements are generally for fixed terms and contain explicit termination provisions.

Finally, there is no merit to the Commonwealth's contention that it always had the power to unilaterally modify or nullify the agreements under state law, such that the federal government could have no reasonable expectations. The Commonwealth founds that argument on the reference to

"State and local law" in the statute authorizing 287(g) agreements. But that language refers to the conduct of state or local law-enforcement officers under 287(g) agreements, not to the authority to enter into such agreements in the first place or to modify them. In particular, it says that state or local officers "may carry out" functions relating to the enforcement of immigration law "to the extent consistent with State and local law." 8 U.S.C. § 1357(g)(1).

The contracts themselves expressly disaffirm any unilateral right to modification. They contain modification provisions that provide that modifications "must be proposed in writing and approved and signed by both parties." *See, e.g.*, SA 413. That sets the agreements here apart from the agreements at issue in the pair of public-utilities cases that the Commonwealth invokes, *see* Appellants Br. 26, which included terms that explicitly tied the parties' obligations to future regulatory action. *Energy Rsrvs. Grp.*, 459 U.S. at 403 (no Contracts Clause violation where contracts included "governmental price escalator clause" that "provide[d] that if a governmental authority fixes a price for any natural gas that is higher than the price specified in the contract, the contract price shall be increased to that level"); *City of Charleston v. Public Serv. Comm'n of W. Va.*, 57 F.3d 385, 394 (4th Cir. 1995) (no Contracts Clause violation where "bond contracts

themselves contain express acknowledgements that the parties' rights were subject to legislative regulation").

"Given the value ascribed to contracts in our society, and the Constitution's explicit proscription on the state's impairment of contracts," an intent to confer "the power unilaterally to modify … contracts" will not be inferred "absent the clearest evidence." *Baltimore Tchrs. Union*, 6 F.3d at 1016. There is no such evidence here.

### B. The 287(g) Law is not drawn in an appropriate and reasonable way to advance a significant and legitimate public purpose.

Once a substantial impairment of contractual obligations has been established, "the inquiry turns to the means and ends of the legislation," with the court asking "whether the state law is drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose.'" *Sveen*, 584 U.S. at 819.

The Commonwealth's efforts to show that the 287(g) Law is reasonably and appropriately drawn to a legitimate public purpose put it in a bind. The "public purpose" advanced by the 287(g) Law is obvious—the law seeks to alter policies and practices for the enforcement of federal immigration law. That is apparent from the text of the 287(g) Law, which imposes a series of

terms—each and every one of which governs the conduct of ICE and its officers—that must be satisfied for 287(g) agreements to avoid being deemed void and unenforceable. It is also apparent from the law's legislative history, which indicates that it was passed in response to allegations about the conduct of *federal* immigration officers in Minnesota and elsewhere. SA 271.

The problem, however, is that that clear public purpose is also clearly illegitimate. The federal government's role in the regulation of immigration is "preeminent," *Toll v. Moreno*, 458 U.S. 1, 10 (1982), and "broad," *Arizona v. United States*, 567 U.S. 387, 394 (2012). Within the realm of immigration, the United States must act as "one national sovereign, not the 50 separate States." *Id.* at 395. The Supreme Court has acknowledged that, while states may at times have "understandable frustrations" with federal policies on immigration, a state "may not pursue policies that undermine federal law." *Id.* at 416. For the Commonwealth to defend the 287(g) Law on the basis of the actual public purpose animating it, therefore, it would have to concede that the law tries to do precisely what the Commonwealth lacks the power to do—regulate the conduct of immigration enforcement within Virginia.

Virginia insists that "disagreement with federal policy … is a perfectly valid justification for withholding its resources," Appellants Br. 33, but that

does not provide any justification for nullifying a contract. Otherwise, states would possess a limitless right to void any public contract, simply by declaring that they have decided they do not like their counterparty's conduct anymore. The very case on which the Commonwealth relies makes clear that states cannot "consider impairing the obligations of their own contracts on a par with other policy alternatives." *Baltimore Tchrs. Union*, 6 F.3d at 1020 (alteration and quotation marks omitted). And the case does not remotely suggest that a policy disagreement with the federal government, within an exclusively federal domain, constitutes a legitimate public purpose for a state law nullifying contracts. The impairment in that case was a furlough plan established in response to a budget shortfall, in the face of a legal requirement to balance the budget and a mid-year round of cuts to state aid. *Id.* at 1014.

Unable to defend the 287(g) Law on the basis of the public purpose that actually animated it, the Commonwealth shifts to various other rationales for the law. *See* Appellants Br. 31. For instance, the Commonwealth refers to "maintaining community trust necessary for effective policing" and "establishing safeguards governing the circumstances in which Virginia officers and resources participate in federal civil

immigration enforcement." Appellants Br. 31. But none of the 287(g) Law's "safeguards" are addressed to the conduct of Virginia's own officers; rather, all are addressed to federal authorities and agents and seek to control their conduct—and the law demands that they must be accepted or the agreements will be deemed void. Stripped of their circumlocutions, then, the Commonwealth's appeals to "effective policing" and "safeguards" are just another way of repeating its erroneous argument that it can nullify agreements based purely on a disagreement with federal immigration policy.

The other rationales the Commonwealth cites—"preserving state and local law-enforcement resources," "limiting liability exposure," and "preserving transparency under Virginia law," Appellants Br. 31—are, in addition to being plainly post-hoc, at odds with the text of the law. For instance, if the goal were really to conserve law-enforcement resources, one might think that one of the terms that the law demands be included in 287(g) agreements to prevent their nullification would address and limit the expenditure of state and local resources. Yet that is not the case—on the contrary, all the required terms seek to govern the conduct of ICE and its agents, not the expenditure of resources by local law enforcement. If the goal of the law were to "limit[] liability exposure," Appellants Br. 31, then one

might expect that the law would seek to limit the liability of state and local law-enforcement officers participating in 287(g) agreements with federal authorities. Yet there is no such provision—the only provision that is even vaguely connected to liability is the provision that requires that *federal* authorities "consent to the jurisdiction of the courts of the Commonwealth for any civil … proceedings." JA 111. And if the law were really intended to address "tension with Virginia's transparency regime," Appellants Br. 32, one might think that one of the required terms in the 287(g) Law would have something to do with transparency and public disclosure of information. Yet again, the law contains nothing whatsoever to that end—its sole provisions about information sharing prohibit ICE and its agents from requesting information from the Commonwealth or localities. JA 111.

The Commonwealth's reliance on the post-hoc resource preservation rationale also embroils it in a series of self-contradictions. Courts have stressed that, "[b]ecause 'the State's self-interest is at stake,'" legislative measures designed to alter public contracts have a "'special status'" and must be "more scrupulously examined." *Baltimore Tchrs. Union*, 6 F.3d at 1019 (quoting *U.S. Tr. Co.*, 431 U.S. at 26) (citing *Allied Structural Steel*, 438 U.S. at 244 & n.15). The Commonwealth resists that rule, asserting that "[t]he

Commonwealth of Virginia is not a party to the challenged § 287(g) agreements," because the "agreements are between the federal government and Virginia localities or local law-enforcement entities." Appellants Br. 35. That argument is in tension with the Commonwealth's emphasis elsewhere that the local law-enforcement entities that entered into the agreements are mere "political subdivisions" or "subordinate governmental instrumentalities" of the state. *See, e.g.*, Appellants Br. 29. It is also legally unsupported: The "special status" under the Contracts Clause that warrants more scrupulous examination applies to "[p]ublic contracts," *Baltimore Tchrs. Union*, 6 F.3d at 1019, and courts have had little trouble concluding that it applies with the same force where, as here, a state law tries to alter or nullify a contractual obligation incurred by a municipality or other local entity. *See, e.g.*, *Sullivan v. Nassau Cnty. Interim Fin. Auth.*, 959 F.3d 54, 57-58, 66 (2d Cir. 2020) (applying particular scrutiny warranted for laws impairing public contracts to New York state law that authorized state agency to disapprove contracts entered into by county).

The point of the heightened scrutiny applied to legislative measures designed to alter public contracts is to determine whether the state "is acting like a private party who reneges to get out of a bad deal." *Sullivan*, 959 F.3d

at 65. There, again, the Commonwealth's post-hoc "resource preservation" rationale causes a problem, because it makes it sound like that is exactly what the Commonwealth is doing: Unilaterally nullifying agreements that it has decided expend too many state and local resources. The Commonwealth insists that that is not so—it "did not simply cancel the agreements to escape an obligation or capture a financial benefit." Appellants Br. 35. But the Commonwealth cannot simultaneously defend the law as a legitimate means of "conserving state resources" while insisting that it did not "simply cancel the agreements to escape an obligation or capture a financial benefit." Appellants Br. 33, 35.

Ultimately, the knots into which the Commonwealth ties itself, in offering up various post-hoc justifications for the 287(g) Law, confirm that the law can be upheld only if this Court concludes that Virginia has the right to nullify contracts with the federal government simply because the Commonwealth disagrees with federal enforcement of immigration law. It has no such authority.

### C. The Commonwealth did not merely exercise control over its subdivisions.

Virginia is mistaken to suggest that because its subdivisions are parties to the contracts in question, it is somehow entitled to nullify them. The

Commonwealth insists that, because it could have instructed its subdivisions not to enter into contracts in the first place, and could instruct them to exercise their rights under the agreements to terminate them (though it stops short of asserting a right to force localities to breach the agreements, *see* Appellants Br. 39), then surely it can nullify the contracts altogether.

That plainly does not follow. To the contrary, the possibility that there might have been other measures that the Commonwealth could have taken to achieve its purposes tends to undermine, rather than bolster, its defense of the law. Under the Contracts Clause, "a State is not free to impose a drastic impairment when an evident and more moderate course would serve its purposes equally well." *U.S. Tr. Co.*, 431 U.S. at 31. If, as the Commonwealth asserts, it has the unquestionable right within its state system to direct local entities to renegotiate their 287(g) agreements and, if those renegotiations prove unsuccessful, to terminate the agreements in accordance with their terms, then why did it not do so? Why did the Commonwealth instead choose the far more drastic approach of enacting a law nullifying the agreements?

The difference between what the 287(g) Law actually does and the more moderate course of action the Commonwealth invokes in defending it is not a mere matter of form. Rather, it has direct, tangible effects on the

federal government counterparty. As noted, while some of the 287(g) agreements are terminable at will by the localities, others have 90-day notice provisions that apply to both parties. Because the law simply declares any contract that does not have its required provisions void and unenforceable, it deprives the federal government of the benefit of those notice provisions.

At a more fundamental level, the Commonwealth cannot defend the constitutionality of the law it actually enacted by hypothesizing an imaginary alternative action it claims it could have taken. Even if it is true that the Commonwealth could have directed local officials to terminate their 287(g) agreements, that course of action might have had political ramifications that the actual law was intended to avert. For instance, some local officials may have resigned rather than comply with the directive, challenged the directive on state law grounds, or otherwise used the levers of power within the Commonwealth to resist the directive. *See, e.g.*, *Nolan v. Grewal*, No. A-4614-19, 2022 WL 221550, at *1 (N.J. Super. Ct. App. Div. Jan. 26, 2022) (per curiam) (local sheriff challenged directive requiring state attorney general approval of immigration enforcement agreements with federal authorities under state administrative procedure act). The "political expediency" of avoiding such contentious, intra-state political conflicts cannot justify the

drastic measure of nullifying the contracts "when other politically unpopular alternatives were available." *Sullivan*, 959 F.3d at 66.

The Commonwealth's arguments about "interpos[ing] federal authority between a state and its political subdivisions" get it backwards. Appellants Br. 29. The United States' claims simply ask the Court to look at what the 287(g) Law says, to see that it impairs contractual relations and is not reasonably and appropriately drawn to any legitimate public purpose, and to invalidate it. By contrast, the Commonwealth's arguments invite the Court to look beyond the law itself and instead to make presumptions about the Commonwealth's relationship with or control over its localities. To make matters worse, there is no state of affairs that would cause the law to be upheld. If the Commonwealth is correct about its authority to control its localities, there was no need other than political expediency to nullify the contracts instead. And if the Commonwealth is wrong, and it in fact lacks the authority to direct its localities to terminate all existing 287(g) agreements, the premise of its argument falls apart.

## II. The district court correctly held that the United States is likely to prevail on its intergovernmental-immunity claim.

For similar reasons, the 287(g) Law is barred by the doctrine of intergovernmental immunity. That doctrine derives from the principle that

"the States have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by Congress to carry into execution the powers vested in the general government." *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 436 (1819). The doctrine prohibits "state laws that *either* 'regulat[e] the United States directly *or* discriminat[e] against the Federal Government or those with whom it deals.'" *United States v. Washington*, 596 U.S. 832, 838 (2022) (alterations in original) (quoting *North Dakota v. United States*, 495 U.S. 423, 435 (1990) (plurality opinion)).

The district court correctly concluded that the United States was likely to prevail on its claim that the 287(g) Law violates intergovernmental immunity. As the district court noted, the 287(g) Law's provisions directly address federal agencies and officers and impose obligations on them. SA 58-59. The law is a series of "shall" provisions, which regulate everything from what ICE agents may wear, to where they may conduct immigration enforcement activities, to where they consent to jurisdiction, to what information they may request, to what surveillance technology and other investigative methods they can use. JA 111-112.

The Commonwealth nevertheless insists that the 287(g) Law does not directly regulate the federal government because the mechanism employed by the law is not to impose obligations on the federal government directly, but instead to negate a contract with the federal government unless the federal government accedes to Virginia's demands. Appellants Br. 41.

Achieving direct regulation by coercion is no more permissible than doing so expressly. Other courts of appeals have properly rejected efforts by states to use roundabout means to effect a regulation of the federal government. For example, the Third Circuit held that a state "directly regulates the federal government by banning contracts that only the federal government can make." *CoreCivic, Inc. v. Governor of N.J.*, 145 F. 4th 315, 325 (3d Cir. 2025). Though the law cleverly sought to "sidestep" the intergovernmental immunity doctrine by not imposing direct prohibitions on the federal government, the court saw "the law for what 'it really is': a direct regulation on the federal government." *Id.* at 319. The court explained that "[i]ntergovernmental immunity is not a formalist doctrine" and that a state cannot "evade the limits on immunity 'by indirectly achieving the same result.'" *Id.* at 322 (quoting *Miller v. City of Milwaukee*, 272 U.S. 713, 715 (1927)).

The Ninth Circuit reached the same conclusion in *United States v. King County*. There, the county promulgated an executive order that directed officials to ensure that future leases for providers of essential services at the airport prohibited them from providing services to ICE-chartered flights. 122 F.4th 740, 747 (9th Cr. 2024). As in *CoreCivic*, although the executive action at issue on its face only imposed conditions on contracts between local airport authorities and private parties, the functional effect of that action was to "effectively grant[] King County the power to control ICE's transportation and deportation operations." *Id.* at 756 (internal quotation marks omitted).

The 287(g) Law uses a different, but similarly impermissible, mechanism to attempt to regulate the federal government. Where the actions at issue in those cases interfered with federal functions by depriving the federal government of contractual counterparties, the law at issue here explicitly voids agreements with the federal government if they do not contain a detailed set of provisions governing the conduct of ICE and its agents. The voiding provisions are "freestanding state law commands," and they are directed at contracts to which the federal government is a contracting party. Appellants Br. 42.

The Commonwealth's reliance on *McHenry County v. Raoul*, 44 F.4th 581 (7th Cir. 2022), is misplaced. Appellants Br. 46-49. That case did not purport to nullify contracts unless the federal government agreed to certain conditions, but instead prohibited state and local officials from entering into or renewing contracts to house or detain individuals for civil immigration violations and required such officials to exercise their rights under the termination provisions of any existing agreements. 44 F.4th at 586. In other words, *McHenry* involves the more moderate action that the Commonwealth did not take here but claims it could have taken. As detailed above, the Commonwealth cannot defend the law it enacted by rewriting it.[4]

## III. The district court properly assessed the remaining *Winter* factors.

Virginia does not seriously contest the remaining preliminary-injunction factors, other than to rely on its erroneous merits arguments.

---

[4] The various federalism professors, as *amici curiae*, engage in the same rewriting. They assert: "Virginia's 287(g) statute requires state and local agencies to terminate their voluntary agreements with immigration authorities unless the federal government agrees to certain conditions." Federalism Professors Amicus Br. 22. Like the Commonwealth, the professors never mention, much less grapple with, how the 287(g) Law actually operates, by declaring void and unenforceable agreements that lack its required provisions.

### A. The government established irreparable harm.

The district court concluded that the violation of the Supremacy Clause and Contracts Clause presented immediate, irreparable harms. That conclusion is correct. *See New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 366-67 (1989) (irreparable injury established by law that violates Supremacy Clause); *Connecticut State Police Union v. Rovella*, 494 F. Supp. 3d 210, 220 (D. Conn. 2020) (likely Contracts Clause violation establishes irreparable harm); *Donohue v. Mangano*, 886 F. Supp. 2d 126, 150 (E.D.N.Y. 2012) (same); *see also United States v. California*, 173 F.4th 1060, 1069 (9th Cir. 2026) ("When a plaintiff seeks a preliminary injunction because of an alleged constitutional violation and shows it is likely to prevail on the merits, that showing will almost always demonstrate it is suffering irreparable harm as well." (alterations and quotation marks omitted)).

The Commonwealth conceded that a Supremacy Clause violation establishes irreparable harm before the district court. SA 65. Before this Court, the Commonwealth does not challenge the district court's determination that being subjected to a law that likely violates the Supremacy Clause and Contracts Clause establishes irreparable harm. Instead, it merely argues that the district court's assessment of the merits

was wrong and reiterates its point that participation in 287(g) agreements is voluntary. Appellants Br. 58-61.

### B. The balance of the equities and public interest support the injunction.

The district court concluded that the balance of the equities and the public interest weighed in favor of an injunction, because neither the Commonwealth nor the public has a legitimate interest in the enforcement of an unconstitutional law. That conclusion is correct. *See Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021) (en banc); *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002).

As with irreparable injury, the Commonwealth does not contest that analysis but merely asserts that it is inapplicable because the district court's assessment of the merits was wrong. Appellants Br. 62. The Commonwealth further asserts that the injunction goes beyond barring enforcement of the law to further prohibit the Commonwealth from "interfering with the performance of existing § 287(g) agreements by any party to such existing agreements." SA 18; *see* Appellants Br. 63. But the problem that the district court identified was that any effort to renegotiate or otherwise address the 287(g) agreements would come in the shadow of the 287(g) Law, which

impermissibly declared the agreements void. It is not clear exactly what measures the Commonwealth proposes to take, but unless it abandons the invalid law, the problem the district court identified will plague any interference with the ongoing performance of the extant agreements. The district court's order, therefore, appropriately preserves the status quo.

## CONCLUSION

For the foregoing reasons, the injunction should be affirmed.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

MEGAN LACY OWEN
*Principal Deputy Assistant Attorney General*

MARK R. FREEMAN
DANIEL TENNY

*/s/ Randall C. Smith*
RANDALL C. SMITH
*Attorneys, Appellate Staff*
*Civil Division*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-4027*
*randall.c.smith@usdoj.gov*

OCTOBER 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 9,129 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) because it was prepared using Word for Microsoft 365 in Century Expanded BT 14-point font, a proportionally spaced typeface.

*/s/ Randall C. Smith*
Randall C. Smith

## CERTIFICATE OF SERVICE

I hereby certify that on October 16, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*/s/ Randall C. Smith*
Randall C. Smith